1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                        WESTERN DIVISION

4        THE HONORABLE FLORENCE-MARIE COOPER, JUDGE PRESIDING

5

6    CAROL JO GAVIN AND ALBERT JAMES        )
     GAVIN,                                 )
7                                           )
                           Plaintiffs,      )
8                                           )
                                            )
9            vs.                            )   No. CV 05-9001 FMC(SSx)
                                            )
10   CITY OF LOS ANGELES; WILLIAM J.        )
     BRATTON; MICHAEL BERKOW; JOHN EGAN;    )
11   ERIC LILLO; DEBRA McCARTHY; MICHAEL    )
     WILLIAMS; BRIAN HOSPODAR; ROBERT       )
12   VANINA; SANDY JO MacARTHUR,            )
                                            )
13                         Defendants.      )
     _____)

14

15

16                 REPORTER'S TRIAL TRANSCRIPT

17                  Los Angeles, California

18                Tuesday, September 2, 2008

19      Day 1 of Jury Trial, Page 1 through 207, Inclusive

20

21                             PAT CUNEO, CSR 1600-CRR-CM
22                             Official Reporter
                               United States Courthouse
23                             Roybal Federal Building
                               Room 181-E
24                             255 East Temple Street
                               Los Angeles, California 90012
25                             (213) 617-1817
                               grammacuneo@aol.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF:    KONELL, RUGGIERO & KONELL
                            BY:  CHERYL KONELL RUGGIERO
 3                          and  JEROME KONELL
                              ATTORNEYS AT LAW
 4                          888 S. Figueroa Street
                            Suite 860
 5                          Los Angeles, California 90017
                            (213) 538-1360
 6                          crkr@krklawyers.com

 7
      FOR THE DEFENDANTS:   ROCKARD J. DELGADILLO, CITY ATTORNEY
 8                          BY:  DANIEL P. AGUILERA, DEPUTY
                            and  BETH ORELLANA, DEPUTY
 9                          700 City Hall East
                            200 North Main Street
10                          Los Angeles, CA  90012
                            (213) 978-8279
11                          Daniel.Aguilera@lacity.org

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

CHRONOLOGICAL INDEX OF WITNESSES

| PLAINTIFFS'<br>WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE | VOL |
|---|---|---|---|---|---|---|
| ALBERT JAMES GAVIN | 144 | | | | | 1 |

ALPHABETICAL INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR<br>DIRE | VOL |
|---|---|---|---|---|---|---|
| GAVIN, ALBERT JAMES | 144 | | | | | 1 |

EXHIBITS

| PLAINTIFFS'<br>EXHIBIT | DESCRIPTION | FOR<br>IDENTIFICATION | IN<br>EVIDENCE | VOL |
|---|---|---|---|---|
| 10 | Document | | 160 | 1 |
| 11 | Document | | 156 | 1 |
| 19 | Documents | | 163 | 1 |
| 20 | Documents | | 165 | 1 |
| 21 | Documents | | 175 | 1 |
| 28 | Documents | | 175 | 1 |

```
 1    LOS ANGELES, CALIF.; TUESDAY, SEPTEMBER 2, 2008; 8:38 A.M.

 2                              -oOo-

 3       (The following was held outside the prospective jurors'

 4                          presence:)

 5            THE COURT:  Good morning.

 6                      (All counsel responded.)

 7            THE CLERK:  On the record in Civil Case 05-9001

 8    FMC, Carol Jo Gavin vs. City of Los Angeles.

 9            Please state your appearances.

10            MS. RUGGIERO:  Sheryl Konell Ruggiero for

11    plaintiffs Carol Gavin and Albert J. Gavin.

12            MR. KONELL:  Jerome Konell for the plaintiff.

13            THE COURT:  Good morning.

14            MR. AGUILERA:  Good morning, Your Honor.

15    Dan Aguilera from the City Attorney's Office for the

16    defendants.  With me is Beth Orellana also from the City

17    Attorney's Office for the defendants; and at the end of

18    counsel table is defendant Jeri Weinstein.

19            THE COURT:  Thank you.

20            All right.  Be seated, please.

21            One of the things I wanted to do this morning, I

22    did look at the question of continuing violation; and I'll

23    talk about that in a minute.

24            It was just to firm up for myself exactly what

25    claims are still outstanding and what defendants remain in
```

1   the action.  I went through a lot of papers and ended up not

2   absolutely sure.

3              MS. RUGGIERO:  May I address the court, Your

4   Honor.

5              THE COURT:  Please.

6              MS. RUGGIERO:  Yes.  There are six -- well,

7   seven -- I'm sorry -- six claims, possibly seven, depending

8   on what the decision is today with respect to continuing

9   violations.

10             Regarding Jim Gavin, we have the Section 1983

11  First Amendment free speech issue; we have the municipal

12  liability, *Monell*; we have the supervisory liability, *Larez*;

13  we have the family leave; the FEHA violation; and we have

14  the intentional infliction of emotional distress.

15             With respect to Carol Gavin, we have possibly the

16  discrimination case pursuant to FEHA and we have the

17  intentional infliction of emotional distress.

18             THE COURT:  Okay.  That's comforting.  That's

19  exactly what I had written; and the remaining defendants?

20             MS. RUGGIERO:  The City of Los Angeles, Deputy

21  Chief Berkow, Captain Jeri Weinstein, Captain John Egan,

22  Captain Eric Lillo, Detective Robert Vanina, Captain

23  Mike Williams, Lieutenant McGill -- which we will probably

24  agree to dismiss -- Detective Brian Hospodar, and let me

25  just make sure.

1          MR. AGUILERA:  Your Honor, I believe the two that

2    are missing are Sandra Jo MacArthur and Debra McCarthy.

3          MS. RUGGIERO:  Thank you, Your Honor.  Correct.

4          THE COURT:  Okay.

5          MS. RUGGIERO:  With respect to the discrimination

6    claim.

7          THE COURT:  Right.  Okay.  More defendants than I

8    realized but at least I got the claims right.

9          All right.  I did look at the trial briefs and the

10   material provided on the question of continuing violations

11   doctrine.  I wrote out a chronology of the events complained

12   of by the plaintiff from 2001 through 2005.

13         There are a number of arguments raised by the

14   defense.  It seems to me most of them are focused on whether

15   the evidence supports plaintiffs' claim that these incidents

16   were, in fact, evidence of discrimination.

17         That's a jury call.  The jury may feel that they

18   were based on the fact of her gender.  The jury may feel

19   that this is just part of doing business.  But I don't think

20   that goes to admissibility.

21         There is evidence based on testimony of the

22   plaintiff as to her perception of these events; and in terms

23   of the Richards question of permanence, plaintiff contends

24   that she and her husband both repeatedly were assured that

25   the complaints that she brought were being investigated and

1    were being looked into.

2            So I don't see that any permanence had attached to

3    those.   My conclusion is the evidence is admissible in

4    support of plaintiffs' claims under the continuing violation

5    doctrine.

6            So do we have any other issues or questions open

7    this morning while we're waiting for the panel?

8            MR. AGUILERA:  Your Honor, I'd just like to bring

9    to the court's attention our witness situation.

10           THE COURT:  Okay.

11           MR. AGUILERA:  We have an update for the court and

12   for plaintiffs' counsel, although I e-mailed Miss Ruggiero

13   yesterday.

14           With respect to defendant retired Deputy Chief

15   Michael Berkow, he is the police chief of Savannah Chatham

16   in Georgia.   He advised us yesterday that Savannah is

17   beginning precautions to evacuate because of Hurricane Hanna

18   which has a storm track that is directly in line with the

19   city.

20           So he is fairly certain that because the hurricane

21   is supposed to make landfall on Friday of this week that he

22   cannot make it this week.   He did assure me that he would

23   make every effort to be available next week, and we are

24   going to be checking with him probably on a daily basis to

25   determine what his status is.

```
1              THE COURT:  Excellent.

2              MR. AGUILERA:  With respect to Detective

3    Robert Vanina, he is also a defendant.  We understand that

4    he is scheduled to return from vacation on September 9.  My

5    understanding is September 9 is his first day back at work.

6              I have requested that the part of the department

7    that works with our office, Risk Management, take all steps

8    they are able to take to advise Detective Vanina to be in my

9    office on the 9th, to be prepped and ready to go on the

10   10th or after whenever he can be accommodated.

11             I was also advised this morning by Miss Ruggiero

12   through an e-mail that some of her experts are not available

13   until next week; and assuming we're in the defense case next

14   week, we have no problem accommodating them out of order.

15             THE COURT:  Okay.  Good.  Thank you.

16             MS. RUGGIERO:  Thank you.

17             And I agree with what Mr. Aguilera has stated.

18   Also, just for the court's knowledge, my client Carol Gavin

19   often has to go to the restroom sometimes suddenly.  It

20   would be fine if she just quietly leaves?

21             THE COURT:  Sure; no problem.

22             MS. RUGGIERO:  I just wanted to give notice.

23   Thank you.

24             MR. AGUILERA:  Sorry to keep getting up after

25   sitting down, Your Honor.  A couple of other things.
```

```
1              In the defendants' supplemental trial brief
2    regarding continuing violation -- and I'll preface this by
3    saying I did not raise this issue in the best way possible.
4              The very last paragraph brings up the issue that
5    the individual defendants that are left in Carol Gavin's
6    case cannot, under California law, be sued for
7    discrimination.
8              THE COURT:  Right.
9              MR. AGUILERA:  That's only a cause of action for
10   the employer.  So I would ask that -- certainly by the time
11   evidence is being presented and then when we get to jury
12   instructions, that that be cleared up.
13             The other issue that I wanted to raise this
14   morning is one of the witnesses on plaintiffs' witness
15   list -- and he appears in the first 24 or 25 -- is
16   Luis Torres.
17             Mr. Torres, I expect, will be questioned about a
18   hard drive that Deputy Chief Berkow requested be removed
19   from his computer before he left the department.
20             My understanding of the evidence that's been
21   gathered during discovery is that there is no tie between
22   removing a hard drive, taking data out of a computer, and
23   this case.
24             We think it's merely going to be offered to make
25   the department look bad, make Berkow look bad; and if that's
```

1  going to be the case, what I'm going to ask for at least,

2  because I know I'm hitting the court with this right before

3  we start, is that we have an offer of proof before we get to

4  Mr. Torres.

5          THE COURT:  Okay.  I think that's reasonable.

6          MS. RUGGIERO:  Your Honor, there's evidence that

7  former Deputy Chief Berkow asked that his hard drive be

8  removed in pursuant to litigation; but Luis Torres will

9  testify that he wanted it removed so that nobody could

10  access it; and that's why we feel it's extremely relevant.

11          Deputy Chief Berkow stated it was for the purpose

12  of litigation.  Luis Torres said he wanted it such as no one

13  could access the information.

14          THE COURT:  What's the timing?

15          MS. RUGGIERO:  Right before he left for Savannah.

16  I believe it was in early November 2006.  Late November?

17  Early November 2006 or late October?

18          MR. AGUILERA:  I can elaborate if the court would

19  like, Your Honor.

20          Miss Ruggiero has correctly summarized the

21  deposition testimony of Chief Berkow.  He is, unfortunately,

22  been targeted as a defendant in many of our cases.  At the

23  time he had the hard drive removed, he had been questioned

24  by Mr. Bradley Gage who I believe the court is familiar with

25  from the Wallace case.

```
 1              THE COURT:  Right.
 2              MR. AGUILERA:  Mr. Gage was questioning
 3    Chief Berkow in what was the Yomni Crystal case which was a
 4    state court case which has since been tried.
 5              Chief Berkow -- and if we have to put this
 6    evidence on, we will -- instructed members of his command,
 7    that was Internal Affairs, and the police department's IT
 8    people that he wanted his hard drive removed from his desk
 9    top computer; and the purpose of that was to preserve it for
10    any litigation.
11              So the hard drive was, in fact, preserved by his
12    successor Deputy Chief Mark Perez.  Yes, Mr. Torres will say
13    the chief wanted it removed.  He asked him if he could
14    replace it.
15              But, again, there is no indication that Jim Gavin
16    or Carol Gavin were somehow prejudiced because he made that
17    request or because that was actually done.  We feel it has
18    nothing to do with the case.
19              THE COURT:  So the evidence is that it was removed
20    from his hard drive and it was preserved?
21              MR. AGUILERA:  Yes.
22              THE COURT:  By LAPD?
23              MR. AGUILERA:  Yes.
24              THE COURT:  And remained available?
25              MR. AGUILERA:  Yes.
```

1          MS. RUGGIERO:  May I address that, Your Honor?

2          THE COURT:  Yes.

3          MS. RUGGIERO:  The evidence is in conflict as to

4     whether there is a chain of custody and whether it was

5     preserved specifically because of Luis Torres's testimony

6     that should Deputy Berkow wanted, quote, to make sure that

7     no one could get his work on his computer after it was

8     removed.

9          So in light of the timing of this, in light of the

10    fact that there were numerous e-mails that we did receive

11    between Deputy Chief Berkow and Captain Weinstein, we

12    believe it's important for the jury to decide itself whether

13    or not Deputy Chief Berkow was trying to hide information

14    for litigation, be it the this litigation, which in terms of

15    timing I think is extremely relevant, as well as other

16    litigation.

17         We don't know and nobody knows whether that hard

18    drive remained in custody of the LAPD, and that should be

19    for the jury to decide.

20         MR. AGUILERA:  We disagree, Your Honor.

21         This is purely a discovery issue.  The law is

22    pretty clear on what a defendant's duties are in terms of

23    preserving evidence so that there's not a spoliation claim.

24    Lawyers can't bring a spoliation claim in state court

25    anymore but certainly it can be raised.

1          The e-mails we produced that are going to be

2     talked about in this trial all took place in the fall of

3     2004 and bleeding into 2005.  Chief Berkow left in 2006.

4     This case was filed at the end of 2005.

5          It's been a lot of time to do discovery.  The

6     parties asked for and received from the court modification

7     of the scheduling order to do discovery.  There was never a

8     motion brought to compel the production of the disk.

9          I can represent to the court, because I'm the

10    lawyer that's handled this case from its inception, that I

11    had custody of the disk.  I had it sent out to be analyzed.

12    We tried to get all of the e-mails that we possibly could,

13    and I turned all of the e-mails that I could off of that

14    disk over to the plaintiffs in this case.

15         Now, after I did that, there was never a motion

16    brought to compel the disk to be turned over; and that's the

17    appropriate procedure under, I believe, the *Warbird* case.  I

18    may be misstating it.

19         But I believe that there is ample case law to

20    protect the party who believes that something has been

21    tampered with to come to court and say:  We want the actual

22    disk produced.

23         Now, in the law of spoliation, it's -- there are

24    some elements that are very important that the court has to

25    consider; that the party that has control over the evidence

1    has an obligation to preserve it at the time; and here, in

2    this case, there was no destruction of evidence or none that

3    we're aware of.

4              Second, that if anything was destroyed, it was

5    with a culpable state of mind.  Well, we certainly never got

6    there in discovery; and that that -- that the destroyed

7    evidence is somehow relevant to the parties' claim or

8    defense such that a reasonable trier of fact could find that

9    it would support that claim or defense.

10             And the cases that I'm citing for these

11   propositions are *Residential Funding Corp. v. The George*

12   *Financial Corp.*, 306 F.3d 99 at 109.  That's a Second

13   Circuit case.

14             Also *William T. Thompson Company v. General*

15   *Nutrition Corp.*, 593 F.Supp. 1443 at 1455.  That is a

16   Central District of California case.

17             And *Nationwide Mutual Fire Insurance Company v.*

18   *Ford*, 174 F.3d 801 at 804.  That's a Sixth Circuit case.  So

19   just to wrap this up, we believe that on this record there

20   is no showing that has been made by the plaintiff that the

21   city refused to turn the disk over, that the disk itself was

22   requested, and that a proper showing was made to turn it

23   over and, therefore, we don't think this evidence is

24   relevant or should come in.

25             THE COURT:  Okay.  Did you want to respond?

1        MS. RUGGIERO:  Yes, Your Honor.

2        Plaintiffs are not claiming that this a spoliation

3  issue, we are not claiming that it is a discovery issue.  We

4  did not learn about this through discovery.  We learned

5  about it through an anonymous phone call to my office that a

6  hard drive was missing; and through that phone call, we took

7  depositions and determined that Deputy Chief Berkow tried to

8  hide what was on his computer.

9        He came into the LAPD in, I believe, April of

10  2003; and everything that's on his computer from April 2003

11  to the time that he left could be relevant to our case; and

12  we didn't -- strike that.

13        Mr. Aguilera didn't have access to that hard drive

14  until we brought it up.  So it wasn't even part of

15  discovery.  All we want to bring it in for is to show that

16  Deputy Chief Berkow cannot be trusted.

17        It is something that the jury should be able to

18  determine with respect to his credibility.  We're not

19  claiming spoliation, and we did subpoena Deputy Chief Berkow

20  to bring in the hard drive and he did not bring it in.

21        THE COURT:  Well, I suppose it might go to

22  credibility.  My concern is I don't have evidence that, in

23  fact, even though he may have said:  Take out the hard drive

24  so no one can get access to it; that, in fact, access was

25  denied.

1          There are e-mails that have been turned over.  I

2    don't have any evidence that anything was removed from this

3    hard drive, that anyone tampered with it.  Although he may

4    have instructed that it be destroyed or hidden, it wasn't.

5    It's been available.  It is available.

6          It seems to me while it may go to credibility, it

7    certainly smacks more of character evidence; and if we had

8    some indication that things, in fact, had been hidden,

9    destroyed, concealed, removed from the hard drive, I would

10   be certainly more inclined to let the evidence in that it

11   was at his instruction.

12         But absent that evidence, I think it's more

13   prejudicial than probative so I will not allow evidence of

14   that testimony.

15         MS. RUGGIERO:  May I respond briefly, Your Honor?

16         THE COURT:  Yes.

17         MS. RUGGIERO:  There are e-mails subsequent to the

18   knowledge the department had that the hard drive was

19   missing, and it was missing for a certain period of time;

20   and through these e-mail correspondence which we have in our

21   exhibits, it can be determined that the department couldn't

22   find the hard drive.

23         And then lo and behold, at some point they said:

24   Oh, we found it.  And I do believe that it's extremely

25   suspicious under those circumstances that the hard drive was

 1   removed, everyone agrees it was removed.

 2          We have evidence that Deputy Chief Berkow stated

 3   he wanted it such that no one could have access to it.  It

 4   went missing.  We didn't have access to it.  Mr. Aguilera

 5   didn't have access to it during discovery.

 6          And then after, when we brought it up in discovery

 7   during depositions, it was only then that they looked for it

 8   and through e-mails you can see that no one could find it.

 9          Then suddenly it's found; and it's so suspicious

10   and it is so pertinent to show Deputy Chief Berkow's

11   conspiratorial nature that I believe it is extremely

12   probative and should be admissible.

13          THE COURT:  Let me just ask the follow-up

14   question.  I got the impression from you, Mr. Aguilera, that

15   you had access or possession of this hard drive throughout

16   the case.

17          MR. AGUILERA:  I don't have possession of it right

18   now but I have control of it.

19          THE COURT:  But since when?

20          MR. AGUILERA:  Since, I believe, January of 2006.

21   Quite a ways back.

22          THE COURT:  Okay.

23          MR. AGUILERA:  What happened, just to address

24   something, Miss Ruggiero, brought up --

25          THE COURT:  Excuse me a second.  I need to turn

1    the fan on because it's so warm in here.

2         Go ahead.

3         MR. AGUILERA:  What happened is Chief Berkow was

4    very hard to get to depose while he was still here; and, in

5    fact, we had a lot of scheduling problems.  At the end of

6    2006, before he left, he was being deposed in other cases

7    and then he left.

8         Miss Ruggiero took the unusual step of actually

9    issuing a subpoena in Georgia, and the subpoena requested

10   that he produce the hard drive at his deposition.

11        Chief Berkow advised me that he was very busy, he

12   was a brand new chief in Savannah.  He had a lot of stuff

13   that he was trying to get under control.  He was not

14   available for his deposition.  That deposition never went

15   forward.

16        If you want to look at it from the standpoint that

17   he disobeyed the subpoena, he did.  But nothing was done to

18   enforce that subpoena.

19        We later produced him here in Los Angeles for his

20   deposition, and his deposition took a day.  In the interim,

21   because I now wanted to find out well where was this hard

22   drive, Berkow, I believe, had represented to me when he was

23   subpoenaed in Georgia that he didn't have any hard drive

24   that belonged to the LAPD; and we certainly took the

25   position that that's a piece of city property.  You just

1    can't take it.

2           When I inquired, I was told that the hard drive

3    had been booked into evidence and, in fact, it was.  I

4    retrieved it.  I had a computer forensics firm examine it

5    and tell me what they could retrieve from the hard drive

6    that was responsive to some pending discovery.

7           And I believe that using that information I

8    responded to some of the discovery that was propounded in

9    this case.  But I go back to the fact that there was never

10   any follow-up discovery, there was never a motion made, and

11   it's still 403.  It's character evidence and it's very

12   prejudicial to the defense.

13          We're going to be shooting off on this collateral

14   issue if we're forced to bring in all these people to

15   explain this situation.

16          THE COURT:  All right.  My ruling stands.

17          Okay.  As soon as we get a panel, we will get

18   started.

19                          *(Recess.)*

20              **VOIR DIRE OF PROSPECTIVE JURORS**

21          THE CLERK:  All rise.

22       *(The prospective jurors entered the courtroom.)*

23          THE COURT:  Good morning.

24                    *(All counsel responded.)*

25          THE CLERK:  Calling Civil Case 05-9001 FMC,

1    Carol Jo Gavin vs. City of Los Angeles.

2              THE COURT:  All right.  We have prospective jurors

3    in the courtroom.  Before I ask you to be sworn, I'm going

4    to introduce you to the people at counsel table.

5              I'll start with plaintiff.  Counsel, would you

6    introduce yourself and the people at your table, please.

7              MS. RUGGIERO:  Thank you, Your Honor.

8              To my far left is plaintiff Jim Gavin, plaintiff

9    Carol Gavin, our law clerk Kacy Do, myself the attorney for

10   plaintiffs, Sheryl Konell Ruggiero, and my law partner also

11   for plaintiffs, Jerome Konell.

12             THE COURT:  Thank you.

13             And for the defense?

14             MR. AGUILERA:  Thank you, Your Honor.

15             Good morning.  I'm Daniel Aguilera.  I'm a deputy

16   city attorney with the City of Los Angeles, and trying this

17   case with me is Miss Beth Orellana also with the City

18   Attorney's Office; and sitting next to her is one of the

19   defendants Captain Jeri Weinstein.

20             Also, you may see detectives coming in and out of

21   the courtroom.  They help us.  They're from the LAPD.

22   Seated at this table back here is Detective Carla Cryer and

23   Detective John Wiley.

24             THE COURT:  Thank you.

25             All right.  Does any of you recognize or think you

1    know any of the people you just met or whose names you've

2    just heard?  I don't see any hands.

3          Would all the prospective jurors please stand and

4    raise your right hands to be sworn.

5                      **PROSPECTIVE JURORS SWORN**

6          THE CLERK:  Ladies and gentlemen, do you and each

7    of you solemnly swear that you will make true answers to

8    such questions that may be asked of you regarding your

9    qualifications to serve as trial jurors in the cause now

10   before this court, so help you God?

11         THE PROSPECTIVE JURORS:  I do.

12         THE COURT:  Thank you.  Be seated, please.

13         As you could probably surmise, this is a civil

14   case, an action brought against the City of Los Angeles on

15   behalf of the Los Angeles Police Department.

16         What I'm going to do is give each of the attorneys

17   about a five-minute opportunity to give you a little

18   mini-opening statement so that you will understand

19   essentially what the case is about, what the parties are

20   attempting to prove, what your responsibilities would be.

21         I think it will give you a better understanding of

22   the case that we're going to ask the jury to try and also an

23   understanding of why we ask the questions that we ask of you

24   during the jury selection process.

25         So we'll start with plaintiff; and, Miss Ruggiero,

1    is that you?

2            MS. RUGGIERO:  Yes.

3            THE COURT:  I think the way we worked this out is

4    if you stand behind the podium and just turn the microphone

5    around, the reporter can hear you and all the jurors can see

6    and hear you at the same time.

7            On this side.  Can you get through?  Okay.

8            **OPENING MINI-STATEMENT BY MS. RUGGIERO**

9            MS. RUGGIERO:  Excuse my back, Your Honor.

10           THE COURT:  That's okay.

11           MS. RUGGIERO:  Good morning.

12           This is a case about two dedicated Los Angeles

13   police officers who were reprimanded and punished for doing

14   their job and for doing the right thing; and although this

15   case concerns specific events that occurred within the last

16   several years, this story really begins over 20 years ago

17   when Dorka Lisker was murdered.

18           Dorka Lisker, Bruce Lisker's mother, and she was

19   murdered in Sherman Oaks, California, in 1983.

20           Many years later, in June of 2003, Jim Gavin, a

21   plaintiff in this case, was a sergeant in Internal Affairs

22   and was assigned to investigate a complaint written to and

23   against the Los Angeles Police Department by the still

24   imprisoned Bruce Lisker, Dorka Lisker's son, who had been

25   convicted of murdering his mother.

1          The complaint written by Mr. Lisker alleged

2     discrepancies and conflicts in the evidence that led to his

3     conviction and also untruthful statements made by the LAPD

4     homicide investigator who had originally investigated the

5     murder of his mother.

6          During Jim Gavin's investigation of Mr. Lisker's

7     complaints, he uncovered information and information that

8     tended to validate Mr. Lisker's allegations.

9          However, before he could finish his investigation,

10    before he could complete his report, a follow-up report that

11    would be sent to the District Attorney's Office who would

12    then determine if Mr. Lisker's case should be reopened, if

13    Dorka Lisker's murder case should be reinvestigated and the

14    DA would also be able to determine whether or not a man was

15    wrongfully imprisoned.

16         Before Jim Gavin was able to complete that report,

17    he was told to close the case, to shut it down.  Although

18    Jim Gavin reluctantly did as he was ordered, due to the fact

19    that he was not permitted to fulfill the duties of his job

20    within the department, he was compelled to step outside of

21    the department and speak out.

22         He provided information to Bruce Lisker's

23    representatives and he provided information to the

24    *Los Angeles Times* knowing that he was in grave danger of

25    damaging his career or losing his career as well as the law

1   enforcement career of his wife carol Gavin, also a plaintiff

2   in this case.

3          He abided by the promise that both the Gavins made

4   to the citizens of Los Angeles and make to the citizens of

5   Los Angeles every day:  To protect and to serve.

6          For that, the Los Angeles Police Department

7   retaliated not only against Jim Gavin, but also against

8   Carol Gavin, a third generation Los Angeles police officer

9   who also had been sexually harassed for years before

10  Jim Gavin was assigned to investigate Bruce Lisker's

11  complaints.

12         During this trial, you will hear and see evidence

13  of the Los Angeles Police Department's retaliatory behavior

14  that was intended to cause the Gavins harm and did cause

15  severe emotional harm, the severe emotional and physical

16  dismantling of Jim Gavin, Carol Gavin, their marriage, and

17  the family that they had cherished and cultivated with their

18  four sons.

19         Thank you, and I look forward to speaking with you

20  again.

21         THE COURT:  Thank you.

22         Statement for the defense?

23         MS. ORELLANA:  Thank you, Your Honor.

24         May I enter the well?

25         THE COURT:  Please.

**OPENING MINI-STATEMENT BY MS. ORELLANA**

MS. ORELLANA:  Good morning.

Ladies and gentlemen, the story the plaintiffs are going to tell you in this trial is inconsistent with common sense.  This is not a case about retaliation, this is not a case about revenge.

There has been no revenge or retaliation taken against Jim Gavin and his wife Carol, and this is not a case about gender discrimination or sexual harassment.  Carol has not been treated differently because of her gender.

You won't have to look for ulterior motives or buy into a complex conspiracy theory to decide this case.  To decide this case, ladies and gentlemen, you only need to apply common sense; and common sense will tell you and Jim and Carol's stories don't make any sense.

For example, you will hear that during the very same time period that Jim will claim he was retaliated against, you will also hear evidence that he received coveted assignments within the department.

You will hear he was made the officer in charge of an important training program for counterterrorism measures for the LAPD.  You'll hear that he was responsible for the department's West Point Leadership Training Program; that he earns $20,000 in overtime in one month and more money that year than he had ever earned before.

```
 1              You'll also hear that he was given a take-home car
 2   to use for his job.  You'll also hear that he was assigned
 3   important research projects for the department including
 4   ones for Internal Affairs and a presentation that
 5   Chief Bratton was going to give at the leadership training
 6   program.
 7              You will also hear that he was promoted to the
 8   rank of lieutenant, and you'll hear that he was given the
 9   department's highest honor, the Medal of Valor.
10              Common sense tells you that Jim Gavin was given
11   these promotions, assignments, and awards because he did
12   good work, he was trusted, and he was respected.  He was not
13   given these things because the department was out to get
14   him, was out for revenge.
15              Common sense will also tell you that Carol's story
16   is not one of gender discrimination and sexual harassment.
17   The LAPD has women officers at all ranks including Assistant
18   Chief Sharon Papa, Deputy Chief Sandy Jo MacArthur,
19   Commanders Debra McCarthy, Jo McNamara, Captains
20   Jeri Weinstein, Sharon Buck, Anita Ortega, and the list goes
21   on.
22              Since the 1970s, the LAPD has in place policies on
23   discrimination, harassment, and retaliation.  In addition to
24   those policies, the department has conducted regular
25   training at roll call, mandatory training classes for all
```

1    officers, mandatory training for supervisors; and over the

2    years, there has been instituted over 20 different places

3    for officers to go both inside and outside the LAPD to

4    report discrimination, harassment, or retaliation.  The

5    department takes these issues very seriously.

6              Yet you will hear testimony, ladies and gentlemen,

7    that despite these policies, training, and resources,

8    Carol Gavin never complained to anyone that she was being

9    discriminated against.

10             That's right.  Carol.  A supervisor of 12 years

11   with the LAPD.  A person who's been charged with knowing

12   department policies and available resources never reported

13   discrimination, harassment that she now claims began in

14   2001.

15             Common sense will tell you, ladies and gentlemen,

16   you don't wait several years to report discrimination and

17   harassment.

18             Thank you.

19             THE COURT:  Thank you.

20             All right.  I'm going to give you some information

21   about our schedule and then I'll be asking questions to

22   determine if there are any of you who would be unable to

23   serve on this jury if you were chosen.

24             We have a time estimate of eight court days for

25   the trial.  We're in trial in this department on Tuesday

1    through Friday of each week.  So eight court days would take

2    us through this week and also next week which is Tuesday,

3    September 9, through Friday, September 12.

4            It may be that the trial will not take that long.

5    I try to give the jurors a generous estimate because I don't

6    want to find out that toward the end one of you has a

7    conflict.

8            If, in fact, the trial consumes the full eight

9    days, then we need more time for the jury to deliberate.

10   The jury would start deliberating the following Monday.

11           I don't do trials in the courtroom on Mondays

12   because I use Monday to handle criminals matters,

13   sentencing, law and motion, all kinds of other things.

14           But if I have a deliberating jury, then of course

15   you can do that on Monday in the jury room.  So September 15

16   is that Monday.  I can never predict how long deliberations

17   will take.  Sometimes very short trials require long

18   deliberation.  Sometimes lengthy trials only need an hour or

19   two and I can't tell you.

20           I think reasonably deliberations could take a day

21   or two on a case this length just looking at averages.  So I

22   say when I'm asking you if you are available that your

23   answer would be "yes" if you're available on the days that I

24   just described through September 16.

25           I think that's a very safe kind of outside time

1    estimate of when we would need you.

2           You also need to know about our hours because they

3    are somewhat different.  Today will be more of a standard

4    trial day.  We'll take a lunch break at noon and go this

5    afternoon from 1:30 to 4:00.

6           But every day after today, we will revert to my

7    normal trial schedule which is 8:00 to 1:30.  We don't take

8    a lunch break when we're in trial.  I give you two

9    fifteen-minute breaks so you can grab a snack during those

10   breaks.  But you will get five hours of trial in and at 1:30

11   you are done for the day.

12          So jurors really like that schedule.  You get to

13   get downtown before the traffic gets too bad and you

14   certainly leave to go home before traffic gets bad; and then

15   you have your afternoons free to do whatever you'd like to

16   do with them and then you've gotten credit for a full day of

17   jury trial.

18          But what I want you to think about is that it's

19   imperative that you be able to arrive at 8 o'clock.  We

20   start right on time and we can't begin until all jurors are

21   here.  So if you have morning responsibilities, taking

22   children to school or something, you have to think about

23   that and let me know whether you would be able to assure me

24   that you could be here by 8 o'clock so we can start every

25   day.

```
1              So I'm going to ask you then if there are any of
2    you who would be unavailable to serve if you were chosen for
3    this trial; and if you raise your hand and I call on you,
4    please stand up.  We have microphones that we'll pass
5    around; and let me know first what your name is and then
6    what the problem is that would keep you from being
7    available.
8              So let me start on the left side, on my left.  Is
9    there anyone over on the left side here who would be
10   unavailable?
11                  (The prospective jurors responded.)
12             THE COURT:  Oops.  Is the mike on?
13             THE PROSPECTIVE JUROR:  My name is Randin
14   Kinsbruner.
15             THE COURT:  Okay.
16             THE PROSPECTIVE JUROR:  I have a business trip
17   that I will going to Florida on Monday and I will be there
18   until Friday.
19             THE COURT:  Okay.  Is that something --
20             THE PROSPECTIVE JUROR:  It was prescheduled.
21             THE COURT:  Is that anything that could be
22   rescheduled if you were on this jury?
23             THE PROSPECTIVE JUROR:  Sure.
24             THE COURT:  Okay; thank you.
25             Let me get that microphone working.
```

```
 1                    (Pause in the proceedings.)

 2            THE COURT:  Battery is dead?

 3            THE CLERK:  No.  It was completely charged.

 4            THE COURT:  Okay.  We have another?

 5                    (Pause in the proceedings.)

 6            THE COURT:  This one working?

 7            THE CLERK:  Yes.

 8            THE PROSPECTIVE JUROR:  My name is Vennie Turner

 9   and I have a reservation in Las Vegas from 9-12 through

10   9-15.

11            THE COURT:  12 to 15?

12            THE PROSPECTIVE JUROR:  Yes, ma'am.

13            THE COURT:  Okay; thank you.

14            Okay.  In the middle in the front row?  I think

15   right in front of you, Alicia.  Okay.

16            THE PROSPECTIVE JUROR:  My name is Sharon Stender,

17   and I have a doctor's appointment, a rather important one,

18   on the 15th.

19            THE COURT:  Okay.  Let me look again at these

20   dates.  Okay.  If you were in fact on the jury and it was

21   deliberating starting on the 15th, that's the Monday,

22   right?

23            THE PROSPECTIVE JUROR:  Right.

24            THE COURT:  Okay.  I think we could work around

25   it.  And tell me your last name again.
```

```
 1              THE PROSPECTIVE JUROR:  Stender.

 2              THE COURT:  Thank you.

 3              THE PROSPECTIVE JUROR:  Hi.  My name is Meredith

 4    Marcus.  I have a business trip the 11th through the

 5    13th.

 6              THE COURT:  And is that something that could be

 7    rescheduled if you were on the jury?

 8              THE PROSPECTIVE JUROR:  Unfortunately, it affects

 9    several other people as well.

10              THE COURT:  Okay; thank you.

11              THE PROSPECTIVE JUROR:  Good morning, Your Honor.

12    I'm Andres Molina.

13              THE COURT:  I'm sorry.  I didn't hear you.

14              THE PROSPECTIVE JUROR:  Andres Molina.  And I am a

15    director for a nonprofit organization where we feed 500

16    families a week including homeless, and it's basically just

17    myself and another person that runs the center.

18              Today I have to go to a food bank and pick up

19    groceries and vegetables to feed our community, and

20    basically I run the center practically on my own without any

21    staff so it's very hard for me to be here every day.

22              THE COURT:  Okay; thank you very much.

23              THE PROSPECTIVE JUROR:  My name is Lydia

24    Alcantara, and I have a planned vacation on September 11

25    through the 26.
```

```
 1              THE COURT:  And you are leaving the area?

 2              THE PROSPECTIVE JUROR:  Yes.  I'll be going

 3     abroad.

 4              THE COURT:  Okay; thank you.

 5              THE PROSPECTIVE JUROR:  My name is Cherlene

 6     Panganiban.  On Wednesday, September 10th, my

 7     mother-in-law is going to be on vacation.  She provides

 8     child care for my baby and my toddler.

 9              THE COURT:  I'm sorry.

10              THE PROSPECTIVE JUROR:  I have a toddler and a

11     baby and my mother-in-law is going on vacation September 10.

12              THE COURT:  Does she normally take care of them?

13              THE PROSPECTIVE JUROR:  Yes.

14              THE COURT:  Okay.

15              THE PROSPECTIVE JUROR:  Hello.  My name is Joan

16     McSweeney.

17              THE COURT:  Hold on one second because I have a

18     question.  I didn't hear the last name of the last person

19     who spoke to me.

20              THE PROSPECTIVE JUROR:  Panganiban.

21              THE COURT:  Can you spell it?

22              THE PROSPECTIVE JUROR:  P-a-n-g-a-n-i-b-a-n.

23              THE COURT:  Thank you.

24              Yes.

25              THE PROSPECTIVE JUROR:  My name is Joan McSweeney,
```

1   and I have a scheduled appointment for surgery on my leg on

2   the 10th.  I have waited for it for quite a while because

3   I have an HMO and I finally got the date.  But it could be

4   postponed if need be but I don't know.  It would be another

5   month or so before I could get another appointment.

6           THE COURT:  All right.  Thank you.

7           THE PROSPECTIVE JUROR:  I'm Janet Martin and I

8   have a doctor's appointment this Friday at 9:20.

9           THE COURT:  I'm sorry.  I couldn't hear you.

10           THE PROSPECTIVE JUROR:  I have a doctor's

11   appointment this Friday at 9:20 in the morning.

12           THE COURT:  This Friday?

13           THE PROSPECTIVE JUROR:  Yes; uh-huh.

14           THE COURT:  Is that something you could

15   rescheduled?

16           THE PROSPECTIVE JUROR:  I'd have to call my OB

17   because she scheduled me this appointment for two weeks.

18           THE COURT:  Okay.

19           THE PROSPECTIVE JUROR:  Hi.  My name is Ruth

20   Burrage, and I have a court appearance tomorrow.

21           THE COURT:  What time?

22           THE PROSPECTIVE JUROR:  10 o'clock.

23           THE COURT:  That's something you're required to

24   attend?

25           THE PROSPECTIVE JUROR:  Yes.

```
 1              THE COURT:  Okay.  And how much of the day do you
 2     think that's going to consume or do you know?
 3              THE PROSPECTIVE JUROR:  I don't know.
 4              THE COURT:  Okay; thank you.
 5              Tell me how to spell your last name.
 6              THE PROSPECTIVE JUROR:  B-u-r-r-a-g-e.
 7              THE COURT:  Thank you.
 8              Anybody else?
 9                         (No response.)
10              THE COURT:  Okay.  May I see counsel at sidebar,
11     please.
12                  (The following was held at the bench:)
13              THE COURT:  Okay.  Mr. Kinsbruner said he could
14     reschedule his business trip so I'm inclined to keep him.
15              Mr. Turner has reservations in Vegas September 12
16     to 15.  Is 12 a Friday?
17              ALL COUNSEL:  Yes.
18              THE COURT:  Because the 15$^{th}$ I figure if the
19     they can't deliberate on a Monday, I can always start on
20     Tuesday but Friday the 12$^{th}$ could be a problem.  So should
21     we excuse him?  Anybody who wants to keep him and not let
22     him go to Vegas?
23                         (Laughter.)
24              MR. AGUILERA:  We can excuse him, Your Honor.
25              THE COURT:  And we'll all get on a bus to Vegas.
```

```
 1              Sharon Stender said says she has a doctor's
 2    appointment.  That one we should keep.  If we're
 3    deliberating, we can accommodate her.
 4              Meredith Marcus cannot reschedule her business
 5    trip, 11 to 13.  Should we let her go?
 6              MS. RUGGIERO:  Yes.
 7              MR. AGUILERA:  That's fine.
 8              THE COURT:  Mr. Molina, I think feeding 500 people
 9    is more important than your trial.  Nothing personal, but
10    what a good man.
11              MS. RUGGIERO:  Yeah.
12              MR. AGUILERA:  Yes.
13              THE COURT:  Miss Alcantara has a vacation abroad.
14              MS. RUGGIERO:  We have to let her go.
15              MR. AGUILERA:  That's fine.
16              THE COURT:  I think we're okay with the numbers
17    because we only need eight.
18              All right.  Miss Panganiban needs child care so
19    she's excused.
20              MR. AGUILERA:  That's fine.
21              MS. RUGGIERO:  That's fine.
22              THE COURT:  Joan McSweeney has surgery which she
23    thinks she could postpone.  What's your preference?
24              MS. RUGGIERO:  With the HMO, I would hate for
25    her to have --
```

```
 1              MR. AGUILERA:  Let her go.

 2              THE COURT:  Okay.  Janet Martin has a doctor's

 3    appointment Friday.  She said she could reschedule it.

 4              MS. RUGGIERO:  The only thing, just because she

 5    said OB, I don't know if you want to ask her.  Since it's

 6    every two weeks, does she have problem?

 7              THE COURT:  She said every two months the doctor

 8    brings her in every two months.  Is that what you heard?

 9              MS. ORELLANA:  I heard two weeks.

10              MS. RUGGIERO:  I heard two weeks.

11              MR. AGUILERA:  I didn't catch it.

12              MS. RUGGIERO:  So I was thinking, if it's every

13    two weeks, is there something going on?

14              THE COURT:  Is that what you heard?

15              MS. ORELLANA:  I heard two.

16              MR. KONELL:  Maybe we should let her go if it's

17    every two weeks.

18              THE COURT:  That concerns me.  Maybe we should let

19    her go.

20              Ruth Burrage has a court appointment tomorrow at

21    10:00 a.m. which could keep her out all day so she's gone.

22    So where are we?

23              Eight; that leaves us 17.  We have 16.  If we have

24    eight jurors and eight peremptories, that would leave only

25    one challenge for cause.
```

```
 1            MS. RUGGIERO:  Wow.

 2            THE COURT:  It's three per side.  Thank you.  I

 3  was being very generous.

 4            MS. RUGGIERO:  You shouldn't have corrected her.

 5                          (Laughter.)

 6            MS. ORELLANA:  Might have come in handy.

 7            THE COURT:  We're fine then; thank you.

 8            MR. AGUILERA:  Thank you.

 9            MS. RUGGIERO:  Thank you.

10    (The following was in the prospective jurors' presence:)

11            THE COURT:  All right.  Counsel has agreed that

12  the following people may be excused.  I'm going to read the

13  names of all the people who are excused.

14            Please wait until I've read the entire list.  And

15  then if you'll go back to the Jury Assembly Room and let

16  them know you've been excused from this trial.

17            Vennie Turner, Meredith Marcus, Andres Molina,

18  Lydia Alcantara, Cherlene Panganiban, Joan McSweeney, Janet

19  Martin, and Ruth Burrage.

20            Thank you all very much.

21       (The named prospective jurors exited the courtroom.)

22            THE COURT:  Those of you who remain we're going to

23  begin the process of jury selection, and I think we may end

24  up talking to all of you.  Yes.

25            We'll be calling you up to sit either in the jury
```

1    box.  We'll fill the jury box with 14 people and put the

2    rest of you in the front row here; and I will question all

3    of you and the attorneys will have a brief opportunity to do

4    follow-up questions of all of you when I'm done.

5              And then we will begin, as you may be aware if

6    you've been through this process before, the lawyers have a

7    limited right to ask the court to excuse a certain number of

8    jurors.

9              The fact that you start out in the box doesn't

10   necessarily mean that you'll end up being on the jury, but

11   it gives us a chance to get information from all of you.

12             What we're trying to do is we're going to pick a

13   jury of eight people and we're going the try to find eight

14   people whose life experience and background is such that

15   they don't have a are strong interest in the outcome of this

16   case before it even starts.

17             Sometimes what's happened to you in your life

18   creates a real emotional reaction to cases like this or

19   similar cases where it would be very hard to be fair and

20   objective and openminded because you've experienced

21   something similar.

22             For example, just to pick the obvious, if you had

23   a situation in your employment where you felt you reported

24   some wrongdoing and you were punished for it and retaliated

25   against by your employer, this is not the jury for you to

1    sit on because, obviously, you couldn't give the defendants

2    a fair trial.

3          Your emotional reaction would really impair your

4    ability to intellectually analyze and evaluate the evidence.

5    So we ask you questions and some of them will be obvious to

6    you based on what you've heard and what you know about the

7    case so far.

8          Just to try to find out what's in your background,

9    what's happened to you in the past, what strong views you

10   might have that could impair your ability to be fair.

11         We're looking for eight judges; and my definition

12   of a good judge, besides somebody who pays attention and

13   tries to be smart, is someone who keeps an open mind and who

14   doesn't favor one side or the other and does not care

15   whether the plaintiff wins or the defendant wins and is

16   willing to listen to the evidence, evaluate it, decide who

17   appears to be most truthful, apply the law evenly and fairly

18   and come up with a just result.

19         And so when we question you about your experiences

20   and your background and your opinions, it's to try and find

21   out if this is a case where you could do that; and if you

22   are excused because of something you've experienced or

23   something you strongly believe in, it doesn't mean you

24   couldn't go down the hall and sit in on a copyright

25   infringement case and be an absolutely splendid judge.

 1            It just means that for this case it's just going
 2    to be too hard for you to keep an open mind because of
 3    things that have happened to you.
 4            So what we need from you is candor and honesty in
 5    your responses.  When you raised your hand and took an oath,
 6    you promised to answer all our questions truthfully.
 7            If I ask you for information that you would rather
 8    not disclose in a room full of strangers, please let me know
 9    that you'd like to go to the sidebar and we'll confer with
10    you privately there.
11            The most important thing is that you give us the
12    information.  The lawyers have very little time to make what
13    are really important decisions for their clients, and they
14    can only do those -- make those decisions intelligently if
15    you have given them the information they need.
16            So please don't hold back.  Don't conceal
17    information.  We go to the sidebar a lot during jury
18    selection.  Nobody minds.  In fact, sometimes we kind of
19    like to get the exercise so just tell us:  I'd like to go to
20    sidebar.  Don't be embarrassed about it but please don't
21    hold back material information that would be useful to the
22    attorneys.
23            Okay.  We're going to begin calling names, and
24    I'll ask you to come and be seated first in the jury box and
25    then in the front row.

```
1              THE CLERK:  Kevin S. O'Brien.  O-B-r-i-e-n.
2    Please step forward.  All way down the first row.
3              Rosie Martinez Gonzalez.  M-a-r-t-i-n-e-z.
4    G-o-n-z-a-l-e-z.
5              Bruce J. Peterson.  P-e-t-e-r-s-o-n.
6              Calvin G. Nestler.  N-e-s-t-l-e-r.
7              James R. Biby.  B-i-b-y.
8              David A. Whitacre.  W-h-i-t-a-c-r-e.
9              Sharon A. Stender.  S-t-e-n-d-e-r.
10             Laura L. Porter.  P-o-r-t-e-r.
11             Cynthia P. Sears.  S-e-a-r-s.
12             Milton A. Fuentes.  F-u-e-n-t-e-s.
13             Kelly A. McAlack.  M-c-A-l-a-c-k.
14             Marlene A. Lopez.  L-o-p-e-z.
15             Robert J. Bogan.  B-o-g-a-n.
16             Randin Kinsbruner.  K-i-n-s-b-r-u-n-e-r.
17             Kosta P. Poulopoulos.  P-o-u-l-o-p-o-u-l-o-s.
18             Bethany L. Marvin Stevens.  M-a-r-v-i-n.
19   S-t-e-v-e-n-s.
20             Charles R. Price.  P-r-i-c-e.
21             THE COURT:  Okay.  We're going to begin with the
22   brief questionnaire that each of you has been given; and
23   I'll start with Juror No. 1, Mr. O'Brien.  We need to get a
24   microphone to you, sir, because otherwise we won't hear what
25   you say.
```

43

```
 1              The room doesn't look that big but the acoustics
 2    are awful so we need to be passing this mike around as we
 3    use it.
 4              THE CLERK:  We're down to one.
 5              THE COURT:  Down to one; okay.
 6                   (Pause in the proceedings.)
 7              THE COURT:  Thank you.  Could you answer the
 8    questions on that form, sir?
 9              THE PROSPECTIVE JUROR:  Yes.  My name is Kevin
10    O'Brien.  I live in the City of San Pedro, California.  My
11    current occupation is a telecommunications manager-engineer.
12    Self-employed for about five years.
13              I am married.  My spouse is an engineer at
14    Northrop Grumman.  I have no children.  And I have served on
15    one jury and it was a hung jury.
16              THE COURT:  Okay.  Was it --
17              THE PROSPECTIVE JUROR:  It was criminal.
18              THE COURT:  Criminal.  Okay.  Thank you very much.
19              Miss Gonzalez.
20              THE PROSPECTIVE JUROR:  My name is Rosie Gonzalez.
21    I live in the City of Lawndale.  I work for an aerospace
22    company, Northrop Grumman.  I've been there for a total of
23    19 years.  I'm married.  My husband also works for Northrop
24    Grumman.  He's middle management.
25              We have one son and he attends Bishop Montgomery.
```

```
 1              THE COURT:  I'm sorry?

 2              THE PROSPECTIVE JUROR:  He attends Bishop

 3    Montgomery High School, and I have never been on a panel.

 4              THE COURT:  Okay; thank you.

 5              Mr. Peterson.

 6              THE PROSPECTIVE JUROR:  My name is Bruce J.

 7    Peterson.  I live in the City of Claremont, California, L.A.

 8    County.  I work for Southern California Edison.  I'm an

 9    accountant.  I've been there 40 years.

10              I'm married.  My wife is a stay-at-home mom.

11    She's a RN by trade.  I have three grown children out of the

12    home.  One is a sales rep, one is an accountant, and the

13    fourth -- or the third is a dental technician.

14              I have two children that are going to college.  I

15    have served on a jury before; three cases, two criminal, one

16    civil; and we reached verdicts on all three.

17              THE COURT:  Okay.  Was the civil case similar in

18    any respect to this one?

19              THE PROSPECTIVE JUROR:  No, ma'am.

20              THE COURT:  Okay; thank you.

21              Mr. Nestler.

22              THE PROSPECTIVE JUROR:  Yes.  My name is Calvin

23    Nestler.  I live in Encino.  I'm currently retired.  I was a

24    former business manager in the aerospace electronics

25    industry.  However, I do have some extraneous information
```

1    maybe pertaining to this No. 3 question.

2              THE COURT:  Okay.

3              THE PROSPECTIVE JUROR:  I'm currently a volunteer

4    at the West Valley Police Station, detective section.

5              THE COURT:  All right.

6              THE PROSPECTIVE JUROR:  I'm not sure I could be

7    fair and impartial in this particular case.

8              THE COURT:  Okay.  Go ahead and give us the rest

9    of the information, and then the attorneys may want to talk

10   to you.

11             THE PROSPECTIVE JUROR:  Okay.  I'm not officially

12   married at this time.  I do have two grown children.

13   Occupations; one is a preschool teacher and the other one is

14   an office manager.  I have served on a jury before.  I

15   recall two of the juries were both criminal cases.

16             THE COURT:  Did the jury reach verdicts?

17             THE PROSPECTIVE JUROR:  I'm sorry?

18             THE COURT:  Were you able to reach a verdict?

19             THE PROSPECTIVE JUROR:  Yes.  Yes, in both cases.

20             THE COURT:  Okay.  Thank you, sir.

21             Mr. Biby.

22             THE PROSPECTIVE JUROR:  My name is James Robert

23   Biby.  I live in Valencia.  I'm a vice president for a large

24   funeral and cemetery corporation.  I'm married.  My wife

25   teaches autistic children.

```
 1              I have three grown children; one is a student in
 2    college, one works for Adidas Tailormade, and one works for
 3    DirecTV as a producer.  I've been on two juries before.
 4    They were both criminal, and we reached two verdicts.
 5              THE COURT:  Okay; thank you, sir.
 6              Is it Mr. Whitacre or Whitacre?
 7              THE PROSPECTIVE JUROR:  Whitacre.
 8              THE COURT:  Whitacre.
 9              THE PROSPECTIVE JUROR:  Yes.  My name is David
10    Whitacre.  I live in the City of LaVerne, the western L.A.
11    County region.  I'm a 20-year paramedic.  I am married.  My
12    wife is also a paramedic.
13              I have three college daughters.  I have served on
14    a jury before, many juries, criminal cases; and we all
15    reached a verdict.
16              THE COURT:  Who are you employed by, sir?
17              THE PROSPECTIVE JUROR:  I'm employed by American
18    Medical Response in the Inland Empire.
19              THE COURT:  Thank you.
20              Could we pass the microphone all the way down to
21    Miss Stender, please.
22              THE PROSPECTIVE JUROR:  Yes.  My name is Sharon
23    Stender and I reside in Chatsworth, California.  Currently,
24    I'm a homemaker.  I've been a homemaker this time around for
25    six years.  Prior to that, I was working in development in
```

1    nonprofit.

2         I am married.  My husband is a dentist.  I have

3    two grown children.  My daughter is a TV news producer, my

4    son is a film editor, and I have never served on a panel.

5         THE COURT:  Okay.  I missed what you said you did

6    before you became a homemaker.

7         THE PROSPECTIVE JUROR:  I was working in a

8    nonprofit, a couple of organizations in development.

9         THE COURT:  Okay; thank you.

10        Miss Porter.

11        THE PROSPECTIVE JUROR:  My name is Laura Lynn

12   Porter.  I'm from Torrance, California.  I've taught since

13   1965 in various situations.  Right now I'm just subbing.

14        I'm married.  My husband is a retired aerospace

15   engineer from Boeing.  I have a grown daughter who has

16   worked for NASA for the last six years, training astronaut,

17   and in two weeks will be hired by the FBI.

18        I have been on two criminal cases.  We reached

19   verdicts.  One civil case and we reached a verdict.

20        THE COURT:  Okay; thank you.

21        Miss Sears.

22        THE PROSPECTIVE JUROR:  My name is Cynthia P.

23   Sears.  I live in Los Angeles, California.  I work for

24   Douglas Emmett Management and Accounting.  I'm not married.

25   I don't have any grown children, and I've never served on a

1    jury before.

2            THE COURT:  Thank you.

3            Mr. Fuentes.

4            THE PROSPECTIVE JUROR:  My name is Milton Fuentes.

5    I live in Los Angeles, California.  I am an owner of a

6    restaurant for about a year.  I've been doing that all my

7    life, though.

8            I am married.  I have a year-and-a-half daughter

9    and I have served as a juror before and it was criminal and

10   it was guilty.

11           THE COURT:  Jury reached a verdict?

12           THE PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Okay; thank you.

14           Miss Lopez.

15                        (No response.)

16           THE COURT:  Did I miss somebody?  I'm sorry.

17           McAlack.

18           THE PROSPECTIVE JUROR:  My name is Kelly McAlack.

19   I live in Los Angeles.  I work in a bookstore.  I have

20   worked there eight years.  I'm not married.  I don't have

21   children, and I served on a civil case and a criminal case,

22   and they both reached verdicts.

23           THE COURT:  Okay; thank you.

24           Now Miss Lopez.

25           THE PROSPECTIVE JUROR:  My name is Marlene Lopez.

1  I live in Montebello.  I'm a dispatcher, and I've been doing

2  that for 22 years.  I have three grown children.  One is a

3  stay-at-home mom and my sons are -- one is a tattoo artist

4  and one is in retail; and I have served on a jury, civil,

5  and we did reach a verdict.

6         THE COURT:  Okay.  Was the civil case similar in

7  any way to this one?

8         THE PROSPECTIVE JUROR:  No.

9         THE COURT:  All right.  Thank you.

10        Mr. Bogan.

11        THE PROSPECTIVE JUROR:  Hi.  My name is Robert

12  Bogan.  I live in Lancaster, California.  My current

13  occupation, I have worked for Lockheed Martin for about the

14  last ten years.  I am married.  My wife is retired from

15  Kaiser, a secretary.

16        I have two grown children.  One is a graduate and

17  a student -- or next year anyway for journalism; and my son

18  is into computers; and I have never been called to serve on

19  a jury.

20        THE COURT:  Okay; thank you.

21        Mr. Kinsbruner.

22        THE PROSPECTIVE JUROR:  Hi.  My name is Randin

23  Kinsbruner.  I live in Thousand Oaks, California, Ventura

24  County.  Currently I'm employed at Star Caps.  We're the

25  largest manufacturer of baseball hats based out of Asia.

1   I've been there ten years.  I'm an executive; married; two

2   children; ten-year-old boy, seven-year-old girl.  I have

3   never served on a jury before.

4            THE COURT:  Okay; thank you.

5            You get your exercise today, Alicia.

6            Mr. Poulopoulos.

7            THE PROSPECTIVE JUROR:  My name is Kosta

8   Poulopoulos.  I live in the City of Norwalk.  I work for

9   Pepsico for about a month now and I'm a half owner of a

10  hamburger stand.

11           I'm married with a 17-year-old son.  I've served

12  on a criminal and civil jury, and both times we reached a

13  verdict.

14           THE COURT:  Okay.  The civil case similar to this?

15           THE PROSPECTIVE JUROR:  Not even close.

16           THE COURT:  Okay; thank you.

17           Miss Stevens.

18           THE PROSPECTIVE JUROR:  My name is Bethany Marvin

19  Stevens.  I live in the City of Los Angeles.  I am an

20  attorney.  I'm a civil litigator and have been for two

21  years.

22           I'm married and my husband works for a digital

23  media company.  He's in the production of Internet content.

24  I have no children, and I've never been with the jury

25  before.

```
 1              THE COURT:  Thank you.  Are you with a firm or on
 2    your own?
 3              THE PROSPECTIVE JUROR:  I'm with a firm downtown
 4    HellerEhrman.
 5              THE COURT:  Okay.  What kind of cases have you
 6    been handling?
 7              THE PROSPECTIVE JUROR:  Mostly general commercial
 8    litigation, antitrust, intellectual property, that kind of
 9    stuff.
10              THE COURT:  Okay.  Have you ever worked on any
11    employment related cases.
12              THE PROSPECTIVE JUROR:  No.
13              THE COURT:  Okay; thank you.
14              Mr. Price.
15              THE PROSPECTIVE JUROR:  My name is Charles R.
16    Price.
17              THE COURT:  Put the microphone a little closer to
18    your mouth.
19              THE PROSPECTIVE JUROR:  I live in San Pedro.  I'm
20    retired from the construction industry.  Labor.  I'm
21    married.  My wife is a -- I have no grown children.  I have
22    no children.  I served on a jury, a criminal case.  We were
23    able to reach a verdict.
24              THE COURT:  Okay.  All right.  Thank you, sir.
25              Okay.  I'm going to ask some questions now of all
```

1    of you; and what I'd like to have you do is if you have

2    information about what I'm -- the subject matter.  If you

3    have a positive answer to my question, please raise your

4    hand; and I will go around and call on each of you and ask

5    you some follow-up questions.

6              The handicap, of course, is that darn microphone

7    because we just have to keep passing it around.  Do we have

8    a second one now?

9              It's getting fixed.  Okay.  But at least we'll

10   give one to the people in the main box.  It's cumbersome but

11   if you don't use it, then the answers get lost and the

12   lawyers really need the information.

13             And it is an improvement.  We used to have to have

14   microphone with a cord, and I was always worried that we

15   were going to strangle half of our jury box while we passed

16   it around so I think this is definitely an improvement.

17             Okay.  Let me ask first if any of you have ever

18   filed a lawsuit against anybody.

19                      *(No response.)*

20             THE COURT:  I'm not seeing any hands so I assume

21   the answer -- yes.  Mr. Kinsbruner.  Now we have to wait a

22   second.

23                  *(Pause in the proceedings.)*

24             THE COURT:  Yes, tell me about that.

25             THE PROSPECTIVE JUROR:  Real estate investment.

53

1    I'm a builder as well.

2              THE COURT:  Okay.

3              THE PROSPECTIVE JUROR:  And I had just a few

4    builder disputes, things like that.  Nothing major.

5              THE COURT:  Okay.  Did you hire lawyers for those

6    cases?

7              THE PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Were you satisfied with the

9    representation?

10             THE PROSPECTIVE JUROR:  Yes.

11             THE COURT:  Okay.  All right.

12             Anybody else?

13                 *(The prospective jurors responded.)*

14             THE COURT:  Yes.  Mr. -- I'll learn your names

15   eventually.  Nestler.

16             THE PROSPECTIVE JUROR:  Nestler.  I filed two

17   small claims actions.

18             THE COURT:  Okay.  And you just --

19             THE PROSPECTIVE JUROR:  But they settled before it

20   went to court, actually.

21             THE COURT:  Okay.  So nothing left you terribly

22   bitter about the system?

23             THE PROSPECTIVE JUROR:  No.

24             THE COURT:  Okay.  Next to you is Mr. Peterson.

25   Could you just give him the microphone.

```
 1              THE PROSPECTIVE JUROR:  Yes.  I was in a class

 2   action suit against property issue regarding the building of

 3   the 210 Freeway.

 4              THE COURT:  Okay.  Was that resolved to your

 5   satisfaction?

 6              THE PROSPECTIVE JUROR:  Yes, ma'am.

 7              THE COURT:  Okay.  Good.  Anybody else?

 8                        (No response.)

 9              THE COURT:  Okay.  Any of you ever been sued?

10                        (No response.)

11              THE COURT:  I don't see any hands.

12              Okay.  How many of you have ever supervised other

13   employees at work?

14                   (The prospective jurors responded.)

15              THE COURT:  Just about everybody.  Would I be safe

16   in assuming that many of you have had situations where

17   unhappy employees have come to you to complain about

18   coworkers or problems they have or the way they're being

19   treated?  Would you raise your hand if you've had that

20   experience in connection with supervising people?

21                   (The prospective jurors responded.)

22              THE COURT:  Just about all of you have.

23              Have any of you had a situation where you were

24   supervising other employees where you became embroiled in

25   either a grievance claim, a complaint, something that you
```

1    had to resolve through some sort of administrative hearing?

2              Any of you have gone that far with it?

3                *(The prospective jurors responded.)*

4              THE COURT:  I have a couple of hands, three hands.

5    Let me start with Mr. O'Brien.  Tell me what that was about

6    and what happened.

7              THE PROSPECTIVE JUROR:  The case was a sexual

8    harassment, and I had to give an affidavit to the district

9    attorney on behalf of the person.

10             THE COURT:  On behalf --

11             THE PROSPECTIVE JUROR:  On behalf of the person

12   that was harassed.

13             THE COURT:  That was making the complaint?

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Okay.  Were you ever called as a

16   witness?

17             THE PROSPECTIVE JUROR:  Never called as a witness.

18             THE COURT:  Do you know if the complaint was

19   resolved?

20             THE PROSPECTIVE JUROR:  It was resolved.

21             THE COURT:  And were you satisfied with the

22   outcome?

23             THE PROSPECTIVE JUROR:  It was an acceptable

24   outcome as far as I was concerned, I guess.

25             THE COURT:  All right.

1          THE PROSPECTIVE JUROR:  I wasn't involved from

2  pretty much that point on.

3          THE COURT:  Okay.  Miss Gonzalez, did you have

4  your hand up?

5          THE PROSPECTIVE JUROR:  Yes.  At work where I work

6  at, we had an individual that was embezzling money; and I

7  was one of the ones that was called into the office since

8  supposedly there were rumors at the beginning; and five

9  months later it turned out to be true.  The case is still

10  ongoing.  I don't know if I'll be called to be a witness or

11  anything.

12          THE COURT:  But they did ask you for information

13  about a person they suspected?

14          THE PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Did you have any personal encounter

16  with the suspect about this?

17          THE PROSPECTIVE JUROR:  No.  I just worked with

18  him for about two weeks and that was it.

19          THE COURT:  Okay.  Then I think there was another

20  hand.  Mr. Bogan.

21          THE PROSPECTIVE JUROR:  This was false charges

22  were brought on me for insubordination and workplace

23  violence which never occurred.  I had a witness who wrote a

24  statement to that fact, and it was brought to the

25  management.

1             The management disregarded the statement.  It was

2    the captain who initiated the whole thing.  And without

3    doing any investigation, I was written up for a period of

4    two years as the main contributor which was not the case.

5             The captain had no charges brought against him

6    whatsoever, and the management seemed to -- he made a

7    statement that I will back up my captains and that, to me,

8    says whatever; they had a free rein to do as they pleased

9    and it was never resolved.

10            I had to carry that written burden for two years

11   under the threat of being terminated if any additional thing

12   was to happen.

13            THE COURT:  Where were you working at the time?

14            THE PROSPECTIVE JUROR:  Lockheed Martin.  I'm

15   still there.

16            THE COURT:  So it never got resolved?

17            THE PROSPECTIVE JUROR:  It never got resolved.  It

18   was as if the written statement of another employee was

19   disregarded completely stating that the captain initiated

20   the whole thing.  He was in my face.  He was yelling and

21   screaming.  He was out of control.  Made me out as the

22   person who was out of control and that was not the case so

23   it was never resolved.

24            THE COURT:  Okay.  Have there been any

25   repercussions other than you felt a threat during the period

1   of time this was hanging over your head; did anything

2   further happen to you?

3             THE PROSPECTIVE JUROR:  No.  Because I backed way

4   off.  I just kind of stayed out of everyone's way, did my

5   job and just went home; and I had to really watch my Ps and

6   Qs even though -- I was marked.  I felt marked.

7             THE COURT:  How many years ago did this happen?

8             THE PROSPECTIVE JUROR:  This happened about a year

9   and a half ago.

10            THE COURT:  Okay.  So it's pretty recent?

11            THE PROSPECTIVE JUROR:  Pretty recent.

12            THE COURT:  How do you feel about sitting on this

13  case?

14            THE PROSPECTIVE JUROR:  I'm not sure.  The

15  company, it's individual with the company as far as I'm

16  concerned.  The management just doesn't -- they kind of run

17  in a clique; and I'm -- and I don't feel comfortable with

18  that.

19            You can bring to their attention that we have a

20  problem that can be fixed and it never -- you know, they

21  say:  Yeah, we'll take care of it but it never gets taken

22  care of.  I mean, you can put it in writing and whatsoever,

23  it never gets taken care of.

24            THE COURT:  It's got to be very frustrating.

25            THE PROSPECTIVE JUROR:  Yes, it is.

```
 1            THE COURT:  Do you think you can set aside that
 2   experience and listen to the evidence in this case and make
 3   an objective decision?
 4            THE PROSPECTIVE JUROR:  I'd try to be fair at most
 5   things.  Just fair which makes me impartial.  I'm not
 6   guaranteed that I can do that, but I try to be fair with
 7   just about everything so possibly, yes.
 8            THE COURT:  Okay.  Thank you, sir.
 9            Mr. Kinsbruner, did you have your hand up?
10            THE PROSPECTIVE JUROR:  I had a young lady that
11   worked for me for over ten years and she was accused of
12   child abuse by her school.  So I went as a supportive
13   executive of the company to sit and listen to it, and they
14   found them not guilty which was wonderful.  So that's my
15   experience with an employee.
16            THE COURT:  Okay.  I'm sure she was very
17   appreciative that you were there for her.
18            THE PROSPECTIVE JUROR:  Oh, yeah.
19            THE COURT:  Anyone else have similar experiences?
20   Yes, Mr. Whitacre.
21            THE PROSPECTIVE JUROR:  Yes.  I have never been
22   accused of anything, but my job requires me several times a
23   year to be called in for depos and also witnesses for
24   various calls.  So I'll just let you know I'm in the system.
25            THE COURT:  What types of things?
```

1              THE PROSPECTIVE JUROR:  Depos.  People use me as a

2    witness for civil litigation or the last one was a witness

3    for a drunk driving case.

4              THE COURT:  For a coworker?

5              THE PROSPECTIVE JUROR:  No.  Just --

6              THE COURT:  I'm sorry.  I forgot.  I was trying to

7    remember.

8              THE PROSPECTIVE JUROR:  I was trying to let you

9    know I've been in the system but nothing against me.

10             THE COURT:  Sure, right.  Okay; thank you.

11             THE PROSPECTIVE JUROR:  All right.

12             THE COURT:  Anybody else?

13                         *(No response.)*

14             THE COURT:  Do any of you, other than what might

15   have come up in what we just talked about, feel you've been

16   the subject of any kind of discrimination in the workplace?

17                         *(No response.)*

18             THE COURT:  Any of you ever file a claim or

19   grievance based on discrimination, retaliatory, harassment,

20   anything like that?

21                         *(No response.)*

22             THE COURT:  Okay.  I want to talk to you briefly

23   about the burden of proof in this case.  Some of you have

24   been on juries.  Most of you who have been on criminal

25   juries and so it's important to understand that we have a

1    very different burden of proof in a civil case.

2            In a criminal case, the burden of proof is the

3    very highest burden of proof that we have in the country.

4    It's proof beyond a reasonable doubt because the

5    Constitution so jealously guards and protects the right of

6    an accused not to be deprived of his freedom or her freedom

7    unless the proof is of the very highest level.

8            In a criminal case, the burden is on the

9    government; no burden on the defendant.  The defendant

10   doesn't have to testify, doesn't have to call any witnesses,

11   can be found not guilty simply because the government did

12   not meet that very high standard of proof.

13           But in a civil case, the burden is much more

14   evenly distributed.  It's called proof by a preponderance of

15   the evidence; and each side is obligated to bring in

16   evidence, to present evidence to you and to try to persuade

17   you that that side should win.

18           So what we try to imagine the evidence on a scale

19   and if it tips only slightly in favor of the plaintiff, the

20   plaintiff prevails.  If it tips slightly in favor of the

21   defendant, the defendant prevails.

22           But the burden is not this heavy burden on a

23   plaintiff that we have in a criminal case; and at the end,

24   you'll be asked to evaluate all of the evidence, all of the

25   testimony of the witnesses, the arguments, apply the law,

1   and decide which has persuaded you that that side is more

2   likely than not to be entitled to prevail.

3         Is there anyone who would have difficulty in

4   applying that standard or following those instructions?

5                    *(No response.)*

6         THE COURT:  I'm going to tell you at the end of

7   the case that you must follow the law as I give it to you

8   whether you agree with it or not.

9         I'll be giving you instructions on the law that

10  applies to this set of facts.  The jury room is not the

11  place to decide the law is incorrect and should be changed.

12        If you disagree with it, you're certainly welcome

13  to write to your congressman and say something ought to be

14  different.  But you must follow the law.

15        This came up just last week in a case that was

16  being tried upstairs one flight up from here, the Pellicano

17  case.  The jury began to deliberate.

18        They had made a promise to follow the law and said

19  all the things that jurors will say and, in the jury room,

20  one of the jurors said:  Well, you know, I don't think

21  wiretapping should be illegal.  After all, if the police can

22  wiretap, everybody should be allowed to wiretap so it

23  shouldn't be against the law.  This isn't a crime.

24        Well, the judge had just instructed him that, yes,

25  wiretapping is a crime and so he just immediately decided

63

```
1    that he didn't like that law and wasn't about to follow it.

2            Fortunately, the other jurors were able to tell

3    the judge who excused him from the jury and they had

4    alternates and they were able to continue with deliberations

5    with twelve people who followed the law as they had agreed

6    to.

7            But it's very important that -- probably the law

8    in the area in this case is not as dramatic as a question of

9    wiretapping.  But nonetheless, do you all agree that you

10   will follow the law as I instruct you and not decide which

11   parts you like and which parts you don't?

12                          (No response.)

13           THE COURT:  I see people nodding their heads.

14   Okay.  Mr. Nestler, I know that attorneys are going to want

15   to ask you some more questions because you have already

16   indicated that you might have trouble being fair in this

17   case.

18           THE PROSPECTIVE JUROR:  I'm just not sure.

19           THE COURT:  Yes.  And they'll ask you some more

20   questions about that but I want to ask because I never think

21   of all the things that might be relevant in a case like

22   this.

23           Is there any of you for any reason feel that you

24   should not sit on this jury if you were chosen; that you

25   could not be openminded and objective and fair to both
```

```
 1   sides.  This would be the time to tell me.  Yes.
 2              (The prospective jurors responded.)
 3              THE COURT:  Miss Stevens.
 4              THE PROSPECTIVE JUROR:  I do think I could be fair
 5   and impartial and unbiased.  I just wanted to raise that I
 6   have five siblings and my older brother is a policeman, a
 7   detective.
 8              THE COURT:  Thank you.  I meant to ask that
 9   question and I forgot to do it.
10              THE PROSPECTIVE JUROR:  We're very close and we
11   talk about his work, investigations, very frequently.
12              THE COURT:  Okay.  Let me ask then.
13              One of the things that -- the instructions that I
14   gave that you probably know as a lawyer is that you're not
15   allowed to discuss anything about the case while the trial
16   is being conducted.  Would you be able to follow that
17   instruction and resist the temptation to discuss it with
18   your brother during the trial.
19              THE PROSPECTIVE JUROR:  I can.  And, also, he's
20   not in L.A. or California.
21              THE COURT:  Okay.  So the impression I got from
22   what you just said is that you feel you could be fair to
23   both sides in spite of your relationship?  Would I be
24   correct about that?
25              THE PROSPECTIVE JUROR:  I think so but I -- I do
```

1   have that kind of innate pro-cop thing going.

2           THE COURT:  In this case, it really cuts both

3   ways.  We have police officers plaintiffs and police

4   officers defendants so it's not as powerful as it is where

5   officers are only on one side.

6           THE PROSPECTIVE JUROR:  Absolutely.  I just wanted

7   to you let you.

8           THE COURT:  Thank you.  But I did mean to inquire

9   about that even though it's on both sides.  Are there any of

10  you who have close friends or family members who are in law

11  enforcement?

12          *(The prospective jurors responded.)*

13          THE COURT:  Anybody else?

14          *(The prospective jurors responded.)*

15          THE COURT:  Let me just start with Mr. Biby.

16          THE PROSPECTIVE JUROR:  My brother-in-law is a

17  L.A. County sheriff.

18          THE COURT:  Okay.  Do you feel that that would

19  influence the outcome in this case if you were on a jury?

20          THE PROSPECTIVE JUROR:  No, no.

21          THE COURT:  Okay; thank you.

22          Who else in the front row?  I saw another hand.

23  Yes, Miss Gonzalez.

24          THE PROSPECTIVE JUROR:  One of my close friends of

25  the family, he runs the Carson sheriff's station and I have

1    another one that works out of the Rampart Division.

2              THE COURT:  Did you feel you could give both sides

3    a fair trial despite those friendships?

4              THE PROSPECTIVE JUROR:  I think so.

5              THE COURT:  Okay.  And in the back row, did I see

6    some hands?  Miss Sears.

7              THE PROSPECTIVE JUROR:  My brother works for LAPD

8    and my sister-in-law is a sheriff.

9              THE COURT:  Okay.  First, I'll ask you.  Would you

10   be able to follow the instruction that you not talk about

11   the case with them until the case is over?

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  And do you feel you could give both

14   sides a fair trial?

15             THE PROSPECTIVE JUROR:  Yes.

16             THE COURT:  All right.  Somebody else in the back

17   row?

18             THE PROSPECTIVE JUROR:  My father used to be in

19   law enforcement.

20             THE COURT:  Where did he work?

21             THE PROSPECTIVE JUROR:  In El Salvador.

22             THE COURT:  Do you feel that you can be fair to

23   both sides in this case?

24             THE PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Okay; thank you.

1          Miss Lopez.

2          THE PROSPECTIVE JUROR:  My father worked for

3     Orange County Sheriff's Department and he is deceased right

4     now.

5          THE COURT:  Okay.  And what's your sense of

6     sitting on this trial?  Are you comfortable about that?

7          THE PROSPECTIVE JUROR:  Uh-huh, yes, I am.

8          THE COURT:  Okay.  Anybody else?

9                         *(No response.)*

10         THE COURT:  And over here, anybody that we haven't

11    talked to?

12                        *(No response.)*

13         THE COURT:  Okay.  All right.

14         And I started to ask if there were any reasons

15    that any of you could not be fair and impartial or for any

16    reason could not sit as jurors if you're chosen.  Anybody

17    else have a positive answer to that?

18                        *(No response.)*

19         THE PROSPECTIVE JUROR:  This applies to anyone?

20         THE COURT:  If for any reason you think you would

21    have trouble being fair to both sides, then you should tell

22    me, yes.

23         THE PROSPECTIVE JUROR:  I'd like a side bar.

24            *(The following was held at the bench:)*

25         THE COURT:  Mr. Price, this is a microphone for

1    the court reporter.

2              THE PROSPECTIVE JUROR:  Yes.  My house was broken

3    into and we're only gone for about an hour and almost walked

4    in on them.  I don't know what could have happened then.

5              THE COURT:  You must have been very frightened.

6              THE PROSPECTIVE JUROR:  As far as I know, the guys

7    are still out there; and I have a problem with that, uh-huh.

8              THE COURT:  Do you think that that would affect

9    the decision you might make in this case?

10             THE PROSPECTIVE JUROR:  Yeah, I'm afraid it might.

11             THE COURT:  How would it influence you?

12             THE PROSPECTIVE JUROR:  Pardon?

13             THE COURT:  How would it affect your decision?

14             THE PROSPECTIVE JUROR:  Well, I have the problem

15   with anything involved with crime now because I never had no

16   justice in mine, and I just got a bad attitude about it.

17             THE COURT:  So you think you would have trouble

18   being fair to both sides and keeping an open mind?

19             THE PROSPECTIVE JUROR:  Yes, I think maybe I

20   would.

21             THE COURT:  Okay.  Counsel have any questions?

22             MR. AGUILERA:  We don't have anything.

23             MS. RUGGIERO:  No, no.

24             THE PROSPECTIVE JUROR:  Your Honor, thank you.

25             THE COURT:  Okay.

```
 1      (The following was in the prospective jurors' presence:)

 2              THE COURT:  All right.  Questions on behalf of the

 3      plaintiff?  Sorry.  You're just sitting down and I'm going

 4      to have you stand up again.

 5              MS. RUGGIERO:  Thank you, Your Honor.

 6                      (Pause in the proceedings.)

 7              MS. RUGGIERO:  Thank you.  Good morning again.

 8              I have a few specific questions because, a

 9      follow-up from Judge Cooper.  Miss Lopez --

10              THE PROSPECTIVE JUROR:  Yes.

11              MS. RUGGIERO:  -- you mentioned that you are a

12      dispatcher.

13              THE PROSPECTIVE JUROR:  For a moving company.

14              MS. RUGGIERO:  Okay.  I wasn't sure.  And that was

15      for 22 years?

16              THE PROSPECTIVE JUROR:  Yes.

17              MS. RUGGIERO:  And do you like your job?

18              THE PROSPECTIVE JUROR:  I love my job.

19              MS. RUGGIERO:  And, Mr. Kinsbruner, what exactly

20      do you do for the baseball hat company?

21              THE PROSPECTIVE JUROR:  I'm the executive vice

22      president of a company that has nine thousand employees

23      worldwide.  Company is based in Hong Kong and I'm in charge

24      of everyday operations from accounting to design

25      development, shipping, distribution, sales, and pretty much
```

1    all the day-to-day operations of the company.

2            MS. RUGGIERO:  And, Mr. Biby, what funeral home do

3    you work for?

4            THE PROSPECTIVE JUROR:  I don't.  I oversee the

5    San Fernando-L.A.-Ventura County area.  I have a large

6    territory.  I have about 42 homes and cemeteries that I

7    oversee.

8            MS. RUGGIERO:  And do you directly supervise

9    employees in your position.

10           THE PROSPECTIVE JUROR:  I have 35 managers that

11   report to me, and then there's about 350 employees below

12   them.

13           MS. RUGGIERO:  Thank you.

14           Some people think that money for emotional pain

15   and emotional injury and suffering should be given to

16   plaintiffs and victims, and other people think that money

17   should never be given for emotional pain and suffering.

18           Miss Stender, how do you feel about that?  What do

19   you think?

20           THE PROSPECTIVE JUROR:  I believe money should be

21   given.

22           MS. RUGGIERO:  And why do you say that?

23           THE PROSPECTIVE JUROR:  I think there is a cost.

24   I think there's a cost for pain and suffering.  It's a very

25   real issue.

1          MS. RUGGIERO:  Do you believe that someone needs

2     to have physical injury in order to have emotional pain?

3          THE PROSPECTIVE JUROR:  No.

4          MS. RUGGIERO:  And how do you feel about that,

5     Miss Porter?  I'll go across so it's easier on the

6     microphone passing.

7          THE PROSPECTIVE JUROR:  I think there should be

8     compensation within reason.

9          MS. RUGGIERO:  And how would you determine what

10     reason is?

11          THE PROSPECTIVE JUROR:  I really can't.  I just

12     think some sums are outrageous.  If there is a loss of a

13     job, a divorce, a separation of family, I think that some

14     compensation is reasonable.

15          MS. RUGGIERO:  Okay.  And do you think disruption

16     of a marriage would cause emotional distress?

17          THE PROSPECTIVE JUROR:  Absolutely.

18          MS. RUGGIERO:  And how did you feel about money

19     being asked for emotional distress and pain and suffering,

20     Miss Sears?

21          THE PROSPECTIVE JUROR:  I agree with her.  I

22     believe that compensation is -- I mean, if it's within

23     reason, that it should be given depending on the situation.

24          MS. RUGGIERO:  Do you believe that there have been

25     or have you heard of verdicts where you feel the amount of

1    money awarded by the jury was just outrageous?

2              THE PROSPECTIVE JUROR:  Yes.

3              MS. RUGGIERO:  And what made you think that?

4              THE PROSPECTIVE JUROR:  Just the situation and how

5    it -- just to me it didn't make sense so -- I mean, but I

6    wasn't there so I can't really call it.

7              MS. RUGGIERO:  Okay.  So you would listen to the

8    evidence and determine what you believe is fair during this

9    trial?

10             THE PROSPECTIVE JUROR:  Yes.

11             MS. RUGGIERO:  Thank you.

12             And how do you feel about that, Mr. Fuentes?  My

13   clients asking for money for their emotional pain and

14   suffering?

15             THE PROSPECTIVE JUROR:  I think it's justified.

16   It all depends on the circumstances.  I understand, you

17   know, certain loss is -- emotionally can lead to other

18   losses and certain lives and lifestyles.

19             MS. RUGGIERO:  And do you understand that as

20   plaintiffs in a civil case, the plaintiffs here, my clients,

21   can't ask you to do anything other than provide them with

22   money?  For instance, they can't ask you to turn back the

23   clock.

24             THE PROSPECTIVE JUROR:  Yes, of course.

25             MS. RUGGIERO:  Thank you very much.

1           And what about you, Miss McAlack?  How do you feel

2     about our asking for money for emotional pain and suffering?

3           THE PROSPECTIVE JUROR:  I think people should be

4     compensated for emotional pain and suffering.  I think it's

5     something that's really hard to put a price on but --

6           MS. RUGGIERO:  And you understand that my clients

7     will have a hard time putting a price on that?

8           THE PROSPECTIVE JUROR:  Of course.

9           MS. RUGGIERO:  Okay.  And what about you,

10    Miss Lopez.  What do you think about my clients asking you,

11    the jury, for money, monetary compensation for their

12    emotional pain and suffering?

13          THE PROSPECTIVE JUROR:  I think by listening to

14    the evidence we'll be able to decide whether an amount -- I

15    mean, no amount will change the loss of a job or her

16    marriage or whatever.

17          But I think by listening to what we have to and by

18    putting all the facts together, we'll be able to decide

19    whether or not that money is going to change.

20          MS. RUGGIERO:  So if my clients prove by a

21    preponderance of the evidence that they were damaged and

22    that they've proved the elements of their claims, you would

23    feel comfortable awarding money for the emotional distress?

24          THE PROSPECTIVE JUROR:  Yes, I would.

25          MS. RUGGIERO:  Thank you.  And Mr. Bogan.

```
 1          THE PROSPECTIVE JUROR:  For a couple of reasons, I
 2     think monetary settlement should be initiated to help them
 3     get back on their feet if they lost time from work for
 4     emotional distress and what have you.
 5          Secondly, if by preponderance of the evidence they
 6     are chosen to be the ones that have been wronged, then the
 7     party doing the wrong -- a lot of times when money is
 8     awarded and the other parties having to pay out, it causes
 9     them to take a hard look at why, where did we go wrong,
10     what's wrong with our system that causes us to lose a case
11     where these people have been wronged and damaged.  Because
12     if the cause is not fixed, it will continue.  You will be
13     back at square one with some new case.
14          MS. RUGGIERO:  Do you believe that the plaintiffs
15     would have to show they actually lost time from work in
16     order to be compensated for their emotional distress?
17          THE PROSPECTIVE JUROR:  No.  I suffered some type
18     of distress.  I didn't lose anything monetarily.  I didn't
19     go after anything monetarily.  But I understand what
20     emotional stress can do physically.  In a case where it's
21     law enforcement, it's probably going to be two-fold.  I
22     just -- if you're wronged, you're wronged.  You have to pay
23     and leave the other party having to fix the problem or
24     repeat it.
25          MS. RUGGIERO:  Thank you, Mr. Bogan.
```

 1            And, Mr. Kinsbruner, am I pronouncing that

 2   correctly?

 3            THE PROSPECTIVE JUROR:  Kinsbruner.

 4            MS. RUGGIERO:  Kinsbruner.  What do you think

 5   about the Gavins, the plaintiffs, asking for money for their

 6   emotional pain and suffering?

 7            THE PROSPECTIVE JUROR:  Well, I think they're

 8   entitled to their case that you guys are presenting today.

 9   I feel that once the evidence has been put on the table and

10   we hear all the evidence from both sides, we can then make a

11   best decision as to if we feel that it's justified in

12   regards to awarding some type of judgment.

13            At this point, I'd like to hear the evidence from

14   both sides.  We heard the initial evidence or opening

15   statements; and from there, we'll go from there.

16            MS. RUGGIERO:  Okay.  Thank you.

17            Mr. Whitacre.

18            THE PROSPECTIVE JUROR:  Yes.

19            MS. RUGGIERO:  What do you think about awarding

20   emotional distress monetary damages if the plaintiffs prove

21   by a preponderance of the evidence that they have been

22   damaged in that way?

23            THE PROSPECTIVE JUROR:  Well, materialistically I

24   think it's probably the only replacement that you could

25   give; and I think it makes both parties think about what's

1   happening; and if they feel -- if it's justified and it's

2   reasonable, I'm behind it.

3          MS. RUGGIERO:  Thank you.

4          And Mr. Biby.

5          THE PROSPECTIVE JUROR:  Yes.

6          MS. RUGGIERO:  What do you think about what we've

7   been discussing?

8          THE PROSPECTIVE JUROR:  I have no problem with it

9   at all.  As long as the evidence shows it, that's the only

10  way to award someone.  It's fine.

11         MS. RUGGIERO:  And do you believe that someone can

12  have great emotional distress without necessarily being

13  physically injured?

14         THE PROSPECTIVE JUROR:  Yes.

15         MS. RUGGIERO:  And do you believe that it's

16  possible for someone to become very depressed from a

17  workplace problem?

18         THE PROSPECTIVE JUROR:  Uh-huh, I do.

19         MS. RUGGIERO:  Thank you.

20         And Mr. Nestler.

21         THE PROSPECTIVE JUROR:  Yes.

22         MS. RUGGIERO:  How do you feel about what we've

23  been discussing here?

24         THE PROSPECTIVE JUROR:  I'm in favor of it if it's

25  justified under the evidence and within some reasonable,

1   quote/unquote, limit.

2          MS. RUGGIERO:  And do you have a preconceived

3   notion of what that limit would be?

4          THE PROSPECTIVE JUROR:  Not really.  Not really.

5   It's more a gut feel.

6          MS. RUGGIERO:  Okay.  Thank you.

7          And, Mr. Peterson, how do you feel about what

8   we've been discussing in terms of the plaintiffs asking for

9   monetary damages for their emotional pain and suffering?

10          THE PROSPECTIVE JUROR:  I think that's acceptable.

11   We have to hear the case first; and I don't -- I see a limit

12   on it.  But there again, you have to hear the case and judge

13   it from that point.

14          MS. RUGGIERO:  You don't have any preconceived

15   ideas of what that limit would be?

16          THE PROSPECTIVE JUROR:  No, ma'am.

17          MS. RUGGIERO:  You would be fair in listening to

18   the evidence and determining what the damage was to the

19   Gavins?

20          THE PROSPECTIVE JUROR:  Yes, ma'am.

21          MS. RUGGIERO:  Thank you.

22          Miss Martinez -- Gonzalez.  I'm sorry.  Do you go

23   by Martinez-Gonzalez?

24          THE PROSPECTIVE JUROR:  I go by Gonzalez.

25          MS. RUGGIERO:  Okay.  What do you think about what

1    we've been discussing in terms of if the plaintiffs prove by

2    a preponderance of the evidence that they have been damaged

3    and the law provides them damages for their injuries, do you

4    think that you would be able to award money for their

5    emotional distress?

6              THE PROSPECTIVE JUROR:  Yes.

7              MS. RUGGIERO:  Do you believe that or do you have

8    any kind of preconceived notions of what a limit would be in

9    terms of monetary damages?

10             THE PROSPECTIVE JUROR:  No, I can't set a limit.

11   It really all depends on how the individual has taken

12   everything; and if the evidence shows that it all happened,

13   you know, accordingly to the way they're saying it is, I

14   would say as long, you know, as there's enough evidence

15   there and, you know, everybody is being honest and

16   forthright with all their information.

17             MS. RUGGIERO:  And do you think that it's possible

18   to become very depressed because of workplace problems?

19             THE PROSPECTIVE JUROR:  Yes, I do.

20             MS. RUGGIERO:  You hesitated a little bit.  Do you

21   think it's possible that someone would be able to -- or do

22   you think it's possible that a plaintiff would not be able

23   to work anymore because of depression?

24             THE PROSPECTIVE JUROR:  Well, it all depends on

25   the circumstances.  I mean, there's -- there's some cases

1   that, yeah, you know, they -- the individual makes more out

2   of the whole situation than it really is; and there are some

3   people that just say, you know, forget it.  I'm not even

4   going to go through it; and they'll just claim like, you

5   know, something is really bothering me.

6           MS. RUGGIERO:  And do you think if somebody says

7   they're not able to work because of depression that they may

8   be falsely claiming that?

9           THE PROSPECTIVE JUROR:  I would say some, yes.

10          MS. RUGGIERO:  But not everybody?

11          THE PROSPECTIVE JUROR:  But not everybody.

12          MS. RUGGIERO:  Okay; thank you.

13          Mr. O'Brien, what do you think about what we've

14   been discussing?

15          THE PROSPECTIVE JUROR:  I believe there is a lot

16   of frivolous lawsuits in general.  Essentially, if damages

17   should be awarded, they should definitely be proven to be

18   award accordingly.

19          Is there limits?  Maybe not.  Depending on the

20   situation.  If somebody dies or things like that, they're

21   obviously -- it's more -- the more damages would be awarded

22   to something that was maybe over an extended period of time,

23   things like that.

24          MS. RUGGIERO:  Would you be able to listen to the

25   evidence in this case and be fair and impartial and

1    listening to the plaintiffs testify about their pain and

2    suffering?

3              THE PROSPECTIVE JUROR:  Oh, absolutely.

4              MS. RUGGIERO:  Thank you.

5              THE COURT:  I'm going to interrupt.  It's ten

6    minutes to 11:00.  So we're going to take a fifteen-minute

7    break.  You have five more minutes after we get back, but we

8    need to take a recess.  Fifteen minutes.

9              You're on the 7th floor.  Come back to this

10   courtroom.  Remember where you're sitting and sit in the

11   same seat when you come back, please.

12             THE CLERK:  All rise.

13                    (Recess.)

14             THE COURT:  The jurors are again in their seats,

15   and you may continue with questioning.

16             MS. RUGGIERO:  Thank you, Your Honor.

17             Mr. Poulopoulos, good morning.

18             THE PROSPECTIVE JUROR:  Good morning.

19             MS. RUGGIERO:  We were talking about the fact that

20   the plaintiffs will be asking for money damages for their

21   emotional pain and suffering.  What do you think about the

22   fact that plaintiffs can only ask for money for their

23   emotional distress and damages?

24             THE PROSPECTIVE JUROR:  I think they should be

25   compensated in some way, but I would like to hear all the

1    evidence to make sure --

2              THE COURT:  I don't think we have a microphone

3    back there, do we?  I can't hear you.  Sorry.

4                    *(Pause in the proceedings.)*

5              THE PROSPECTIVE JUROR:  Thank you.

6              As I was saying, everybody needs to be

7    compensated, and I'd like to hear the evidence and, you

8    know, make my determination, make sure they didn't bring a

9    lot of the pain and suffering on themselves; and I think the

10   evidence would clarify that for me.

11             MS. RUGGIERO:  And when you say make sure they

12   didn't bring it on themselves, what would make you think

13   that they would do that?

14             THE PROSPECTIVE JUROR:  I think some people,

15   instead of letting things go, they keep it inside by holding

16   it inside, not talking with somebody and not seeking advice

17   from other people.

18             MS. RUGGIERO:  Okay; thank you.

19             THE PROSPECTIVE JUROR:  Thank you.

20             MS. RUGGIERO:  Miss Stevens, first of all, what do

21   you think about asking for monetary damages for emotional

22   distress?

23             THE PROSPECTIVE JUROR:  I think that that's what

24   the law provides for; and as long as the case is proven, I

25   would have no problem adhering to that.

```
 1              MS. RUGGIERO:  And I know that you're a civil

 2    litigator, how long have you been practicing?

 3              THE PROSPECTIVE JUROR:  Only two years.

 4              MS. RUGGIERO:  And you work at HellerEhrman?  It's

 5    a large firm?

 6              THE PROSPECTIVE JUROR:  Yes.

 7              MS. RUGGIERO:  And, specifically, what do you

 8    normally work for?  The defense, for the plaintiff, or both?

 9              THE PROSPECTIVE JUROR:  Our firm is largely

10    defense side work; but in my limited experience, I've had

11    cases representing both sides.

12              MS. RUGGIERO:  And do you believe that you can be

13    fair and impartial in sitting on this jury?

14              THE PROSPECTIVE JUROR:  Yes, ma'am.

15              MS. RUGGIERO:  Thank you.

16              And, Mr. Price, what do you think about what we've

17    been discussing in terms of asking for monetary damages for

18    emotional distress?

19              THE PROSPECTIVE JUROR:  Well, I think it's okay if

20    it's warranted, you know, and if it's a reasonable amount.

21              MS. RUGGIERO:  Do you have a preconceived idea of

22    what reasonable is?

23              THE PROSPECTIVE JUROR:  Well, I mean, there have

24    been claims where ungodly sums have been awarded in cases

25    where I don't think it was warranted.
```

83

1            MS. RUGGIERO:  But in this case you would listen

2   to the evidence to determine what is warranted if anything?

3            THE PROSPECTIVE JUROR:  As far as I could.

4            MS. RUGGIERO:  Okay.  Thank you.

5            I have nothing further, Your Honor.  Thank you.

6            THE COURT:  Questions for the defense?

7            MR. AGUILERA:  Thank you, Your Honor.

8            Let me start with you Mr. Bogan.  How long have

9   you been with Lockheed Martin?

10           THE PROSPECTIVE JUROR:  I started with them in --

11  am I coming through?

12           THE COURT:  No, it's not on.

13           THE PROSPECTIVE JUROR:  I don't see the light.  Is

14  there a light?

15                  (Pause in the proceedings.)

16           THE PROSPECTIVE JUROR:  I started with them in

17  1979 as a builder.  I was working as a structure mechanic.

18           MR. AGUILERA:  Would you consider yourself part of

19  the management team at Lockheed Martin today?

20           THE PROSPECTIVE JUROR:  No, I would not at all.

21           MR. AGUILERA:  I'm sorry.  Go ahead, sir.

22           THE PROSPECTIVE JUROR:  There are people who come

23  in with maybe a couple of months experience that have moved

24  above me without clearances, without DOD clearances.  It's

25  just a place that's filled with issues.  It has nothing to

1   do with anyone else.  It's just my individual insights as to

2   what I've been seeing since I've been with the company.

3          I believe I'm impartial.  I believe in fairness

4   regardless of what side.  If it's fair, I'm okay with it.

5          And what I see there is not fair but that's a

6   corporate thing.  It has nothing to do with this individual

7   case.  I do think I could be impartial; but I see a lot of

8   that and I just kind of overlook it and try to work toward

9   my retirement.  I don't know if I'll be able to change it or

10  anybody will, but I won't be a part of it anymore.

11         MR. AGUILERA:  Mr. Bogan, I represent, along with

12  my colleague Ms. Orellana, the Los Angeles Police

13  Department, a large government entity.  Many people liken it

14  to a corporation.  Does it bother you at all that I

15  represent management as opposed to the individual employees?

16         THE PROSPECTIVE JUROR:  No.  I work with a lot of

17  management to ensure that they get the job done; that they

18  get the function they need to get it done.  Security works a

19  lot with our management.

20         There are good management.  There are people who

21  can manage people, and there are those who don't have a

22  clue.  There are those who don't have people skills.  That's

23  not a crime; but I believe that if you're in management, you

24  have should have people skills.

25         You should generally like people to get the most

1  out of them.  I don't have a problem.  It's not a corporate

2  thing, but it's just individuals that need to be weeded out.

3      MR. AGUILERA:  Let me ask you this; and,

4  certainly, all we can ask of anybody that comes here to

5  serve is that they be fair but let me ask you this little

6  different question.

7      Much of the evidence that you will hear in this

8  trial, just like you might hear in any other trial where

9  there is an employee suing a employer concerns procedures

10  and policies; and those procedures and policies might be a

11  little different than what you have become accustomed to in

12  your workplace.

13      Do you think you would have any problem listening

14  to the way the LAPD does things and not superimpose on that

15  the way things are done at Lockheed Martin?

16      THE PROSPECTIVE JUROR:  Yeah.  I believe I could

17  be impartial.  I don't judge anybody outside of Lockheed

18  Martin.  I kind of leave it there.  It's like bringing your

19  work home with you.  If I bring it here, then I can't be

20  fair.  I have to leave it where it lies.

21      The LAPD is a whole different thing.  I'd have to

22  hear the evidence and the evidence would have to lean, like

23  Your Honor said, one way or the other.  It would have to be

24  60-40.  It couldn't be 49-51.  That's too close.  It has to

25  lean more one way, more left than right.

1          MR. AGUILERA:  Okay.  Let me ask a different

2   question to everybody who is sitting in the box and behind

3   me and excuse my back.

4          You have heard me ask Mr. Bogan the question about

5   superimposing or bringing with you to this trial procedures

6   that either your company uses or that you've learned along

7   the way at some company that you used to work for, can I see

8   by a show of hands if anybody cannot set that aside and

9   listen to the evidence about how the LAPD does things?

10                   *(No response.)*

11          MR. AGUILERA:  And no one has raised their hand.

12   Thank you.

13          Mr. Bogan, when we made the introductions at the

14   beginning of today, you can see that only Jeri Weinstein,

15   one of the individual defendants, is present.  There are

16   many individual defendants that I represent.

17          Does it bother you at all that the other

18   individuals -- there are some seven or eight more of them --

19   are not here today, are not here this morning to participate

20   in this part of the trial?

21          THE PROSPECTIVE JUROR:  No.  I don't know why

22   were, what their causes are.  They may have reasons that

23   they can't attend.

24          MR. AGUILERA:  Would you hold it against them that

25   they are not here?

```
 1              THE PROSPECTIVE JUROR:  No, I wouldn't, not at
 2    all.
 3              MR. AGUILERA:  And, again, let me see by a show of
 4    hands, let me ask those in the jury box and behind me, is
 5    anybody bothered by the fact that all of the defendants are
 6    not present here this morning?
 7                        (No response.)
 8              MR. AGUILERA:  No one is raising their hand.
 9    Thank you.
10              Let me ask Mr. Nestler, if you could pass the
11    microphone to him, Mr. Bogan.
12                   (Pause in the proceedings.)
13              MR. AGUILERA:  Mr. Nestler, how long have you
14    volunteered at West Valley station?
15              THE PROSPECTIVE JUROR:  Approximately eight years.
16              MR. AGUILERA:  And in your volunteer work there,
17    what do you do?
18              THE PROSPECTIVE JUROR:  Somewhat menial.  I answer
19    the phones.  Incoming messages for the detectives.  I route
20    some mail.  I do some computer input of DRs and so forth;
21    and that's about it.  I'm there about four hours a week
22    only.
23              MR. AGUILERA:  And is there anything that bothers
24    you about the fact that this is a lawsuit brought by an
25    officer in the Los Angeles Police Department against other
```

```
 1    people in the Los Angeles Police Department that are also

 2    officers and the city itself?

 3              THE PROSPECTIVE JUROR:  I'm not sure.

 4              MR. AGUILERA:  And why are you not sure, sir?

 5              THE PROSPECTIVE JUROR:  Well, I've been exposed to

 6    all these detectives for the past eight years.  Not that I

 7    -- it doesn't mean they're infallible all the time.  But

 8    nevertheless, I've been exposed to them and I'm just not

 9    sure I'd be fair and impartial.

10              MR. AGUILERA:  Okay.  Do you believe, because

11    there is very limited information right now at this stage of

12    the trial, do you believe that you would give one side more

13    credence, more believability than the other?

14              THE PROSPECTIVE JUROR:  I have to answer that by

15    saying I'm not sure.

16              MR. AGUILERA:  Okay.  Have you ever had any

17    discussions with any of the management team, either the

18    captains or the lieutenants or even a commander or a deputy

19    chief in your volunteer work?

20              THE PROSPECTIVE JUROR:  Just general discussion?

21              MR. AGUILERA:  Sure.

22              THE PROSPECTIVE JUROR:  Yes.  With the lieutenant

23    in charge of the detectives where I'm at.

24              MR. AGUILERA:  I'm sorry.

25              THE PROSPECTIVE JUROR:  But nothing, nothing
```

 1   concerning business, though, particularly.  Casual, casual

 2   conversation.

 3            MR. AGUILERA:  Does the fact that you've had those

 4   conversations make you think that you would give more

 5   credence to a lieutenant versus somebody else that you

 6   talked to?

 7            THE PROSPECTIVE JUROR:  I'm not sure.

 8            MR. AGUILERA:  Okay.  Given your unsureness that

 9   you have expressed to us -- and I certainly appreciate your

10   candor this morning -- would you feel more comfortable if

11   you were sitting as a juror in an case where you're weren't

12   saying:  I'm not sure whether I could be impartial?

13            THE PROSPECTIVE JUROR:  Yes.

14            MR. AGUILERA:  All right.  Thank you, sir.

15            All right.  Why don't you pass the microphone and

16   I'll try to be a little more orderly to Mr. Whitacre.  To

17   your left.

18            Mr. Whitacre, Miss Ruggiero spent quite a bit of

19   time asking each one of you in the box and here behind me

20   how you felt about damages.  Let me turn that question a

21   little bit.

22            Would it bother you if you heard a very, very

23   sympathetic story, maybe even one that made you emotional

24   but you felt that the evidence just did not support your

25   giving a verdict to the plaintiffs in this case, to the

1    people that are suing, could you do that?

2            THE PROSPECTIVE JUROR:  Absolutely.  Absolutely.

3    I hear -- that's part of my job.  I hear sympathetic

4    stories.  I have used to separate myself from hearing the

5    facts.

6            MR. AGUILERA:  Okay.  And I take it the stories

7    you heard were sympathetic oftentimes involve tragic car

8    accidents and things of that nature?

9            THE PROSPECTIVE JUROR:  Yes, sir.

10           MR. AGUILERA:  All right.  Why don't you pass the

11   microphone to Mr. Biby; and, Mr. Biby, I'll ask you

12   basically the same question.

13           If the parties that are suing us, the Gavins, do

14   not prove to your satisfaction according to the laws that

15   Her Honor Judge Cooper gives at the end of the case, could

16   you return a verdict for the defendant?

17           THE PROSPECTIVE JUROR:  Yes.

18           MR. AGUILERA:  All right.  Let me ask Mr. Nestler

19   the same question.

20           THE PROSPECTIVE JUROR:  I'm sorry.  Would you

21   repeat the question?

22           MR. AGUILERA:  Absolutely, sir.

23           If you were to sit as a juror in this case and you

24   listened to all of the evidence, let's say your heartstrings

25   were tugged because you thought it was a very tragic story.

```
 1    Maybe you wanted to cry.  But after listening to the

 2    instructions by Her Honor you felt, well, I have to follow

 3    the law and the law requires me to return a verdict for the

 4    defendants, could you do that?

 5             THE PROSPECTIVE JUROR:  Yes, I believe so.

 6             MR. AGUILERA:  All right.  And let me just ask all

 7    of you, not the same question but a variation on that:  Is

 8    there anyone that would have a problem returning a verdict

 9    for any individual defendant whether you saw them in the

10    courtroom every day or you only saw them once?

11             By a show of hands, would anybody have a problem

12    with that?

13                      (No response.)

14             MR. AGUILERA:  Does anybody have a problem with my

15    question?

16                      (Laughter.)

17                      (No response.)

18             MR. AGUILERA:  I don't see any hands going up.

19    Okay.  Thank you, Mr. Nestler.  If you could pass the

20    microphone to Mr. Peterson.

21             Mr. Peterson, do you believe you can follow the

22    law that's given to you even if you disagree with it?

23             THE PROSPECTIVE JUROR:  Yes, sir, I do.

24             MR. AGUILERA:  And do you think you could return a

25    verdict for the defendants even though you felt a lot of
```

1    sympathy for the story you heard from the plaintiffs?

2              THE PROSPECTIVE JUROR:  Yes, sir.

3              MR. AGUILERA:  Thank you.

4              How about you, Miss Gonzalez?  Could you do that?

5              THE PROSPECTIVE JUROR:  Yes.

6              MR. AGUILERA:  All right.  And, Mr. O'Brien, could

7    you return a verdict for the defense if you felt that the

8    plaintiffs had not carried their burden and had not proven

9    their case?

10             THE PROSPECTIVE JUROR:  Yes.

11             MR. AGUILERA:  Mr. O'Brien, have you ever known

12   anyone to complain about retaliation?

13             THE PROSPECTIVE JUROR:  Yes.  But I found over the

14   period of time that in some cases it was fabricated.  In

15   some cases, it was true but in other cases it was

16   fabricated.  I mean, there were a couple of different

17   people.  A lot of people complain.

18             MR. AGUILERA:  Did you feel it was important to

19   get the whole story, try to get the whole story?

20             THE PROSPECTIVE JUROR:  Absolutely.  Without

21   hearing the whole story, you can't tell how much is true and

22   how much is exaggeration.

23             MR. AGUILERA:  Okay.  Have you ever known anybody

24   to complain about discrimination?  Any form:  Sex, age,

25   race, national origin, anything like that?

1           THE PROSPECTIVE JUROR:  Yeah, I had to give a

2    deposition one time.

3           MR. AGUILERA:  Okay.  And did that involve your

4    company?

5           THE PROSPECTIVE JUROR:  Yes.  Well, not my

6    company.  I was working for a governmental agency, the City

7    of Torrance.

8           MR. AGUILERA:  Okay.  How long ago did you work

9    for the City of Torrance?

10          THE PROSPECTIVE JUROR:  About five years ago.

11          MR. AGUILERA:  Okay.  And how many people did you

12   supervise when you were there?

13          THE PROSPECTIVE JUROR:  I did not supervise

14   people.

15          MR. AGUILERA:  Okay; thank you.

16          If you could pass the microphone behind you to

17   Miss Stender.

18          Miss Stender, if you hear all of the evidence, you

19   feel a lot of sympathy for the plaintiffs in this case,

20   could you nonetheless follow the law that's given to you and

21   render a verdict for the defense if you felt that's what was

22   warranted?

23          THE PROSPECTIVE JUROR:  Yes.

24          MR. AGUILERA:  All right.  And have you had any

25   experiences with either your own or close friends or family

```
1   members that have complained about retaliation?

2           THE PROSPECTIVE JUROR:  No.

3           MR. AGUILERA:  How about discrimination in any

4   form?

5           THE PROSPECTIVE JUROR:  No.

6           MR. AGUILERA:  Okay; thank you.

7           Let me ask the same questions of Miss Porter.

8           Miss Porter, as a teacher, has most of your work

9   been for one district or for several?

10          THE PROSPECTIVE JUROR:  Several different

11  districts.  I been doing this for 20 years and I experience

12  this every day, having to decide what the rule is and what

13  the story is.

14          MR. AGUILERA:  And do you think you could be

15  impartial, even through sympathy, and listen to the law and

16  apply it to the facts as you hear it and render what you

17  thought was the best verdict you could?

18          THE PROSPECTIVE JUROR:  Yes.

19          MR. AGUILERA:  Okay.  Thank you, ma'am.  Let me

20  ask Miss Sears.

21          Miss Sears -- I haven't asked this question so

22  I'll pick on you for a moment.  You live in the City of

23  Los Angeles?

24          THE PROSPECTIVE JUROR:  Yes, I do.

25          MR. AGUILERA:  Have you ever had what I would call
```

1    bad experiences, negative experiences with the LAPD?

2            THE PROSPECTIVE JUROR:  No.

3            MR. AGUILERA:  How about with the city itself

4    where they didn't fix the sidewalk quickly, there was a big

5    pothole, the tree was running into your window, anything

6    like that?

7            THE PROSPECTIVE JUROR:  Potholes.

8                        *(Laughter.)*

9            MR. AGUILERA:  Okay.  Have you ever made a claim

10   to the city for any kind of damages?

11           THE PROSPECTIVE JUROR:  No.

12           MR. AGUILERA:  Okay.  Have you ever known anybody

13   who has complained or sued for retaliation?

14           THE PROSPECTIVE JUROR:  No.

15           MR. AGUILERA:  How about for discrimination?

16           THE PROSPECTIVE JUROR:  No.

17           MR. AGUILERA:  And just the question I've been

18   asking everyone.  If you got to the end of the case, let's

19   say you sat as a juror and you felt a lot of sympathy for

20   what you heard, the story you heard, could you return a

21   verdict for the defense if you thought that was the right

22   result?

23           THE PROSPECTIVE JUROR:  Yes.

24           MR. AGUILERA:  Okay.  Thank you, ma'am.

25           And, Mr. Fuentes, you've been in the restaurant

1    business for only a short time?

2              THE PROSPECTIVE JUROR:  Actually, my parents have

3    been in the business for some 24 years so that's why I said

4    all my life.

5              MR. AGUILERA:  Okay; thank you.  I didn't hear

6    that.  Does the restaurant business, as you've been exposed

7    to it, have you had employees working for you or your

8    parents have for them?

9              THE PROSPECTIVE JUROR:  Yes.

10             MR. AGUILERA:  And have you ever been involved in

11   any kind of a claim or a lawsuit for retaliation?

12             THE PROSPECTIVE JUROR:  There was once a wages

13   that weren't paid correctly.

14             MR. AGUILERA:  Okay.  And did you personally

15   become involved either as a witness or --

16             THE PROSPECTIVE JUROR:  Yes.

17             MR. AGUILERA:  And did you have to testify?

18             THE PROSPECTIVE JUROR:  Yeah.  Yeah, I did have to

19   testify for that.

20             MR. AGUILERA:  Okay.  And was that matter resolved

21   satisfactorily to you and your family?

22             THE PROSPECTIVE JUROR:  Yeah, definitely.

23             MR. AGUILERA:  Okay.  If you get to the end of the

24   case and you feel the defense deserves a verdict in its

25   favor, could you do that?

```
 1                THE PROSPECTIVE JUROR:  Yes.

 2                MR. AGUILERA:  Even though you thought it was a

 3      sympathetic story?

 4                THE PROSPECTIVE JUROR:  Uh-huh.

 5                MR. AGUILERA:  Is that "yes"?

 6                THE PROSPECTIVE JUROR:  Yes.

 7                MR. AGUILERA:  Thank you, sir.  Please pass it to

 8      Miss McAlack.

 9                Miss McAlack, in the bookstore you work, are there

10      other employees?

11                THE PROSPECTIVE JUROR:  Yes.

12                MR. AGUILERA:  Are you a owner or do you work

13      there as an employee?

14                THE PROSPECTIVE JUROR:  I'm a employee.

15                MR. AGUILERA:  Okay.  And how many co-employees

16      are there?

17                THE PROSPECTIVE JUROR:  Like 30 or 40.

18                MR. AGUILERA:  Have you ever known of anybody that

19      either claimed or sued for retaliation?

20                THE PROSPECTIVE JUROR:  No.

21                MR. AGUILERA:  How about discrimination?

22                THE PROSPECTIVE JUROR:  No.

23                MR. AGUILERA:  Have you ever had a position where

24      you've supervised other people?

25                THE PROSPECTIVE JUROR:  Yes.
```

1        MR. AGUILERA:  And how many others have you

2    supervised?

3        THE PROSPECTIVE JUROR:  Like eight.

4        MR. AGUILERA:  And if you felt that the defense

5    deserved a verdict in this case, could you do that?  Could

6    you return a defense verdict?

7        THE PROSPECTIVE JUROR:  Yes.

8        MR. AGUILERA:  Any hesitancy about that?  You

9    seemed to pause a little.

10       THE PROSPECTIVE JUROR:  Yeah.  I just want to say

11   that I served on different cases, completely different than

12   this.  It was a drug-related case and I was very

13   uncomfortable with the law.  I didn't realize what it was

14   until I got into the process.

15       And I did -- we did give a verdict, but I felt bad

16   about it.  I didn't like the law, and I didn't like agreeing

17   with the law.  So I don't know what the law is in this case

18   and I don't know exactly what it's about, but I'm hoping

19   that I don't get in that situation.

20       MR. AGUILERA:  I think what you just described is

21   all we can ask of people that come here to serve is that

22   even if you don't like the law, that you can apply it to the

23   facts as you find it.

24       THE PROSPECTIVE JUROR:  Right.

25       MR. AGUILERA:  Do you think you can do it because

1    you've done it before?

2            THE PROSPECTIVE JUROR:  Yes.

3            MR. AGUILERA:  All right.  Thank you, ma'am.

4            Let me ask Miss Lopez.  Same question, ma'am.

5    Could you return a defense verdict if you thought the

6    defendants deserved it?

7            THE PROSPECTIVE JUROR:  Once I hear all the

8    evidence.

9            MR. AGUILERA:  Okay.  And then I don't know if I

10   got Mr. Kinsbruner so I'll ask you the same question, sir.

11   Could you return a defense verdict if you thought the

12   defense merited it?

13           THE PROSPECTIVE JUROR:  Yes, sir.

14           MR. AGUILERA:  Okay.  And, finally, the people

15   behind me; and I'll start with the young lady that has the

16   microphone closest to her, Miss Marvin Stevens.

17           And I'll ask you some of the same questions I

18   asked the people in the jury box.  Have you ever known

19   anybody that has made a claim for retaliation?

20           THE PROSPECTIVE JUROR:  No.

21           MR. AGUILERA:  How about discrimination?

22           THE PROSPECTIVE JUROR:  I don't think so.  I knew

23   someone that toyed with the idea but never followed through.

24           MR. AGUILERA:  Okay.  How about this idea of maybe

25   applying law that you don't like, maybe hearing a story that

1  is very sympathetic.  Could you, if you felt that the

2  defense deserved a defense verdict, could you return that?

3          THE PROSPECTIVE JUROR:  Yes, sir.

4          MR. AGUILERA:  Okay.  If you'll pass it

5  Mr. Poulopoulos.

6          THE PROSPECTIVE JUROR:  Poulopoulos.

7          MR. AGUILERA:  Okay.  I'm working on it.

8          Could you do that, sir?  Could you return a

9  verdict for the defense if you thought the defense deserved

10  it?

11          THE PROSPECTIVE JUROR:  Absolutely.

12          MR. AGUILERA:  Okay.  In Pepsico, do you manage

13  other employees?

14          THE PROSPECTIVE JUROR:  No.

15          MR. AGUILERA:  Okay.  In any jobs you had before

16  Pepsico, did you do that?

17          THE PROSPECTIVE JUROR:  Yes.

18          MR. AGUILERA:  And how many was the greatest

19  number?

20          THE PROSPECTIVE JUROR:  275.

21          MR. AGUILERA:  In that experience, sir, did you

22  ever run across a situation where those subordinate

23  employees complained about discrimination or retaliation?

24          THE PROSPECTIVE JUROR:  No.

25          MR. AGUILERA:  Okay; thank you.

1        Finally, let me get to Mr. Price.  Mr. Price, if

2   you listen to all of the evidence and you felt that it was

3   very sympathetic, the story was very compelling, but the law

4   compelled you to give a defense verdict, could you do that?

5        THE PROSPECTIVE JUROR:  Yes.

6        MR. AGUILERA:  Is there anything about this case,

7   Mr. Price, that bothers you; the fact that there's a police

8   department involved or police officers suing police

9   officers?

10        THE PROSPECTIVE JUROR:  No.

11        MR. AGUILERA:  Okay; thank you.

12        That's all I have, Your Honor.  Thank you.

13        THE COURT:  All right.  Thank you.

14        May I see counsel at sidebar?

15        *(The following was held at the bench:)*

16        THE COURT:  Any challenges for cause?

17        MS. RUGGIERO:  Mr. Nestler and Mr. Bogan.

18        MR. AGUILERA:  Those are my two.

19        THE COURT:  Neither of you knows what he wants to

20   do?

21        MS. RUGGIERO:  He said he can't be fair.

22        THE COURT:  He really wants to get off this jury.

23        Mr. Nestler, I'll excuse him for cause so that

24   we're going to put Cynthia Sears in Seat No. 4.

25        Are you ready to begin exercising peremptories?

```
 1              MS. RUGGIERO:  Yes.

 2              THE COURT:  Peremptory is with the plaintiff.

 3              MS. RUGGIERO:  Yes.  Would like to excuse

 4    Mr. O'Brien, No. 1.

 5              THE COURT:  Mr. O'Brien, No. 1.  And Milton

 6    Fuentes moves to Seat No. 1.

 7              MR. AGUILERA:  May I have a moment, Your Honor?

 8              THE COURT:  Sure.

 9                   (Pause in the proceedings.)

10              MR. AGUILERA:  We're dealing with the first eight?

11              THE COURT:  The first eight.

12              MR. AGUILERA:  We would like to exercise our

13    challenge and excuse No. 7.

14              THE COURT:  Miss Stender is excused and Kelly

15    McAlack is in Seat No. 7.

16              Plaintiff.

17              MS. RUGGIERO:  Number 2, Miss Gonzalez.

18              THE COURT:  Okay.

19              Defense.

20              MR. AGUILERA:  Miss McAlack, Your Honor.

21              THE COURT:  All right.  Number 7 is excused and

22    Mr. Bogan is in Seat No. 7.

23              MS. RUGGIERO:  This is my last one?

24              THE COURT:  Yes.

25              MS. RUGGIERO:  I just want to make sure I
```

1   understand the process.  If I accept as constituted --

2           THE COURT:  It's not a waiver.

3           MS. RUGGIERO:  I will accept the jury as

4   constituted.

5           THE COURT:  Okay.  Defense?

6           MR. AGUILERA:  Mr. Bogan.

7           THE COURT:  I'm not surprised.  Okay.  Randin

8   Kinsbruner, I wrote his name down.  And that puts Kosta

9   Poulopoulos in Seat No. 7.

10          We don't need to get to Mr. Price.  I wrote down

11  "unclear on the concept" but we don't need to get to him so

12  we don't have to worry about it.

13          *(A discussion was held off the record.)*

14    *(The following was in the prospective jurors' presence:)*

15          THE COURT:  All right.  Our attorneys have picked

16  a jury.  We have a jury of eight people and I'll read the

17  names of the eight people who will be our jurors.  If your

18  name is read, please don't leave the room.  If I do not read

19  your name, then I ask you to please go back to the Jury

20  Assembly Room and let them know that we have picked a jury

21  and you've been excused from this trial.

22          Our jury consists of Milton Fuentes, Marlene

23  Lopez, Bruce Peterson, Cynthia Sears, James Biby, David

24  Whitacre, Kosta Poulopoulos, and Laura Porter are our

25  jurors; and the rest of you are excused with our thanks.

| | |
|---|---|
| 1 | *(The prospective jurors exited the courtroom.)* |
| 2 | THE COURT:  Don't sit back down yet because we'll |
| 3 | do musical chairs here.  We have four in the front and four |
| 4 | in the back in the following order:  Milton Fuentes will be |
| 5 | in the second seat, front row second from the end.  Exactly, |
| 6 | yes.  And then Marlene Lopez next to him. |
| 7 | Mr. Price, you are excused, sir.  Thank you. |
| 8 | *(The prospective juror exited the courtroom.)* |
| 9 | THE COURT:  And then Bruce Peterson and Cynthia |
| 10 | Sears.  Behind Mr. Fuentes, James Biby, David Whitacre, |
| 11 | Kosta Poulopoulos, and Laura Porter. |
| 12 | Okay.  Now, that you're all seated, would you all |
| 13 | please stand and raise your right hands to be sworn. |
| 14 | **JURORS SWORN** |
| 15 | THE CLERK:  Ladies and gentlemen, do you and each |
| 16 | of you solemnly swear that you will well and truly try the |
| 17 | cause now before this court and a true verdict therein |
| 18 | render according to the evidence, so help you God? |
| 19 | THE JURORS:  I do. |
| 20 | THE COURT:  Thank you. |
| 21 | Be seated, please. |
| 22 | **PRELIMINARY JURY INSTRUCTIONS BY THE COURT** |
| 23 | THE COURT:  Okay.  I'm going to take a few |
| 24 | minutes.  I'll give you some general instructions that apply |
| 25 | to the trial of this case and in all cases. |

```
 1          When I'm done, I'll ask you to follow Miss Mamer
 2   into the jury room.  She'll show you where the jury room is.
 3   She'll give you some general instructions that you'll need
 4   for your coming and going and tell you how to get to the
 5   backroom and get into the jury room when you need to get
 6   here and other information you need in order to function and
 7   things like parking.  She does all that stuff.
 8          Then we'll break for lunch.  We'll resume at 1:30
 9   and at 1:30 we'll start the trial with opening statements by
10   counsel.
11          Now that you are our jury it's important that you
12   understand exactly what your responsibilities are.  You have
13   two major responsibilities:  To decide what the facts are
14   and then to apply the law to those facts and determine what
15   verdict you should reach.
16          Deciding what the facts are requires you, of
17   course, to listen and attend to the evidence and make a
18   decision as to what happened.
19          Judging the credibility of witnesses is an
20   important part of that job and I never know in advance of
21   trial how daunting a task that's going to be.
22          Sometimes witnesses testify essentially to the
23   same things and people generally agree on what happened.
24   They just don't agree on what it means or what the legal
25   consequences are or what somebody's intent was, whether
```

1   something was deliberate or accidental, but pretty much they

2   are all saying the same thing.

3           Other trials, witnesses are diametrically opposed

4   to each other.  They'll give you to utterly different

5   versions of an event, and they can't both be telling the

6   truth.  If that happens, the jury's duty and responsibility

7   is to decide who's telling the truth and who's lying; and

8   that's a hard task.

9           People get on the stand, they raise their right

10  hand, they swear that they're going to tell the truth and

11  some of them will lie to you; and I promise you, after 25

12  years on the bench, I've seen people do that.  You just have

13  to make that call.  You have to be willing to say, you know,

14  that person wasn't telling the truth.

15          How you do that is really very much common sense.

16  The teacher that's on the jury indicated she does this sort

17  of thing all the time and so do all of you.

18          People come to you with an explanation for

19  something, whether it's your children, coworkers, friends;

20  and you think:  That just doesn't ring true.  It doesn't

21  make sense.  It's not common sense.  It's not consistent

22  with what I know about what happened.

23          And you work things through in your mind and

24  decide whether something is credible or not; and the

25  function of a jury is very much the same.

```
 1              There will be physical evidence.  There will be
 2   documents for you to look at.  There will be records that
 3   were created at the time some events occurred and you can
 4   see:  Is this testimony consistent with what that person
 5   said at the time or what someone else witnessed at the time?
 6   And you put it all together and you decide what happened.
 7              Once you've decided what happened, then you take
 8   the jury instructions that I will have read to you and given
 9   to you that tell you what the law is; and you decide what
10   does that mean?  Now that we know what happened, what does
11   that mean?  What result do we reach?  Who wins in this
12   lawsuit?  And those are the two big important chores that
13   you'll do.
14              In deciding what happened, you're going to be
15   instructed that you must rely on the evidence that you get
16   in this courtroom and nothing else.
17              Evidence will be for the most part testimony of
18   witnesses under oath.  There will also be exhibits.  I have
19   binders of exhibits here so I know you're going to get to
20   see lots of exhibits.
21              Things are introduced into evidence and admitted.
22   When an exhibit is admitted during the trial, you will
23   probably see it at the time it's admitted.  We have a large
24   screen here.  Most of the time the exhibits are blown up on
25   the screen so while a witness is looking at a piece of
```

1  paper, you can be looking at what the witness is reading so

2  you are fully aware of just exactly what that evidence is.

3       If something is not shown to you at the time of

4  testimony, you will have it in the jury room when you

5  deliberate; and so you can take your time and read as much

6  as you want.

7       What we want to make sure that you understand is

8  that you can't base your decision on things that are not

9  evidence.  Anything you hear outside this courtroom is not

10 evidence.  Things that other people might want to say to you

11 about civil litigation or the police department or lawsuits

12 for retaliation or anything else, that's not evidence in

13 this case and you must disregard it.

14      Statements of attorneys are not evidence.  The

15 lawyers, as you know, have already been allowed to speak to

16 you and they'll address you in a more detailed opening

17 statement in a few minutes.

18      They'll do a closing argument when the trial is

19 over.  They'll ask questions throughout the trial.  But

20 these lawyers were not personally present when the events

21 that you're going to hear about happened so they cannot give

22 you evidence because they don't have personal information,

23 and they're not under oath.

24      What they do is give you their best estimate of

25 what the evidence is going to be so that it will make sense

1   you when you hear it; and they ask questions designed to

2   bring out the evidence.

3          But the questions aren't evidence themselves so

4   it's important to be able to separate that.  If a lawyer

5   asks a question just loaded with information, you know:

6   Isn't it true that on Thursday afternoon at 2 o'clock in the

7   afternoon you saw a man sitting on a red bench and he stood

8   up and he pulled out a knife?

9          And the witness says:  No.  You don't have any

10  evidence.  You don't anything about a knife or a red bench

11  or anything else.  The only evidence is that answer under

12  oath, not what was contained in the question.  So it's

13  important to keep those things separate in your mind.

14         From time to time the lawyers will probably object

15  to some questions that are asked.  You've seen it on TV

16  often enough.  You know the drill.  It's just the only

17  method we have of making sure that what you hear is

18  admissible evidence.

19         My function is very much like a referee.  We have

20  rules of evidence that we all operate by, and I apply those

21  rules of evidence and decide if something is admissible in

22  this case.  Is it relevant?  Is it material?  Is it hearsay?

23  Is it improper opinion?  Is it something the jury can use to

24  reach a verdict?

25         If I decide it's appropriate for you to use it,

1   I'll overrule the objection and let the evidence come in.

2   If I sustain the objection, then you didn't hear an answer

3   and you can't consider that question.

4           The most difficult thing, I think, is when a

5   lawyer asks a question, the witness answers very quickly,

6   and then the objection comes in, and I sustain it.

7           It's hard because you've already heard the answer

8   and now I'm telling you that there was no answer.  What you

9   need to do is just kind of disregard what you heard.

10          If you wrote it down, because you're allowed to

11  take notes, if you wrote it down, cross it out because it

12  didn't become part of the evidence that you should consider

13  when you go in to deliberate.

14          I've already talked to you about the burden of

15  proof in a civil case.  That it's a preponderance, not proof

16  beyond a reasonable doubt and it's important to keep that in

17  mind.

18          And I'm going to tell you about a few of the rules

19  that apply to you and some instructions that I'm imposing on

20  you now.  The most important, I think, is that you must not

21  talk to each other or anybody else about this case while the

22  trial is in progress.

23          I know right now it's the only thing you have in

24  common, but it's the one thing that you're not allowed to

25  discuss until you begin to deliberate.

1    And while that seems like a very harsh restriction

2    to impose on you, it's designed to prevent you from reaching

3    conclusions too early.

4    If you start talking about the evidence at the

5    beginning of the case, it's very easy to say:  Okay.  Now we

6    know what happened.  It's very clear.  And you haven't heard

7    witnesses to the contrary.  You may not have even heard

8    cross-examination.

9    And, believe me, it is very easy to change your

10   mind frequently during the course of the trial as more and

11   more evidence comes in.  So keeping an open mind is very

12   important and one way that we believe -- one thing that will

13   help you do that is not to talk to each other about the

14   evidence you heard until the trial is over.

15   You can't talk to anybody else about the evidence

16   you hear at all until the trial is over.  So people in your

17   home, if you go by the office, you can't talk to friends or

18   coworkers about it.

19   One of the reasons is that people have such strong

20   opinions about the kinds of cases we try in our courtrooms

21   and they tend to share them whether you ask them or not.

22   If they hear what it's about, they'll tell you

23   what they think and very possibly give you advice on what

24   kind of a verdict you ought to reach.

25   You don't need that sort of pressure.  This is a

1  hard time job you have taken on, I assure you.  And you

2  don't need to be worried that:  Oh, my gosh.  When it's over

3  and I reach a verdict that my friend advised against, I'm

4  going to have to explain that.

5       Nobody needs that sort of pressure so as long as

6  you answer "The judge said I can't talk about it," people

7  realize that that's true when they hear you say it and they

8  won't talk to you anymore.

9       So, again -- and that is also a part of just

10  protecting you from outside influences.  Many years ago,

11  jurors used to be sequestered whenever the trial started.  I

12  could put you all up in a Motel 6 for the next two weeks but

13  I will not do that to you because I trust you to follow

14  these rules and to not either talk about or share with

15  anybody what's going on.

16       And certainly it's not because what we do here is

17  secret.  There's never a locked door.  You see lots of

18  people are sitting here watching the trial.  If anyone is

19  real curious about the case you're trying, they're free to

20  come and watch it all they like.  We don't just want you

21  engaging in discussion with them.

22       You are free to take notes during the course of

23  the trial.  You'll each be given a notebook with a number

24  that corresponds to your seat, and you'll have that with you

25  throughout the trial and during deliberations.

1    If you find notetaking is helpful to you and with

2    a two-week trial it's often a good idea to at least maybe

3    summarize what a particular witness was called for, then go

4    ahead and take notes.

5    If you find notetaking distracting and you have a

6    good ability to remember what you hear, then don't do it.

7    It's a very personal decision.  The fact that someone takes

8    notes doesn't make their memory any better than yours; and

9    the fact that someone takes notes does not mean that they

10   have made an official record of the trial.

11   The official record is being made by Miss Cuneo.

12   She writes down every word that's being said during the

13   course of the trial.  If when you get to deliberate you find

14   that you either can't agree on what a witness said and it

15   has become important or you can't remember, you could ask to

16   have her read back to you from her notes.

17   I don't encourage you to do that because I'll

18   start another trial and I need her out here.  But I'd rather

19   you know that's available as a resource than to have you

20   just be stymied and unable to resolve something because of a

21   disagreement over testimony.

22   You may ask questions during the course of the

23   trial.  We have a kind of cumbersome method of asking

24   questions, but it's the way we have to do it.

25   If we get to the end of the testimony of a witness

1    and there's something you want to know that nobody asked,

2    just raise your hand to let me know you have a question.

3    You need to write it down.

4            We can't have jurors asking questions from the box

5    because if the reason it didn't come out is because I

6    already ruled it inadmissible, it would be very embarrassing

7    for one of the lawyers to have to object to a juror's

8    question.  They don't want to do that.

9            So what we do is we have you write it.  I will

10   look at it, I'll show it to the attorneys.  99 percent of

11   the time we ask the question.  It turns out to be a good one

12   that somebody didn't realize was important or they thought

13   it was covered.  We'll ask the witness.

14           But wait until the end because probably the

15   attorneys are going to cover it.  But you're the ones who

16   have to make the decision in this case.  We don't want you

17   sitting there wondering about something that we forgot to

18   cover.

19           So just raise your hand before the witness leaves

20   the courtroom because, if you wait until after they've gone,

21   we might not be able to get them back.

22           Okay.  During the course of the trial, the lawyers

23   will be allowed to address you as I indicated in opening

24   statement.  It's their opportunity to give you an idea of

25   what this case is going to be about; and since witnesses are

1   often called out of order, it helps you to sort of place

2   them in the story and to know exactly why they're being

3   called.

4           That will happen when we come back after lunch,

5   and then we'll begin with testimony, and that will all

6   happen this afternoon.

7           So we will break.  I'll ask you to go in with

8   Miss Mamer for a few minutes, and there is a full-service

9   cafeteria on the first floor.  You're welcome to have lunch

10  there.  Come back here at 1:30, and remember not to discuss

11  the case with each other or anyone else.  Okay?  I'll see

12  you at 1:30.

13          THE CLERK:  All rise.

14                  *(A luncheon recess was taken.)*

15

16

17

18

19

20

21

22

23

24

25

1    LOS ANGELES, CALIF.; TUESDAY, SEPTEMBER 2, 2008; 1:32 P.M.

2                              -oOo-

3        *(The following was held outside the jury's presence:)*

4            THE COURT:  We're outside the presence of the

5    jury.

6            MR. AGUILERA:  Good afternoon, Your Honor.

7            We wanted to bring to the court's attention

8    because we thought it was an improper argument or part of

9    the opening statement that Miss Ruggiero mentioned the word

10   "retaliation" with regard to Carol's claims.

11           Legally, we don't believe that there is a

12   retaliation claim under FEHA that she is pursuing.  It's a

13   discrimination based on gender and a harassment based on

14   gender claim under FEHA.

15           So we think that to say she was retaliated against

16   even if it was -- even if that is characterized as part of

17   intentional infliction of emotional distress is misleading

18   given that what the causes of action are and what the

19   instructions will be to the jury.

20           So we would like --

21           THE COURT:  Well, I think it's a question of using

22   a word that seems to have a legal connotation but certainly

23   in her summary of claims is included an allegation that on

24   the day that Jim Gavin was transferred, Carol Gavin who had

25   been she had a limited extension to stay where she was, was

1    transferred on that very same day.

2              The argument is that this was done deliberately as

3    retaliation.  I mean, there may not be a claim with that

4    label on it; but I think it is part of either the

5    intentional infliction claim or the FEHA claim.  So it does

6    not seem inappropriate to me based upon my review of the

7    evidence.

8              MR. AGUILERA:  Okay.

9              THE COURT:  All right?

10             MR. AGUILERA:  We just wanted to make a record;

11   it's a little misleading.

12             Thank you.

13             THE COURT:  All right.

14             Would you get the jury, please.

15             THE CLERK:  Yes, Your Honor.

16                 *(The jurors entered the courtroom.)*

17             THE COURT:  The jurors are all present.

18             Opening statement for the People -- for the

19   plaintiff.  I don't know where that came from.

20             **OPENING STATEMENT BY MS. RUGGIERO**

21             MS. RUGGIERO:  Thank you, Your Honor.

22             Good afternoon.  The dismantling of the Gavins

23   lives of which I spoke of earlier today did not happen

24   overnight and did not happen suddenly.  It happened over the

25   span of more than four years.

1          In 2001, Carol Gavin, who has dual status as both

2     a detective and a sergeant for the Los Angeles Police

3     Department, was assigned as a surveillance officer in what

4     is called or what was called at the time Special Operations

5     Section.

6          As a surveillance officer, Carol Gavin would

7     conduct surveillance of other officers who allegedly were

8     involved in criminal activities.

9          During her tenure there, Carol Gavin was subjected

10    to regular and constant gender and sexual harassment to such

11    an extent that she finally hesitantly reported the behavior

12    of her immediate supervisors to several people in her chain

13    of command.

14          During her tenure in Special Operations Section,

15    Carol Gavin was humiliated on a regular basis, was singled

16    out, was accused of manipulating her time off, accused of

17    benefit abuse.

18          She was given negative comment cards for things

19    her male counterparts weren't reprimanded for.  She was told

20    that she needed to persevere despite her complaints.  She

21    wasn't allowed to change squads to avoid the supervisor who

22    was harassing her because she was supposed to persevere.

23          Carol Gavin reported what she believed to sexual

24    discrimination and harassment to her superiors, not only

25    within her chain of command, but outside of her chain of

```
 1    command as well.

 2          And her husband Jim Gavin, also a sergeant at the

 3    time in Internal Affairs, complained for Carol Gavin to

 4    Carol Gavin's captain because while Carol Gavin was a

 5    surveillance officer, she was not supposed to talk with any

 6    other officers.  It was as if she didn't exist as a police

 7    officer.  She was undercover.

 8          So Jim Gavin, on her behalf, spoke with her

 9    captain.  Her captain told Jim:  Stay out of it.

10          Carol Gavin spoke and met with Captain Gannon and

11    another captain Sandy Jo MacArthur.  Sandy Jo MacArthur,

12    you'll hear, is one of the experts in the Los Angeles Police

13    Department on the issue of discrimination.  Who better for

14    Carol Gavin to report her complaints to than

15    Sandy Jo MacArthur?  But nothing was done.

16          And even though she was told they would look into

17    it, even though some sort of informal investigation

18    allegedly ensued, nothing happened.

19          Carol Gavin's emotional state deteriorated, but

20    she wanted desperately to fulfill her duties and she

21    continued working despite her physical symptoms that were

22    now manifesting:  Pain and irritation in her stomach.

23          When she was sick, she was accused of lying about

24    it.

25          While Carol Gavin was in her Special Operations
```

1   Section trying to persevere, Jim Gavin as stated earlier,

2   was a sergeant in Internal Affairs and was investigating one

3   of ten to fifteen other cases.  That case was the

4   Bruce Lisker case.

5          Bruce Lisker had sent a complaint to the

6   Los Angeles Police Department complaining of conflicts in

7   the evidence regarding the murder of his mother.  He

8   complained about the former homicide detective who had lied

9   to the parole board about the murder, about finding things

10  that perhaps weren't really found; and you'll hear evidence

11  about what that is.

12         You'll hear evidence about how Jim Gavin

13  determined that there were two sets of bloody footprints

14  that didn't match.  Only one of those sets was

15  Bruce Lisker's.

16         You'll hear evidence that Jim Gavin discovered a

17  partial shoe print on the autopsy photo of Dorka Lisker's

18  head.  It turns out that that partial shoe print most likely

19  was not Bruce Lisker's shoe print.

20         Jim Gavin determined that there could have been a

21  second suspect at the very least.  He determined during his

22  investigation that Bruce Lisker may have been wrongfully

23  imprisoned.

24         He didn't make the determination.  He just knew,

25  based on what he had read and reviewed and discovered, that

1   this needed to be followed up on.

2           On February 26th, 2004, Carol Gavin is in her

3   SOS position, Jim Gavin is returning from a trip that he

4   took to Florida with a homicide detective where they

5   interviewed a dying witness who could have information about

6   the Dorka Lisker murder.

7           Driving back from the airport on February 26th,

8   2004, Jim Gavin received a telephone call from his immediate

9   supervisor, the assistant officer in charge, Detective

10  Robert Vanina.

11          Detective Vanina told Jim Gavin he was being

12  transferred out of his Valley Investigations position.  This

13  transfer, of which he was given one week's notice, occurred

14  before his tour was up.

15          It occurred after he had requested an extension

16  and he wasn't even allowed to finish his assignment.  He was

17  to move in two weeks.  No explanation was given as to why he

18  was being moved.  The only thing he heard was that it was

19  best for his career.

20          Driving back from the airport, Jim Gavin talks

21  with his wife.  This is the same car trip, the same day his

22  wife Carol Gavin just learned that she was being transferred

23  out of her Special Operations Section position before her

24  tour was up despite the fact that she had requested an

25  extension in her assignment.

 1          The Gavins were upset, and they were suspicious.

 2    They were very concerned that something was starting that

 3    they wouldn't be able to stop, but they tried to make the

 4    best of it.

 5          Carol Gavin ended up being moved before being

 6    allowed to finish her assignment in SOS, the Special

 7    Operations Section.  She ended up being moved to Valley

 8    Investigations where her husband was.

 9          This was her least favorite choice as told to

10    Captain Debra McCarthy.  Debra McCarthy will testify that

11    Carol Gavin was just a little more aggressive than the other

12    guys in her request, in her choices; and she got her last

13    choice.

14          Carol Gavin moved to Valley Investigations and

15    took the place of another sergeant, Sabrina Kuhn, who

16    coincidentally ended up taking Carol Gavin's place at the

17    Special Operations Section.  No explanation was given as to

18    why both females had to switch places before each of their

19    tours was up.

20          Now, though Jim Gavin was moved out of Valley

21    Investigations, he was allowed to finish the cases that he

22    started working on including the Lisker case.  So both

23    Gavins ended up working out Valley Investigations and

24    Internal Affairs for a period of a few months together.

25          Carol Gavin was given Jim Gavin's former partner,

1    Mario Valdez, and Jim Gavin was given no partner.  Still

2    expected to finish his work.

3           Now, the evidence will show that it was common

4    practice to grant extensions that were requested at that

5    time.  The evidence will show that Jim's partner,

6    Mario Valdez, was granted his extension to stay in Valley

7    Investigations.

8           The evidence will show that Jim Gavin did not want

9    to move out of Valley Investigations for very valid reasons.

10          The city will testify that Jim Gavin had requested

11   the move.  He wanted to go to Review and Evaluation Section

12   where he was moved to.  He had requested it himself.  In

13   fact, it came out of his mouth according to one lieutenant.

14          Jim Gavin will tell you it didn't come out of his

15   mouth.  He made it very clear he had no intentions of moving

16   out of Valley Investigations for very good reasons.

17          One, he was extremely involved with his son's

18   coaching and sports and their extra curricular activities.

19   Two, he was continuing his education nearby, getting his

20   Bachelor's Degree.

21          And, three, the schedule that he had there worked

22   with his wife's schedule so that they could avoid day care

23   and babysitters to the extent possible.  Moving out of

24   Valley Investigations would have been a huge disruption to

25   the Gavin family.

1          And the city knew it.   Detective Vanina knew it.

2    They moved him to downtown Los Angeles where his commute

3    time increased significantly and where he could no longer

4    coach his kid's sports and be involved with his kids after

5    school and he ultimately stopped going to school himself.

6          But, again, the Gavins made the best of the

7    situation.   They loved their jobs.   You'll hear them testify

8    that this was their dream.   They always wanted to be police

9    officers.   Carol Gavin is third generation LAPD.   Jim Gavin

10   only wanted to be a police officer especially for the LAPD,

11   and they take their oath seriously.   They love serving the

12   City of Los Angeles.

13          Now, when Carol Gavin entered Valley

14   Investigations, she inherited all of Sabrina Kuhn's cases,

15   the cases that Sabrina Kuhn had been working on before she

16   was transferred out.

17          One of those cases, Carol Gavin soon determined,

18   was what is called out of statute.   It was -- the statute of

19   limitations had already run on that case.   The deadline had

20   lapsed and the investigation could no longer be completed.

21          It was too late to discipline the employee who was

22   the subject of that personnel complaint because someone had

23   allowed the deadline to come and go.   It's called out of

24   statute.

25          Carol Gavin looked at this case and determined:

```
 1    Wow, this personnel complaint is out of statute.  She went

 2    to her immediate supervisor, Detective Vanina who had been

 3    Jim Gavin's former supervisor, and said:  This case is

 4    already out of statute.

 5            Detective Vanina said for Carol Gavin to

 6    investigate it anyway as if it were not out of statute; and

 7    although Carol Gavin questioned this hesitantly, because

 8    this is a paramilitary organization, she doesn't want to

 9    question her superior.  But she questioned and was told

10    investigate it anyway which she did.

11            Many months later, a very negative document is

12    served on Carol Gavin for not bringing to the attention of

13    her supervisor the fact that that case had been out of

14    statute, exactly what she had tried to avoid.

15            Detective Vanina will testify that he just doesn't

16    remember telling her that, but there are witnesses to that

17    conversation.  He told Carol Gavin:  Investigate the case

18    anyway.  She did and she was punished for it.

19            In fact, the document that discusses what happened

20    with that case not only goes to the Chief of Police and the

21    Police Commission, but it goes to what is called the Federal

22    Monitor who is monitoring the activities of the LAPD.  It's

23    a very important document, and Chief Bratton will tell you

24    that.  It's a very serious document.

25            When Carol Gavin wanted to get it amended, she was
```

1    told it's no big deal.  It's no big deal to be counseled and

2    trained.

3            During this trial, you'll hear evidence that

4    Jim Gavin only wanted to get information that he had learned

5    to the DA's office, the District Attorney's office, so that

6    the District Attorney's office could determine whether or

7    not the murder investigation of Dorka Lisker should be

8    reopened and whether or not a man had been wrongfully

9    imprisoned.

10           You'll hear evidence that Jim Gavin was given

11   instructions from a homicide investigator on how to complete

12   the follow-up report that was to be given to the DA's

13   office.  You'll hear evidence that Jim Gavin was accompanied

14   by a homicide investigator when he went to Florida.

15           There was a meeting with the homicide Cold Case

16   Unit to make sure Jim Gavin was conducting the investigation

17   in a complete and thoughtful manner.

18           Jim Gavin was not on a mission.  He doesn't have

19   an agenda.  He will testify that he still doesn't know

20   whether Bruce Lisker is innocent or not.  His job was just

21   to uncover the evidence and bring it to the attention of the

22   District Attorney's office.

23           But what happened?  When Jim Gavin went to his

24   lieutenant at the time, now Captain Williams, to discuss the

25   next trip to interview a witness in Ohio, his lieutenant,

1   now Captain Williams, became angry; and he'll testify that

2   he was angry and he'll testify that he admits that he told

3   Jim Gavin something to the effect of, quote, that

4   motherfucker is going to stay in prison, Sergeant Gavin.

5          He'll admit that.  He was angry.

6          He told Sergeant Gavin to close the case,

7   interview the homicide detective who had allegedly lied to

8   the parole board and shut it down.  No more investigating

9   the murder aspect of this case.

10         Jim Gavin did not want to be insubordinate.  He

11   had just been ordered to complete the case.  He wasn't

12   allowed to complete the follow-up report to the DA's office.

13         Now, during his investigation, Jim Gavin had many

14   discussions with Bruce Lisker's representatives, especially

15   Bruce Lisker's private investigator, because during the

16   investigation that Jim Gavin conducted, the Murder Book of

17   Dorka Lisker could not be located.

18         And so Jim Gavin was forced to generate another

19   Murder Book by gathering all the documents relating to the

20   murder and putting them together, and he got a lot of those

21   documents from Bruce Lisker's representatives as well as

22   from within the LAPD.

23         Jim Gavin, after being told twice to shut the case

24   down, after being told twice that Bruce Lisker was going to

25   stay in prison, ended up doing what he felt he had no choice

1    but to do and that was to provide information that he had

2    learned during his investigation to an outside source.

3           He felt that was the only way that the information

4    would get out so that justice could be done, whatever that

5    justice would be.

6           He spoke and provided information to

7    Bruce Lisker's representatives.  He gave them the footprint

8    analysis report, and he spoke with the *Los Angeles Times*

9    reporters.

10           After he was told to close the case down, a letter

11   was sent to Chief Bratton from the private investigator from

12   Bruce Lisker saying:  Hey, why was this case shut down?  Why

13   did you shut the case down?  There's a lot of information

14   being developed here.

15           And because of that letter from Paul Ingels to

16   Chief Bratton and because the *Los Angeles Times* got involved

17   in the case, sure enough, the Los Angeles Police Department,

18   by way of Captain Weinstein and Deputy Chief Berkow,

19   reinvestigated the murder of Dorka Lisker.

20           But it was only after Jim Gavin went outside of

21   the department that such a reinvestigation occurred because

22   Jim Gavin certainly couldn't do it.  He wasn't allowed to.

23           So what happened to the Gavins?  Jim Gavin

24   received the worst performance rating he had received in

25   many years; and you'll hear testimony that his immediate

1  supervisor, who wasn't involved in the rating, said he would

2  have given him even a worst one because he didn't follow

3  instructions.  He betrayed him.

4         Jim Gavin betrayed his immediate supervisor

5  because he didn't follow instructions and he did the right

6  thing.  He actually followed the policies and procedures of

7  the LAPD by trying to complete his investigation.

8         The policies and procedures of the LAPD mandate

9  that every citizen's complaint be investigated completely

10  and thoroughly, and that's what Jim Gavin was trying to do.

11         Now, during this time Carol Gavin is still in

12  Valley Investigations.  She is around all these people who

13  are very angry, angry with Jim Gavin her husband, and she's

14  feeling somewhat threatened emotionally and she tries to

15  move out of Valley Investigations to get out of that

16  environment.  There's a lot of anger toward her husband and

17  it's starting to contaminate the environment for her.

18         She applies for four positions; doesn't get any of

19  them.  One of the positions, in particular, was for the

20  assistant watch commander at Foothill station; and she ended

21  up, after her examination and interview, being in the

22  outstanding pool along with a few other people.

23         But for some reason, no one was chosen out of that

24  outstanding pool.  Carol Gavin, who later found out she was

25  the No. 1 pick for that job, didn't get the job.  Nobody

130

1   did.   In fact, the job was reposted.   They started all over

2   again looking for another pool of candidates and ended up

3   choosing someone who was with Carol Gavin in the outstanding

4   pool the first time.

5            It doesn't make sense.   If no one was good enough

6   the first time, then why was that same person good enough

7   the second time?   Why didn't Carol Gavin got the job?

8            Well, Jim Gavin learned that Lieutenant Williams,

9   the same Lieutenant Williams who told him to shut the case

10  down, who said "That motherfucker is going to stay in

11  prison," that Lieutenant Williams gave Carol Gavin a poor

12  reference and she didn't get the job.

13           There are numerous details in this case, numerous

14  facts and evidence that you will see and hear during this

15  case; and you will hear both Jim Gavin and Carol Gavin

16  testify as to all the different things, retaliatory in

17  nature, that occurred to both of them before, during, and

18  after the Lisker investigation.

19           You'll hear Jim Gavin testify that the only way he

20  can function now is on medication.   He sees a therapist.   He

21  sees a psychiatrist.   He has to take Ambien to sleep at

22  night.   He's withdrawn.   He hasn't spent much time with his

23  children during the last few years and their marriage has

24  disintegrated.

25           Carol Gavin, for so many reasons you'll hear

1   during this case, became very ill, physically and mentally.

2   While she lost over 40 pounds, Jim Gavin gained over

3   50 pounds.

4           She became extremely depressed, withdrawn, sleeps

5   all the time.  She sees a doctor, a therapist.  She's on

6   various medications so that she can function for her

7   children, but she hasn't been able to work since

8   August 2006.  She barely wants to get out of bed in the

9   morning.

10          The Gavins in this case will tell you their story

11  of how they just wanted to do their job and do it right.

12  They followed the policies and procedures.  They reported

13  wrongdoing when it occurred.  They tried to do everything

14  that they promised to do when they first became police

15  officers for the LAPD, and they were told they couldn't.

16          And for that, they were punished.  And for that,

17  their family fell apart.  They have a son who wants to

18  commit suicide because he gets no attention in the house.

19  His parents sleep all the time.  They can barely function.

20          And if you hear how they were beforehand -- and

21  you will during this trial -- you'll know that the Gavins

22  are not whiners, they're not complainers.  They have dealt

23  with a lot of hardships during their careers; but this was

24  something more than they could withstand.  This caused

25  extreme grief, extreme disruption, and sadness.

```
 1              They barely talk to each other, let alone their

 2    children; and you'll hear from the doctors why that is and

 3    you'll hear from the doctors, especially Dr. MacDonald who

 4    used to work for the LAPD, you'll hear why it's so

 5    devastating to people like the Gavins who devote not only

 6    their careers but their lives to the Los Angeles Police

 7    Department; and when that life becomes disregarded and

 8    meaningless, they fall apart.

 9              They're not proud of falling apart.  Jim Gavin

10    continues to work.  Jim Gavin was promoted and he'll tell

11    you how that occurred.  But he's struggling.  He's doing the

12    best he can and he'll tell you he goes to work every day.

13    He's supposed to be there.  He functions.  But if he weren't

14    on the medication, he wouldn't be able to.  The

15    disappointment in the department is devastating.

16              Thank you, and I look forward to talking to you

17    again at the end of this trial.

18              THE COURT:  Thank you.

19              Opening for the defense?

20              MS. ORELLANA:  Thank you, Your Honor.

21                  OPENING STATEMENT BY MS. ORELLANA

22              MS. ORELLANA:  Good afternoon.

23              Revenge.  Retaliation.  Sounds intriguing, doesn't

24    it?  But why would the department want revenge against Jim?

25    And how exactly was Jim -- excuse me -- how exactly was Jim
```

1    retaliated against?

2           Let's start with the first question.  Why take

3    revenge against Jim?

4           Jim claims it's because of his investigation of

5    the Lisker complaint.  But as I said earlier, ladies and

6    gentlemen, his story is not consistent with common sense.

7           For nearly 60 years, Internal Affairs has been the

8    investigative arm of the Chief of Police.  They identify and

9    report corruption and employee behavior that discredits the

10   department by violating laws like murder, rape, drugs,

11   theft, or behavior that violates department policy like

12   lying, insubordination, neglect of duty.

13          In other words, ladies and gentlemen, the sole

14   purpose of Internal Affairs is to identify and investigate

15   employee misconduct so the department can take appropriate

16   action, including referring cases to the district attorney

17   for prosecution or in case of disciplinary action against an

18   employee such as termination.

19          So why would the department engage in an elaborate

20   course of retaliation against Jim when the Lisker complaint

21   was just another complaint of officer misconduct that

22   Internal Affairs was charged with investigating.

23          You will not hear any testimony that any officer

24   that Jim claims retaliated against him was a friend of the

25   officer he investigated; Andrew Monsue.

1        You will not hear any testimony that any of the

2   defendants had a personal stake in the outcome of that

3   complaint investigation.

4        Instead, ladies and gentlemen, you will hear that

5   the Lisker complaint was just one -- just one of 6,500

6   complaints that Internal Affairs investigates on a yearly

7   basis.  Some of which lead to criminal prosecution, some of

8   which lead to termination, some of which lead to demotion or

9   suspension.

10       So let's consider the second question.  How is Jim

11  retaliated against?  Jim will claim that he was put in

12  positions that he didn't want, that was he was given a

13  negative performance evaluation, and that he was transferred

14  out of Internal Affairs.

15       But the evidence will show, ladies and gentlemen,

16  that at the same time that Jim claims that these bad things

17  were happening to him for no reason other than retaliation,

18  he was also being given coveted positions, special

19  assignments, a promotion, and an award.

20       For example, during the same time period that Jim

21  claims he was told to shut down the investigation, he was

22  informed that he would be assigned to Review and Evaluation

23  Section of Internal Affairs.  We also refer to that as R&E.

24       You will hear evidence, ladies and gentlemen, that

25  assignments to R&E are highly sought offer.  These are

1  management development positions; that officers assigned to

2  R&E go on to promote and promote to the rank of lieutenant

3  which, in fact, is what Jim holds now.

4        The evidence will also show, ladies and gentlemen,

5  that after Jim completes the investigation on the Lisker

6  complaint, he was assigned a special project for Deputy

7  Chief Berkow, one of the alleged retaliators.

8        The project was to research and prepare guidelines

9  for identifying statute of limitations issues which

10  plaintiff's counsel talked about a moment ago as cases being

11  out of statute.  Deadlines being missed.  The department

12  being unable to take action against employees.

13        So Jim does this research, he does this project

14  for Deputy Chief Berkow, and he ultimately provides training

15  to the officers in Internal Affairs on this issue and

16  receives praise from his supervisor Brian Hospodar, again

17  another alleged retaliator.

18        Now, Jim will claim that around February of 2005,

19  he was retaliated against when a personnel complaint was

20  initiated against him and he was loaned to Training

21  Division.

22        The evidence will show, however, that the

23  complaint was issued against Jim because he had, in fact,

24  provided confidential information to people outside the

25  department, specifically Lisker's private investigator,

 1   which is a violation of department policy.

 2          Jim did not deny that he did this; but the

 3   evidence will also show that after reviewing the

 4   circumstances surrounding these disclosures, the Chief of

 5   Police, William Bratton, withdrew the complaint.

 6          He withdrew the complaint because although Jim had

 7   technically violated department policy in releasing the

 8   information, the Chief believed that Jim had only been

 9   trying to do the right thing by doing that and that by

10   turning over the confidential information Jim had no animus

11   towards the department and was only trying to do the right

12   thing.

13          As for Jim being loaned to Training Division, you

14   will hear testimony that Jim was asked where he wanted to be

15   loaned to and that he was loaned to that division, Training

16   Division.

17          You will also hear that he was allowed to keep the

18   rank of Sergeant II, even though that's a coveted position

19   inside Internal Affairs.

20          You will also hear that he was given a department

21   car, that he was put in charge of the department's weapons

22   of mass destruction training which is a key component of the

23   department counterterrorism measures.

24          You'll also hear that he earned substantial

25   overtime during that assignment including the $20,000 in one

1   month of overtime and more money that year than he had ever

2   earned.

3          You'll also hear that he was put in charge of the

4   department's West Point Leadership Training Program which

5   hosted individuals all across the country and that he was

6   asked to prepare a presentation on use-of-force policies on

7   behalf of Chief Bratton that Chief Bratton would be giving

8   at this training program.

9          You will also hear testimony from Jim that he

10  believes he received a negative performance evaluation that

11  will adversely affect his career and his ability to promote.

12         However, you will also hear, ladies and gentlemen,

13  that this evaluation was not negative.  It contained several

14  positive comments throughout it.

15         You will also hear that after making several

16  changes to the evaluation at Jim's request, he nonetheless

17  filed a grievance over it; and you will hear that he has

18  refused to cooperate in the grievance process and has asked

19  that the grievance be stayed pending the outcome of this

20  lawsuit.

21         The evidence will also show, ladies and gentlemen,

22  that Jim has, in fact, promoted to lieutenant despite his

23  claim that his career has been adversely affected and that

24  he received the department's highest honor for service that

25  an officer can receive, the Medal of Valor.

```
 1              Finally, ladies and gentlemen -- and perhaps the
 2    most telling demonstration of the inconsistency in Jim's
 3    story -- is that in March 2005, which is after the alleged
 4    retaliatory complaint and loan to Training Division, Jim
 5    reports this alleged retaliation to Deputy Chief
 6    Sandy Jo MacArthur.
 7              She, in turn, reports that information to the
 8    Inspector General's office who immediately takes action.
 9    However, you'll also hear, ladies and gentlemen, that when
10    Jim was contacted by the Inspector General's office, he
11    refused to cooperate.  He would never be interviewed on that
12    complaint.
13              Now, let's consider the story of Carol Gavin and
14    its inconsistencies.
15              Carol Gavin is a Sergeant II with the Los Angeles
16    Police Department.  She's been a supervisor for twelve
17    years.  Jim, her husband, has been a supervisor for the last
18    fourteen years.
19              As supervisors, Carol and Jim are charged with
20    knowing department policy and providing assistance to
21    subordinate officers and providing them with direction on
22    department policy and resources, where to go for help, what
23    to do in situations.
24              As supervisors, Jim and Carol are also charged
25    with reporting misconduct; and, in fact, it is department
```

1   policy for an officer of the LAPD to fail to take action
2   when they know about misconduct.
3           As I stated earlier, the evidence will show that
4   since the 1970s the department has conducted training on
5   discrimination and cultural diversity; and since the 1980s,
6   the department has conducted training on harassment and
7   retaliation.
8           This training includes information regarding the
9   department's zero tolerance for discrimination, harassment,
10  retaliation.
11          You will also hear that this training tells
12  officers where they can go to report this type of conduct.
13          You will hear evidence that the department
14  provides this type of training in two different forums.  The
15  first is standardized class training which I'm sure some of
16  you have had to go yourself through your employment.
17          The other is roll-call training.  Every day before
18  the start of watch, officers attend roll call and receive
19  information; and during these sessions, officers are
20  provided training on various topics including the
21  department's zero tolerance for discrimination, harassment,
22  retaliation.
23          And you'll hear evidence, ladies and gentlemen,
24  that Jim and Carol received this training and that such
25  training was, in fact, part of their supervisory training

1    courses when they promoted to supervisory ranks.

2            The evidence will also show that the evidence --

3    I'm sorry -- that the issues of discrimination, harassment

4    and retaliation are of such concern to the department that

5    its leaders have enacted a number of policies over the years

6    to address these issues.

7            By 1982, the department had enacted its sexual

8    harassment policy.

9            In 1991, the department created a separate

10   nondiscrimination policy.  Prior to this, the department's

11   respect-for-others policy included its anti-discrimination

12   rules.

13           Then in 1992, the department enacted an

14   anti-hazing policy; and in 1996, the department created a

15   separate anti-retaliation policy.

16           Not only do these policies reflect the

17   department's position that harassment, discrimination, and

18   retaliation will not be tolerated, these policies also

19   inform officers where they can go to make such complaints.

20           And you will hear by that 2001 there were over 20

21   places an officer could go inside or outside the LAPD to

22   report this type of conduct; and you will hear neither Jim

23   nor Carol ever went to any of these places to initiate a

24   complaint about the harassment or discrimination that Carol

25   was experiencing.

1        They never did this despite their training and job

2   duties as supervisors.  Indeed, you'll hear that Jim on one

3   occasion initiated a complaint on behalf of a victim of

4   sexual harassment despite her pleas not to.

5        Instead, ladies and gentlemen, you will hear that

6   when Carol was meeting with Sandy Jo MacArthur she only

7   complained about a personality conflict with the other

8   officers that she worked with when she was assigned SOS.

9        In fact, Sandy Jo will tell you that had Carol

10  told her about the discrimination and harassment that she

11  allegedly was experiencing, she would have reported it just

12  as she can done for Jim when he came to him -- her.  Let me

13  try that again.

14       She would have reported it just as she had done

15  when Jim came to her to report the retaliation he claimed he

16  was experiencing.

17       You will also hear evidence, ladies and gentlemen,

18  that contradicts Carol's claims including contradictory

19  testimony from her own husband Jim.

20       For example, in 2001, Carol claims she received a

21  comment card for lack of case preparation and being late to

22  a briefing.  She claims that that was harassing and

23  discriminatory.

24       Her husband, however, believes that the comment

25  card was a training issue and was warranted and that Carol

 1    should have taken responsibility for the situation.

 2            You will also hear that by August of 2002, Carol

 3    gets transferred to the other squad in SOS away from the

 4    alleged harassers and that she said she was no longer having

 5    problems because of this transfer and because the

 6    problematic supervisor had retired.

 7            You will also hear that in March 2003, Carol

 8    received a performance evaluation from a new supervisor that

 9    she took issue with and asked for changes to be made and

10    those changes were made.

11            She claims now, however, that she still wasn't

12    satisfied with it, although you won't hear any testimony

13    about her grieving that rating.

14            You'll also hear testimony that Carol was served

15    with a notice about a case going out of statute.  These

16    notices do not go into her personnel package.  They won't

17    follow her through her career.  No one will ever know about

18    it unless she chooses to say something.

19            You will also hear that she demanded it be

20    modified and you will hear that it was modified.

21            And you will also hear that during the same time

22    period that she claims she got this notice that was negative

23    and harassing, Jim said Carol never reported problems to him

24    at Valley Investigation Section.  She never told him that

25    she was having any issues at that time.

1          You will also hear that in July of 2005, Carol was

2   reassigned out of Valley Investigative Section because she

3   felt uncomfortable there given what had happened to Jim.

4          She had asked to be moved so she was assigned to

5   CRID, C-R-I-D, which is the Civil Rights Integrity Division;

6   and she was allowed to keep her Sergeant II status even

7   though it was not a coveted assignment.

8          You'll also hear that when she said she was

9   unhappy with that assignment, she was moved once again and

10  allowed to keep her Sergeant II status and coveted

11  assignment.

12         And then you will hear that in December of 2005,

13  Carol and Jim filed their lawsuits; and on New Year's Eve,

14  they arranged to meet with Sandy Jo MacArthur; and during

15  that meeting with Sandy Jo MacArthur, they tell her:  We had

16  to sue you.  Our lawyer told us we had to sue you because it

17  would make Carol's case better.

18         Common sense, ladies and gentlemen.  The evidence

19  will show and common sense will tell you that officers

20  trained to handle extreme stress, that officers trained to

21  take action, that officers trained to identify and report

22  problems don't wait several years to complain about

23  harassment and discrimination.

24         Well, that does it for now.  After you have heard

25  all the testimony, the parties will have another opportunity

1    to address you in the closing argument; and at that time, we

2    will ask you to use common sense and return a verdict in

3    favor of the defendants.

4              Thank you.

5              THE COURT:  Thank you.

6              Evidence for the plaintiff.

7                    PLAINTIFFS' CASE-IN-CHIEF

8         MS. RUGGIERO:  The plaintiffs would call Jim Gavin

9    to the stand, please.

10        **ALBERT JAMES GAVIN, PLAINTIFF'S WITNESS, SWORN**

11             THE CLERK:  Please raise your right hand.

12             Do you solemnly swear that the testimony you're

13   about to give in the cause now pending before this court

14   shall be the truth, the whole truth, and nothing but the

15   truth, so help you God?

16             THE WITNESS:  I do.

17             THE CLERK:  Please state your name for the record.

18             THE WITNESS:  Albert James Gavin.

19                    **DIRECT EXAMINATION**

20   BY MS. RUGGIERO:

21   Q.   Good afternoon, Lieutenant Gavin.

22   A.   Good afternoon.

23   Q.   How long have you been a member of the Los Angeles

24   Police Department?

25   A.   It will be 21 years in December.

1   Q.   When did you enter the academy?

2   A.   December of 1987.

3   Q.   And what prompted you to become a police officer?

4   A.   It was a dream that I had since I was a little kid.

5   Q.   And when did you first meet your wife?

6   A.   We were high school sweethearts.  We lived on the same

7   street since 4th grade; and I met her in 4th grade we

8   started dating in the 11th grade.

9   Q.   And was your wife Carol Gavin?

10   A.   Yes.

11   Q.   Is she Carol Gavin?

12   A.   Yes.

13   Q.   And were you influenced by Carol Gavin's father in

14   terms of becoming a police officer?

15   A.   I was influenced by him, I was influenced by *Dragnet*, I

16   was influenced by *Adam 12*, I was influenced by *Hill Street*

17   *Blues*, I was influenced by the job.

18   Q.   And what was it about the job that excited you?

19   A.   To help people, to protect them, to serve my community.

20   Q.   How long have you and Carol Gavin been married?

21   A.   23 years.

22   Q.   I want to address something that was mentioned before

23   we go on.  You received the Medal of Valor; is that right?

24   A.   Yes.

25   Q.   And why did you receive that Medal of Valor?

1   A.   For heroism.   I went into a burning building and saved

2   a bunch of -- it was a retirement home.   There were

3   approximately a hundred people in there; and myself and ten

4   other officers went into the burning building and started

5   pulling the residents out.

6   Q.   When did that occur?

7   A.   1996.

8   Q.   1996.   When did you actually receive the Medal of

9   Valor?

10   A.   Last year.

11   Q.   Do you know why you received the Medal of Valor so long

12   after the event?

13   A.   No, I don't.

14   Q.   Is that common as far as you know in the LAPD?

15   A.   No.

16   Q.   So after you complained about retaliation, after you

17   filed your lawsuit, you were given the Medal of Valor; is

18   that fair to say?

19   A.   Yes.

20   Q.   Did you find it unusual?

21   A.   Yes.

22   Q.   Are you proud of the medal despite that?

23   A.   I'm very proud.

24   Q.   Can you briefly describe your career up to the time

25   where you were in Internal Affairs working on the

1    Bruce Lisker complaint?

2    A.    As I said earlier, I entered the academy December of

3    1987.  Once I graduated, I was assigned to do my probation

4    in Devonshire Division which is in the Northwest Valley of

5    the San Fernando Valley.

6           Once I finished my probation there, I was

7    transferred to Newton Division which is just south of

8    Los Angeles downtown.  Where I stayed there for a couple of

9    years, and then I was promoted to training officer and again

10   assigned to Devonshire Division where it was my duty and

11   responsibility to training young officers.

12          Then in March of 1991, I was transferred to

13   Foothill Division where I continued to be a training officer

14   until my assignment in December of 1991 as a vice officer

15   investigator.

16          And I worked as a vice investigator until January

17   of '94 and went back to patrol for a few months because I

18   was on the sergeant's list and I wanted to get acclimated

19   with patrol again.

20          And then in May of '94, I made sergeant and then I

21   went to North Hollywood Division, spent a year there.  Once

22   I completed my training, then I was transferred to Wilshire

23   and I spent a year as a patrol sergeant there.

24          Then I was assigned as a special problems

25   supervisor when I was in charge of ten officers, and we

1    worked closely with detectives working on outstanding

2    suspects for different variety of crimes; and we also worked

3    closely with the field enforcement narcotics unit when they

4    did their undercover buy-busts.

5            After that, I was promoted to Sergeant II at

6    Wilshire Vice where I worked there from '97 until '99 and

7    supervised ten officers there; and we did vice enforcement,

8    prostitution enforcement, alcohol beverage and control

9    enforcement, and we also did bookmaking.

10           After that position, I was transferred to

11   Management Services Division which, in essence, is the

12   administrative section for the Chief of Police where I

13   supervised six Sergeant I's and a secretary and we did the

14   administrative work for the chief.

15           He would go to a convention, a meeting; and he'd

16   want to bring along information or he would receive

17   information; and it was our responsibility to review it and

18   do a quick writeup for him.

19           So we worked -- we would do special orders, change

20   in policy for the department all the way to articles that

21   were written by department employees.  We would review them

22   to make sure that it was in the best interests of the

23   department.

24           Right about that time, there was a change in

25   Internal Affairs at the time.  There was maybe five or six

1    investigators in the valley, a total maybe less than a

2    hundred employees; and there was a move within the

3    department because of Charter F that they wanted all of the

4    investigations, citizen complaints, internal complaints, to

5    be conducted by an entity not within the division where the

6    complaint occurred.

7              So they wanted -- the police department went to

8    the Police Commission, got authority for additional

9    supervisors, and there went the expansion of professional

10   Internal Affairs.

11             I saw an opportunity, because my kids were getting

12   older and I wanted to coach in baseball, basketball, and

13   football, I knew Valley Section was just miles away from my

14   home and it would give me that opportunity to be with them

15   during the day and still fulfill my commitment to the

16   department.

17             And I knew that that position was a three-year

18   tour with the opportunity of two additional years.  One, you

19   put in a request for an additional year.  After that year,

20   you put in another request; and I figured five years there,

21   Monday through Friday, weekends off, I coach five days a

22   week, sometimes four, I went back to school, so my life was

23   filled with my family; and then that's when I got the

24   Bruce Lisker case in June of 2003.

25   Q.   Okay.  And, briefly, can you explain to us what

1   Internal Affairs is?

2   A.   Internal Affairs, the responsibility of Internal

3   Affairs is to ensure the department employees are adhering

4   to the policies and procedures of not only the department,

5   but they're not violating the law.

6           That if a citizen is upset with the service that

7   they were given or were concerned about the actions of a

8   police officer, they have an avenue to report it and that

9   was Internal Affairs.

10          If an employee from within the department was

11  concerned about maybe their supervisor appear, somebody they

12  worked with, they, too, had somewhere to go to report

13  alleged misconduct or even criminal misconduct.

14  Q.   So is it fair to say that Internal Affairs has LAPD

15  investigators who investigate complaints about other

16  officers?

17  A.   Yes.

18  Q.   And is it the policy of the Los Angeles Police

19  Department to investigate all complaints made by citizens?

20  A.   Yes.

21  Q.   And what is your understanding as to how an officer is

22  to complete an investigation of a complaint by a citizen?

23  Briefly take us through the steps.

24  A.   If I was working -- when I was working Valley Section,

25  you'd get a complaint on your desk.  It would be the

1    department facesheet, it would give you the name of the

2    complainant, the accused officers, the allegations:  On this

3    day at this time they did this.

4              And then it was my responsibility within ten days

5    to make contact with the complainant to let them know that

6    the Los Angeles Police Department has received your

7    complaint and I am the investigator; and if you need to get

8    ahold of me, this is the phone number you can get ahold of

9    me at.

10             And we would also have an addenda -- not an

11   addenda -- I'm sorry -- my IO notes, my chrono log; and I

12   would place in my log different things I had done for that

13   investigation as the investigation progressed.

14   Q.   Now, you mentioned a couple of things.  "IO" what does

15   that stand for?

16   A.   I'm sorry.  That's "investigating officer."  That is

17   the person that is assigned to the case.

18   Q.   And in the Bruce Lisker case, was that you?

19   A.   Yes.

20   Q.   What is a chrono log?

21   A.   A chrono log is a guide.  It allows the supervisor of

22   an investigating officer to see how they're spending their

23   time.  Are they managing their time properly?  What are they

24   doing with the investigation?  If they've been given

25   direction, have they taken that information and placed it in

1    the log, and have they followed up on the information

2    provided to them, whether it was from their commanding

3    officer or one of the immediate supervisors as officer in

4    charge or an assistant officer in charge?

5              Because we handled 6,600 and some odd complaints,

6    the responsibility, the role of the investigating officers

7    in Internal Affairs had greatly increased.

8              When I first did my loan in 1999, the IOs were

9    handling maybe three or four cases at a time.  By the time I

10   left Internal Affairs, I was handling anywhere between

11   fifteen and twenty.

12             So it was my responsibility to make sure that I

13   placed that information in the chrono log so that my

14   supervisors could get a gauge of how I was progressing on

15   certain cases, was I going to meet the statute?

16             There were mandates from the police department

17   that all the cases needed to be done with five months.  We

18   needed to send a letter out to update the complainant within

19   30 days.  I had to update the commanding officers of all the

20   accused in 30 days.

21             I had to provide an update to my supervisors and

22   my captain, and that information would be placed in the

23   chrono log so everybody had a idea which direction you were

24   going with the case.

25   Q.   Does everything that you do during an investigation of

1   a complaint end up being documented in the chrono log?

2   A.   No.

3   Q.   What types of things would you probably not include in

4   a chrono log?

5           MR. AGUILERA:  Objection.  Vague, Your Honor.

6   Calls for speculation.

7           THE COURT:  Do you understand the question?

8           THE WITNESS:  Yes, I do.

9           THE COURT:  You may answer.

10          THE WITNESS:  You know, if you wanted to pick

11  up items at Scientific Investigation Division, because we

12  worked the valley, it was time-consuming for the 20

13  employees to all get in their car at the same time and to

14  drive down to the Scientific Investigation Division or

15  police headquarters.

16          So you would walk up and down the hallway and say:

17  Do you need anything?  Do you need anything?  And you would

18  put together a list of items.

19          I wouldn't necessarily put that in my chrono

20  because it dealt with other investigations that not

21  necessarily impacted my investigation.

22          It was more of a guide so that the department

23  supervisors knew that this case was coming up, the statute,

24  this case was coming up to the five-month period.  The

25  secretaries knew that they had to write letters to the

Case 2:05-cv-09001-FMC-SS  Document 151  Filed 08/21/09  Page 154 of 207  Page ID #:755

1  complainants letting them know:  Hey, we haven't forgotten

2  you.  We're working on it.

3  Q.   Now, going back, do you recall when you first entered

4  Internal Affairs as a sergeant investigator?

5  A.   Yes.

6  Q.   When was that?

7  A.   July of 2001.

8  Q.   And when you received -- or strike that.

9       When did you receive the Bruce Lisker complaint?

10 A.   June of 2003.

11 Q.   At the time you received the Bruce Lisker complaint,

12 what was your investigative experience?

13 A.   I had worked on use-of-force investigations as a field

14 supervisor.  I had worked on investigations pertaining to

15 pursuits.  I had worked on complaints.

16       Prior to 2001, the charter had changed.  I was

17 handling cases similar to those that I handled at Internal

18 Affairs as a patrol supervisor.  I handled maybe 20 of those

19 investigations:  Excessive force, off-duty alcohol-related

20 incidents.  It really ran the whole gamut of personnel

21 investigations.

22 Q.   Did you have any homicide investigative experience when

23 you received the Bruce Lisker complaint?

24 A.   No.

25 Q.   Did you ever make any claims to any of your supervisors

1    that you had such investigative experience?

2    A.    No.

3    Q.    Did you ever inform any of your supervisors that you,

4    in fact, did not have that type of experience?

5    A.    On several occasions.

6    Q.    And why did you do that?

7    A.    Because I don't feel that I had the necessary knowledge

8    and training to handle an investigation pertaining to a

9    homicide.

10           When you make -- within our department, once you

11   make Training Officer P3, there are two different routes you

12   can go:  You can become a detective and investigate crimes

13   or you can be a field supervisor and ensure the officers

14   respond to calls in a timely fashion.  Those are two

15   different roads.

16           As a detective, you go to detective school and

17   they teach you how to be a detective.  Then once you've been

18   able to prove yourself as being competent, then they will

19   offer you the opportunity to become a homicide detective and

20   then they'll send you to homicide school.

21           I had not been to neither, never been to detective

22   school, never been to homicide school; and I quickly

23   realized that the depth of this investigation that it was

24   way beyond my ability.

25   Q.    And we'll get back to that.

1          Just going back to your career for a moment,

2   during your career, did you earn commendations for your

3   performance?

4   A.   Yes.

5   Q.   I'd like to show you what has been premarked as

6   Exhibit 11.

7                    *(Pause in the proceedings.)*

8          MR. AGUILERA:  Your Honor, defense does not object

9   to publication to the jury.

10          THE COURT:  Thank you.

11                    *(Exhibit 11 received in evidence.)*

12          MS. RUGGIERO:  Thank you.  I'd like to place

13   Exhibit 11 on the Elmo and I guess the projector isn't on.

14   Sorry.

15                    *(Pause in the proceedings.)*

16          THE COURT:  Is the screen on in front of you?

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Okay.

19   BY MS. RUGGIERO:

20   Q.   Lieutenant Gavin, do you have that exhibit?

21   A.   Yes, I do.

22          MS. RUGGIERO:  I'll wait until it gets on the

23   screen.  Is it also going on the television screen here?

24          THE COURT:  I don't know where that television

25   screen came from so I doubt it.

```
 1            MS. RUGGIERO:  Okay.

 2            THE COURT:  It's a new piece of equipment to me.

 3   Maybe it will work.  That would be nice.

 4                 (Pause in the proceedings.)

 5            THE COURT:  Will that thing in the middle go away.

 6            THE CLERK:  Yes.

 7   BY MS. RUGGIERO:

 8   Q.   What is this document, Lieutenant Gavin?

 9   A.   This is a Class D commendation report.

10   Q.   And what is a Class D commendation report?

11   A.   At this level, there are two basic types of

12   commendations.  There's a commendation you would receive

13   from a citizen for work that you had done for them.

14   Something that they had recognized you for or your

15   supervisor.

16            Class D commendation is when you have received

17   four commendations within a twelve-month period.

18            There are three different personnel records you

19   have.  One in Personnel Division within the City of

20   Los Angeles, one at Personnel Division for the LAPD, and one

21   at your division of assignment.

22            A regular commendation would be placed in your

23   divisional package.  The only time -- and this is my

24   understanding -- the only time one of these individual

25   commendations would show up in your personnel record at
```

1  police headquarters is if it was a Class D commendation or

2  it was a citizen commendation.

3          So this commendation here allowed for these

4  commendations and this form here to be placed in my

5  personnel package at PAB, Police Administrative Building.

6  Q.   Okay.  And what is the date of this commendation

7  report, this D commendation report?

8  A.   July 28th, 2003.

9  Q.   And do you know whose signature is down near the bottom

10 as the reporting supervisor?

11 A.   I do not know.

12 Q.   Can you please read the type of this report.

13          MR. AGUILERA:  Objection, Your Honor.  The

14 document speaks for itself.

15          THE COURT:  You may read it.

16          THE WITNESS:  "On September 20th, 2002,

17 Sergeant Gavin was commended for teamwork, attention to

18 duty, and outstanding work ethic.

19          "On December 2nd, 2002, Sergeant Gavin was

20 commended for teamwork, attention to duty, and outstanding

21 word ethic.

22          "December 30th, 2002, Sergeant Gavin was

23 commended for his significant contributions to the newly

24 revised supervisory course.  His creativity, work ethic, and

25 training expertise were invaluable as he facilitated the

1    course curriculum for future sergeant candidates.

2          "On January 13th, 2003, Sergeant Gavin was

3    commended for teamwork, attention to duty, tenacity, and

4    outstanding work ethic."

5    Q.    Thank you.  Is it important, Lieutenant Gavin, to have

6    in your personnel package commendations that discuss your

7    good work ethic?

8    A.    Yes.

9    Q.    Why is that?

10   A.    For promotional considerations, for transfers.  If you

11   want to stay as a supervisor and move vertically or

12   horizontally through the department, you can; and those are

13   some of the assignments that I worked.

14          I worked vice, I worked within the chief's office,

15   and there are a variety of assignments you can work as a

16   sergeant.  But it's important, it's imperative, that you

17   have a rating that reflects some of the attributes that you

18   can contribute to those positions.

19          If you want to promote to lieutenant and start

20   moving up into the management range, these again are some of

21   the attributes that you're looking for and that you want to

22   see appear on your rating; and these are the types of

23   commendations you want to receive.

24   Q.    Thank you.  And I'd like to show you a document that we

25   premarked as Exhibit 10.

1           *(The exhibit was displayed on the screen.)*

2                MR. AGUILERA:  Your Honor, the defense does not

3    object to the admission of the document and its publication.

4                THE COURT:  Thank you.

5           *(Exhibit 10 received in evidence.)*

6                MS. RUGGIERO:  Thank you.  And I'll place this on

7    the Elmo.

8    Q.   What is the date of this document?

9    A.   December 30, 2002.

10   Q.   And what is an interdepartmental correspondence?

11   A.   Interdepartmental correspondence is used for commanding

12   officers to communicate with one another, to provide insight

13   to certain things that may be occurring within the

14   department within their command, or it may be direction that

15   needs to be given or, in this case, accommodation for an

16   employee from one command to another.

17   Q.   And whose signature is at the bottom of that report?

18   A.   That is Captain Sergio Diaz who is now the Deputy Chief

19   of Operations Central Bureau.

20   Q.   And without reading this verbatim, what does this

21   interdepartmental correspondence communicate to you?

22   A.   That I assisted in developing the curriculum and

23   teaching the curriculum for the new supervisors which it

24   went from just the curriculum for the new sergeants but it's

25   also now for all civilian supervisors.  It's a mandate that

```
 1    all city within the LAPD attend this course.

 2    Q.    And you taught the course?

 3    A.    Yes.

 4    Q.    And what type of classes did you teach?

 5    A.    The role of a supervisor, counseling, how to administer

 6    a positive and negative rating report or a commendation, how

 7    to initiate a complaint, how to investigate a complaint,

 8    ethical decision-making.  Everything that a supervisor

 9    would -- a brand new supervisor would come across in their

10    daily activities with their subordinates.

11    Q.    What kinds of subjects would you teach concerning

12    ethical decision-making?

13    A.    We have a -- I think it was a half day where we would

14    talk about ethics.  We would talk about the different

15    policies and procedures of our department, but that course

16    wasn't just for LAPD.

17          We invited agencies from all over Southern

18    California.  It was a Peace Officers Standards and Training

19    certified course so other agencies from within California

20    would send people to this course.

21          It was 144 -- 160 hours.  So we would talk about

22    the different ethical dilemmas you would be placed in as a

23    supervisor:  What is your role at a supervisor?  Are you

24    somebody's friend?  Are you somebody's coworker or are you

25    actually their supervisor?  What happens when they bring
```

1    information to you?  What can happen to you?  What -- you

2    know, are you looking at the liability issue of the

3    department?  Your own personal liability if you fail to

4    report misconduct?

5            So we talked about the different historical things

6    that have occurred in this department that got us to the

7    point where we're at now where we have policies and

8    procedures in place.

9    Q.   When you received the Bruce Lisker complaint while at

10   Internal Affairs, can you describe what documents you

11   received when you first got that assignment?

12   A.   It was a citizen -- it was a citizen complaint form and

13   those are the forms you can find either on the Internet or

14   you can find them in each police station.

15           It was filled out.  It was typed and then signed,

16   I assume, by Bruce Lisker.  Also attached was the

17   department's official complaint form that was generated by

18   our -- within PSB, Professional Standards Bureau, by our --

19   I forget the name of the -- there was a small group and they

20   did all the -- bring in all the correspondence and they

21   would write out the complaints.

22           But it was completed by them; and attached were

23   like 22 allegations where Bruce Lisker, his private eye, and

24   his attorneys believe misconduct had occurred and he was

25   wrongly convicted; and attached was about four to six inches

1    of documents that supported his claim.

2    Q.   Okay.  So let's go back.  You first described what was

3    a citizen's complaint, and I'd like to show you what we

4    premarked as Exhibit 19.

5              THE COURT:  Any objection?

6              MR. AGUILERA:  No objection to its admission, Your

7    Honor.

8              THE COURT:  Thank you.  It's admitted.

9              *(Exhibit 19 received in evidence.)*

10             MS. RUGGIERO:  Thank you.  And it appears to be

11   six pages and I'll put the first page on the Elmo, the

12   projection.

13             *(The exhibit was displayed on the screen.)*

14   BY MS. RUGGIERO:

15   Q.   The first part of it.  Is this the citizen's complaint

16   form that you mentioned?

17   A.   Yes.

18   Q.   And is this what you received as part -- or at least

19   did you receive this as well as other documents when you

20   received the Bruce Lisker complaint investigation

21   assignment?

22   A.   Yes.

23   Q.   And what is the date of this complaint?

24   A.   June 9th of 2003.

25   Q.   And when did you receive the assignment to investigate

1    Bruce Lisker's complaints?

2    A.    Towards the end of June of 2003.

3    Q.    And looking at this complaint, could you please just

4    read that first paragraph.  We won't read the first six

5    pages but just the first paragraph of Bruce Lisker's

6    complaint.

7    A.    Yes.  "On April 7th, 1998, LAPD Detective III Andrew

8    Monsue, Serial No. 20927, wrote a letter to the California

9    Board of Prison Terms, Exhibit A, concerning the March

10   10th, 1983, robbery and murder of my adoptive mother in

11   our family home in Sherman Oaks.

12           "This is a terrible, brutal, vicious crime which

13   Monsue investigated and for which I now stand wrongly

14   convicted.  I didn't discover Monsue's letter in my prison

15   central file until several years after it was written when I

16   was allowed to review a file for an upcoming parole

17   consideration hearing before the board."

18   Q.    And when you received all of the documents as part of

19   your assignment to investigate the Bruce Lisker complaints,

20   did you read all six pages of his citizen's complaint?

21   A.    Yes.

22   Q.    And did you also review what you described earlier as

23   the complaint form from the department?

24   A.    Yes.

25           MS. RUGGIERO:  I'd like to show you what we

1    premarked as Exhibit 20 which is the complaint form.

2              *(Pause in the proceedings.)*

3              MR. AGUILERA:  Again, no objection.

4              THE COURT:  Thank you.  Admitted.

5              *(Exhibit 20 received in evidence.)*

6    BY MS. RUGGIERO:

7    Q.   How many pages is the facesheet of the complaint form?

8    A.   It's usually one -- I mean; I'm sorry -- usually two.

9    It all depends on the information provided by the

10   complainant.

11             They could give us a list of witnesses, a list of

12   officers.  They could attach things.  But, technically, the

13   department form is this page and the back form.

14   Q.   And the back page is page 2?

15   A.   Yes.

16             *(The exhibit was displayed on the screen.)*

17   BY MS. RUGGIERO:

18   Q.   And I will put that on the Elmo.

19             Now, looking at page 1 of the LAPD complaint form,

20   is this what you received when you got the assignment to

21   investigate the Bruce Lisker complaints?

22   A.   Yes.

23   Q.   And what is the date on that form?  What is the date

24   that the form was completed?

25   A.   June 24th, 2003.

1    Q.   And is that at or around the time that you received the

2    assignment?

3    A.   Yes.

4    Q.   And looking at the second page of the complaint form,

5    I'll try to zoom it a little bit.

6              *(The exhibit was displayed on the screen.)*

7    BY MS. RUGGIERO:

8    Q.   Do you see where under "summary" there's a

9    typewritten --

10   A.   Yes.

11   Q.   -- paragraph?  Do you know who wrote that paragraph?

12   A.   No, I do not.

13   Q.   And did you read that paragraph when you were assigned

14   this case?

15   A.   Yes.

16   Q.   And can you please read that short paragraph.

17   A.   Yeah.  On my form I can't -- there we go.

18              "The complainant Bruce Lisker sent in a complaint

19   of employee misconduct form alleging that Detective Monsue

20   wrote a letter to the California Board of Prison Terms in

21   1998 which contained false information.

22              "Monsue was the original investigating detective

23   in the murder of the complainant's mother.  The murder

24   occurred in 1983, and Lisker was arrested and convicted for

25   the murder.

1    "Lisker included with his complaint form 21 items

2    he believes shows that the letter Monsue wrote contained

3    false information.  Monsue is currently a Lieutenant II

4    assigned to Central Area."

5    Q.   Now, in that paragraph it mentions 21 items; and I

6    recall that you mentioned that there were 22 allegations.

7    How did you formulate 22 allegations?

8    A.   I based the allegations on the letter that was written

9    by Lisker.  I'm assuming it was written by Lisker.  It could

10   have been written by his attorney or his private

11   investigator.

12       But when you're dealing with a citizen complaint,

13   you want to ensure that you have factored in all of the

14   issues that they have; that you're not missing anything.

15       When they say 21 items, you need to make sure that

16   there were 21 allegations.  There could be more.  Because my

17   role is to do the initial investigation to provide the

18   commanding officer, the adjudicator, the information that he

19   needs or she to adjudicate this case.

20       And knowing going into this investigation that

21   there is an audit unit within my division -- Professional

22   Standards Review and Evaluation does audits periodic, that

23   the Inspector General's office does audits -- so it behooves

24   you to ensure that you have investigated or at least

25   addressed all of the allegations that a citizen may have in

1  regards to the police department.

2  Q.   And a prisoner is considered a citizen?

3  A.   Yes.

4  Q.   So in this case, Bruce Lisker was considered a citizen

5  making a complaint against an LAPD officer or officers?

6  A.   Yes.

7  Q.   And when you reviewed the documents that you testified

8  to that you received, you then formulated your 22

9  allegations?

10  A.   Yes.

11          THE COURT:  If this is convenient place to

12  interrupt you, it's ten to 3:00 so we'll take a

13  fifteen-minute recess.

14          THE CLERK:  All rise.

15            *(The jurors exited the courtroom.)*

16                *(Recess.)*

17            *(The jurors entered the courtroom.)*

18          THE CLERK:  All rise.  Please be seated.

19          THE COURT:  You may continue.

20          MS. RUGGIERO:  Thank you.

21  Q.   Now, you mentioned that you formulated 22 allegations

22  even though the complaint mentioned 21.  How did you come up

23  with 22 allegations?

24  A.   You know, I don't recall unless I look at the

25  investigation.

1  Q.   And what do you mean "look at the investigation"?  The

2  entire package?

3  A.   Well, yeah, the 22 allegations.

4  Q.   What process did you go through to actually formulate

5  them?

6  A.   I based it upon the letter that was written by Lisker.

7  He had written them in numerical order; and I think the last

8  one was in regards to a letter that was written to the

9  parole board.

10 Q.   Okay.  And so you looked at all the documents that

11 Bruce Lisker provided and formulated these allegations?

12 A.   Yes.  It's kind of like if a citizen says:  Officer

13 used excessive force.  He punched me with his right hand.

14 It would be one allegation.  He used excessive force when he

15 punched the complainant with his right hand.

16       So Lisker and I believe his private investigator

17 and his attorneys outlined all the different points which I

18 turned into allegations that they believed, with the

19 supporting documents that they provided, that they believed

20 Detective Monsue had improperly investigated the case.

21 Q.   Okay.  And if you look at Exhibit 28, which I'll not

22 request to be admitted at this time, but if you look at

23 Exhibit 28 in the notebook, it's Volume 1.

24       No, I'm sorry.  In the box.  Those are the

25 defense.  Volume 1.  Thank you.

170

```
 1            If you'll look at Exhibit 28, do you see where you
 2   have written out all 22 allegations?
 3   A.   (Witness complies.)
 4            MR. AGUILERA:  Objection, Your Honor.  I'm not
 5   sure where this question is going.  Is to this refresh
 6   recollection?  Leading?  I'm not sure.
 7            THE COURT:  What are you asking him?
 8            MS. RUGGIERO:  I'm asking him to -- he can't
 9   recite.  Well, I'll lay a foundation, Your Honor.
10            THE COURT:  Go ahead.
11   BY MS. RUGGIERO:
12   Q.   Lieutenant Gavin, do you remember all 22 allegations of
13   the Bruce Lisker complaint?
14   A.   No.
15   Q.   And is there a document that you wrote at some point in
16   time during your investigation where you actually wrote out
17   all of those allegations?
18   A.   Yes.
19   Q.   And where would those allegations be written?
20   A.   On the final investigation that I submitted.
21   Q.   Okay.  And is Exhibit 28 part of that final
22   investigation?
23   A.   Yes, it is.
24   Q.   And looking at that document, did you generate that
25   document?
```

1    A.    Yes, I did.

2    Q.    And could you please read for us each of the

3    allegations that you formulated after reviewing

4    Bruce Lisker's complaint.

5    A.    Yes.

6          "Allegation No. 1:  Complainant Lisker alleges

7    that on March 10th, 1983, Monsue, while on duty, failed to

8    have photos taken of his vehicle and the contents of his

9    vehicle that held evidentiary value.

10         "Allegation No. 2:  Complainant Lisker alleges

11   that on March 10th, 1983, Monsue, while on duty, failed to

12   have casts or impressions of his footprints made at the

13   scene of the homicide.

14         "Allegation No. 3:  Complainant Lisker alleges on

15   that on March 10th, 1983, Monsue, while on duty, provided a

16   transcript of an interrogation that he conducted of Lisker

17   that he knew or should have known detailed false statements.

18         "Allegation 4:  Complainant Lisker alleges that on

19   March 10th, 1938, Monsue, while on duty, failed to take into

20   evidence the phone that was used by Lisker to summon help."

21         And then apparently there is a typo because there

22   is no Allegation 5.  It goes from 4 to 6.

23   Q.    Okay.  Continue reading.

24   A.    "Allegation 6:  Complainant Lisker alleges that on

25   March 10th, 1983, Monsue, while on duty, failed to have an

1   analysis of the scene where bloody footprints led to.

2           "Allegation 7:  Complainant Lisker alleges that on

3   March 10th, 1983, Monsue, while on duty, failed to have

4   photos taken of his person so that he could have used them

5   in his defense.

6           "Allegation 8:  Complainant Lisker alleges that on

7   March 10th, 1983, Monsue, while on duty, described in an

8   arrest report that it appeared that the shirt Lisker was

9   wearing must have been torn during the struggle with his

10  mother.  Monsue failed to investigate the ripped shirt that

11  Lisker was wearing the day of the murder.

12          "Allegation 9:  Complainant Lisker alleges that on

13  March 10th, 1983, Monsue, while on duty, provided a false

14  report when he wrote that Lisker told him that he had gone

15  through the purse and then Monsue wrote in his report that

16  it appeared the purse had been gone through.

17          "Allegation 10.  Complainant Lisker alleges that

18  on March 10th, 1983, Monsue, while on duty, provided a false

19  report when he stated that Lisker was screaming inside and

20  outside of the residence.

21          "Allegation 11:  Complainant Lisker alleges that

22  on March 10th, 1983, Monsue, while on duty, provided a false

23  report when he stated that upon his arrival he observed

24  blood on Lisker's hands while he was seated in the back of

25  the police vehicle.

1          "Allegation 12:  Complainant Lisker alleges that

2     on March 10th, 1983, Monsue, while on duty, provided a false

3     police report when he wrote that the moist footprints

4     pointed into one direction.

5          "Allegation 13:  Complainant Lisker alleges that

6     on April 4th, 1983, Monsue, while on duty, provided false

7     testimony during a Dennis H hearing when he testified that

8     Lisker had not specified how he touched his mother.  Monsue

9     testified that Lisker held her and during the preliminary

10    hearing he testified that Lisker bent down and cradled his

11    mother.

12         "Allegation 14:  Complainant Lisker alleges that

13    on April 4th, 1983, Monsue, while on duty, provided false

14    testimony during a Dennis H hearing when he testified that

15    he did not observe the keys of the victim in Lisker's

16    bedroom.

17         "Allegation 15:  Complainant Lisker alleges that

18    sometime between April 1983 and June 1983 Monsue, while on

19    duty, coached the jailhouse informant.

20         "Allegation 16:  Complainant Lisker alleges that

21    on November 5th, 1983, Monsue, while on duty, failed to

22    follow up on the telephone records the day of the murder.

23         "Allegation 17:  Complainant Lisker alleges that

24    on November 28th, 1984, Monsue, while on duty, discussed the

25    case with one of the jury members during a break.

1            "Allegation 18:  Complainant Lisker alleges that

2    on October 31st, 1985, Monsue, while on duty, provided

3    false testimony when he stated that he first arrived with

4    his partner.

5            "Allegation 19:  Complainant Lisker alleges that

6    on November 4th, 1985, Monsue, while on duty, provided

7    false testimony during the criminal trial when he testified

8    that he recovered the magnetic key box in the rear yard.

9            "Allegation 20:  Complainant Lisker alleges that

10   on November 13th, 1985, Monsue, while on duty, provided

11   false testimony during the criminal trial when he testified

12   that Lisker stated to the first officers on scene:  Are they

13   going to arrest me?

14           "Allegation 21:  Complainant Lisker alleges that

15   on November 13th, 1985, Monsue, while on duty, provided

16   false testimony during the criminal trial when he testified

17   he did not -- that he did nothing with the entry hall rug.

18           "Allegation 22:  Complainant Lisker alleges that

19   on April 7th, 1988, Monsue, while on duty, provided a false

20   police report when he submitted the letter to the parole

21   board stating that he had made contact with the new

22   homeowners and discovered money and miscellaneous items in

23   the attic."

24   Q.   Thank you.

25           Now, although it states "Allegation 22," because

1   you skipped a number, is it fair to say there are 21

2   allegations?

3   A.   Yes.

4   Q.   Okay.  And after you formulated these allegations, what

5   steps did you take in investigating Bruce Lisker's

6   complaint?

7   A.   Then the next step I took is trying to contact --

8   obviously, Bruce Lisker's in prison and I didn't know how to

9   contact him in prison.  He had placed on the letter the

10  names of his attorneys and their phone numbers and his

11  private investigator.

12          So what I did is I called each one of the numbers

13  and left a message telling them who I was, the purpose for

14  the call, and how they could reach me.

15  Q.   And who is Bruce Lisker's private investigator?

16  A.   Paul Ingels.

17  Q.   And did you ultimately speak with Mr. Ingels during

18  that first set of steps that you took?

19  A.   Yes.

20  Q.   I'd like you to look at Exhibit 21 which contains

21  numerous cases but I'll just put on the Elmo.

22          MR. AGUILERA:  Your Honor, we have no objection to

23  21 and 28 that was just read into evidence.

24          THE COURT:  Okay; thank you.

25              *(Exhibit 21 received in evidence.)*

```
 1              (Exhibit 28 received in evidence.)

 2              (The exhibit was displayed on the screen.)

 3    BY MS. RUGGIERO:

 4    Q.   And I'm putting Exhibit 21 on the Elmo.  Is this the

 5    chrono log you referred to earlier?

 6    A.   Yes.

 7    Q.   And what is the number underneath the words

 8    "chronological record"?

 9    A.   There's a CF number which is "complaint form."  03

10    represents the year and then the dash and then a numerical

11    number which is for catalog and tracking purposes.

12    Q.   And looking at this chronological record, did you

13    notate your attempts to contact Bruce Lisker's

14    representatives?

15    A.   Yes.

16    Q.   And where would those entries be?

17    A.   "June 30th at 11:30.  IO" -- Investigating Officer --

18    "left phone message with Paul Ingels."

19              And then "June 30th, '03 at 11:35 -- 11:45:  IO

20    spoke with Attorney Robert Amadon.  He is representing

21    Bruce Lisker, the complainant."

22              And it was important for me to get ahold of the

23    attorney first because earlier our department during the

24    DNC, the Democratic National Convention, there were claims

25    for damages of excessive force.
```

```
 1              And some of the investigators were contacting the
 2     complainants, the people who were actually demonstrating who
 3     may have been injured by the police.
 4              And some of their attorneys started questioning
 5     that process.  So there was training, a memo that went out
 6     that said:  From now on, please contact attorneys first.  If
 7     you contact people in the middle of litigation or maybe have
 8     allegations of criminal conduct, you know, that are in
 9     county jail, in prison, because they do have a right to an
10     attorney.
11              So my intentions again, like I said earlier, I
12     didn't know how to get ahold of Bruce Lisker; but I wanted
13     to get ahold of his attorney on record so that I would have
14     permission to discuss this case with Bruce Lisker and even
15     the private eye.
16     Q.   And what is the purpose of your discussing the
17     complaint directly with Bruce Lisker?
18     A.   He was the complainant.  He's the one that represented
19     these allegations.
20     Q.   And did you end up speaking directly with Bruce Lisker
21     at any time during your investigation?
22     A.   Yes.
23     Q.   Before speaking with Bruce Lisker, did you, in fact,
24     speak with Paul Ingels?
25     A.   Yes, I did.
```

1   Q.   And what was the purpose of your speaking with

2   Paul Ingels?

3   A.   In looking at the investigation that was provided to

4   me, it appeared to me that Paul Ingels had made -- or had

5   conducted the majority of the interviews, investigation, and

6   that his name was throughout the report.

7   Q.   When you or -- strike that.

8          After you formulated the allegations and after you

9   reviewed all the documents that Bruce Lisker provided in his

10  complaint, did you make any attempts to gather the documents

11  from the murder investigation?

12  A.   Yes.

13  Q.   And why did you do that?

14  A.   I was directed to.

15  Q.   Who directed you to obtain those documents?

16  A.   Ultimately it was Captain Egan.  I was given the word

17  through my supervisor.

18  Q.   Who was that at the time?

19  A.   Mike Burditt.

20  Q.   Okay.  And is that found on your chronological record?

21  A.   I think further down.

22  Q.   If you look in the notebook, it's a lot better.

23  A.   On August 18th, 2003.

24  Q.   Okay.  I'll put page 2 on the Elmo.

25          (The exhibit was displayed on the screen.)

1   BY MS. RUGGIERO:

2   Q.   Is that the third entry *(indicating)* on that page?

3   A.   Yes.

4   Q.   And who is Detective Burditt?

5   A.   He was our assistant officer in charge.

6   Q.   And do you know why Detective Burditt -- strike that.

7         Did Detective Burditt tell you why he wanted to

8   obtain the Murder Book?

9   A.   It was my understanding he received the direction from

10  Captain Egan.

11         MR. AGUILERA:   Objection.   Move to strike.

12  Hearsay, Your Honor.

13         THE COURT:   It's not offered for its truth but

14  just to explain the sequence of events.

15         I'll leave it in.

16  BY MS. RUGGIERO:

17  Q.   Briefly, can you tell us what a Murder Book is.

18  A.   Having never worked a murder investigation, I -- it's

19  my understanding that a Murder Book is all the documents

20  that you compile, your notes, a chrono, the original crime

21  report, all the follow-up reports, evidence reports,

22  evidence testing results, coroner's investigation, photos,

23  everything that you would bring to court to prosecute the

24  defendant for the murder would be contained in that Murder

25  Book.   That's my understanding.

1  Q.   Okay.  And on August 18 when you were directed to

2  obtain a copy of the Murder Book by Detective Burditt, did

3  you go ahead and do as you were instructed?

4  A.   Yes.

5  Q.   And what did you do to locate that Murder Book?

6  A.   On August 21st, 2003, at 10:45 just below that entry

7  on Detective Burditt, I left a message for Detective Lopez

8  at Van Nuys Homicide and tried to obtain the box number

9  because the Murder Book had been placed in Archives.

10          They referred to the Murder Book now in the box

11  number where it could be located.  What location it was

12  archived, stored, and the number of the box in which the

13  Murder Book could be located.

14  Q.   And did you, in fact, get the Murder Book there in

15  Archives?

16  A.   No, I did not.

17  Q.   Why not?

18  A.   The gentleman that I went -- I went to Archives, met

19  with a city employee, gave him the box number.  He brought

20  out a palate with 20 -- 25 boxes in sequential order except

21  the box I was looking for.  That one was missing.

22  Q.   And did the gentleman from the city tell you anything

23  that you could do to try to locate that box yourself?

24  A.   No.  As a matter of fact, we -- when we went there and

25  gave him the box number, we -- I went to follow him and he

181

1  stopped me and said:  No.  You're not allowed back here.

2  It's restricted.

3  Q.   When you went to Archives, did you go by yourself or

4  did you go with someone else?

5  A.   I went with my partner.

6  Q.   And who was that at the time?

7  A.   Sergeant Mario Valdez.

8  Q.   And both of you went to locate the Murder Book?

9  A.   Yes.

10  Q.   And since you didn't find the Murder Book in Archives,

11  did you take any steps after that to try and locate that

12  book?

13  A.   Yes.

14  Q.   What did you do?

15  A.   Well, originally, I went to Van Nuys Detectives.  They

16  didn't have it.  I went to the Van Nuys records clerk, she

17  could only give me the box number.  I contacted the District

18  Attorney's office.  They no longer had the Murder Book.  I

19  contacted the public defender who referred me to the

20  Alternate Defender's office.

21        And as it was explained to me, when somebody is

22  being represented by a public defender, they can't both be

23  represented by the same office so they have an alternate

24  public defender so they referred me to them.

25        They didn't have the Murder Book.  Then they

1  referred me to Juvenile Hall, and I contacted them.  They

2  didn't have the Murder Book.

3          So then finally I contacted Paul Ingels because,

4  in prior conversations, he said that he was able to obtain a

5  copy of the Murder Book and, if I needed one, he could

6  provide it.

7  Q.   So when you went to locate the Murder Book from city

8  Archives, did you already know that Paul Ingels had a copy

9  of the Murder Book?

10  A.   Yes.

11  Q.   Why did you go and look for the Murder Book then in

12  Archives?

13  A.   Because of continuity of evidence.  I wanted -- what's

14  to say the information he provided was false or altered?

15  What I wanted to do is find the original documents or copies

16  of the original documents that were used by my police

17  department and make copies of those or obtain the book

18  itself so I could refer to it and look at the documents he

19  provided.

20  Q.   Are you saying that you would compare the two?

21  A.   Yes.

22  Q.   And were you ever able to do that?

23  A.   No.

24  Q.   Were you ever able to locate the Murder Book at the

25  City of Los Angeles?

1    A.    No, I was not.

2    Q.    So what did you end up doing in order to follow the

3    instructions of Detective Burditt and obtain the Murder

4    Book?

5    A.    I, in a sense, created my own Murder Book.

6    Q.    And how did you do that?

7    A.    I had the DR number, the district reporting number.

8    That's the number when a crime occurs and you get a report

9    from a policeman, you can follow up in the next several

10   days.  You give them your name and they'll have the report

11   number.  That will give you an idea.  Almost a tracking

12   number where you can follow-up with the detective.

13          I had the DR number and I was able to obtain all

14   the reports that referred back to that DR number and had

15   copies of those reports sent to me.  Once looking at those

16   reports, I noticed that photos were taken and they had a

17   number.

18          So I called Scientific Investigation Division and

19   gave them the number and then they were able to give me

20   copies of the photos.

21          I noticed that the coroner's number was there and

22   so I contacted the coroner's office and I told them of the

23   victim, gave them the number for the victim; and they were

24   able to obtain a copy of the coroner's report and then

25   photos of the autopsy.

184

```
 1              And then they sent those -- actually I went down
 2   there and I picked them up.
 3   Q.   So you were able to obtain LAPD and City of Los Angeles
 4   documents from sources in the city as opposed to just from
 5   Paul Ingels?
 6   A.   Yes.
 7   Q.   Did you, in fact, also obtain a copy of the Murder Book
 8   from Paul Ingels?
 9   A.   Yes, I did.
10   Q.   How did you get that Murder Book from him?
11   A.   I went to the Law Office of Mr. -- I believe it was
12   Mr. Amadon or Bornstein in Burbank and went to their office
13   and they provided me a book; and they said this was a
14   photocopy of the Murder Book.
15   Q.   So they gave you an entire copy?
16   A.   Yes.
17   Q.   And did you, in fact, compare the documents that you
18   had with the documents they had?
19   A.   Yes.
20   Q.   And did you find that they were consistent?
21   A.   Yes, I did.
22   Q.   Did you find any documents that you obtained from
23   Paul Ingels to be altered in any way?
24   A.   Not to my knowledge.
25              MR. AGUILERA:  Objection; no foundation.
```

```
 1              THE COURT:  Well, I think it's asking for the
 2   comparison between what you had and what was given to you.
 3              Were there differences?
 4              THE WITNESS:  No, ma'am, there wasn't.
 5   BY MS. RUGGIERO:
 6   Q.   Now, during the investigation that you conducted of
 7   Bruce Lisker's complaints, did you at some point in time
 8   determine that you needed assistance because of your lack of
 9   homicide experience?
10   A.   Yes.
11   Q.   And what did you do to gain that assistance?
12   A.   My -- the supervisors changed.  Detective Burditt was
13   no longer my immediate supervisor.  Detective Robert Vanina
14   was promoted from within Professional Standards Bureau and
15   was transferred out to Valley Section.
16              And I had numerous conversations with him in
17   regards to this investigation and other investigations I was
18   handling; and, in particular, the question kept coming up I
19   had no experience.
20              And Detective Vanina said:  I never worked
21   homicide either but my classmate Detective Dave Lambkin
22   works Robbery-Homicide, the Cold Case Unit.  How about if we
23   call him up, show him everything you have, and let's see
24   what direction he wants us to go.
25   Q.   And did you think that was a good idea?
```

1    A.    Absolutely.

2    Q.    Had Detective Vanina told you that Dave Lambkin was his

3    classmate?

4    A.    Yes.

5    Q.    When someone says "classmate," what does that mean to

6    you?

7    A.    They went through the academy together and, from the

8    beginning of their career, that's somebody that they

9    always can -- they know.

10   Q.    And did you, in fact, end up meeting with Dave Lambkin?

11   A.    Yes, I did.

12   Q.    Before meeting with Dave Lambkin, did Detective Vanina

13   ever ask you about any details of the Lisker complaint?

14   A.    Yes.

15   Q.    And what did he ask you?

16   A.    He asked me the specifics.  What were the allegations?

17   What did you find?  The fact that Monsue testified in court

18   that all the bloody footprints in the house were

19   Bruce Lisker's.

20          Bruce Lisker said:  They weren't my bloody

21   footprints; and then when I went through the documents, I

22   discovered that the bloody footprints had never been

23   analyzed.  However, Monsue testified in court that the shoes

24   that were on Lisker were, in fact, the shoes throughout the

25   house.

```
 1              When I had them analyzed, the analyst said they
 2   were not the shoes of the murderer.  I mean, Bruce Lisker's
 3   shoes were never in the house.  The shoes that Bruce Lisker
 4   were wearing that day weren't inside the house.  The bloody
 5   footprints in the house weren't Bruce Lisker's.
 6   Q.   Okay.  So let's back up.  Do you recall when you met
 7   with the homicide detective, Detective Lambkin?
 8   A.   February of 2004.
 9   Q.   And before February 2004, did you have this discussion
10   that you're explaining with Detective Vanina?
11   A.   Yes.
12   Q.   On more than one occasion?
13   A.   Yes.
14   Q.   On how many occasions did you discuss the Lisker
15   investigation with Detective Vanina, approximately, before
16   that meeting in February of 2004?
17   A.   It would have to be -- it would have to be more than
18   ten; and the reason I say that is I came in at 6:00 in the
19   morning, he came in at 6:00 in the morning, and we would sit
20   around and talk about different cases and this case would
21   come up.
22   Q.   Okay.  And before you met with Detective Lambkin of the
23   Cold Case Unit, did you provide Detective Vanina with any
24   documents so that he could determine for himself where this
25   case was going?
```

1    A.    Yes.

2    Q.    And when did that occur?

3    A.    To my best of recollection, I think it was December or

4    early January of -- December of 2003 or January of 2004.

5    Q.    And what prompted your providing Detective Vanina with

6    the documents and information?

7    A.    He told me that Captain Egan wanted him to review it

8    and determine if there was any validity to these

9    allegations; and so I handed him over the Murder Book that I

10   had.

11            I handed him over all of the court transcripts

12   from the criminal proceeding, the juvenile proceeding, all

13   of the proceedings pertaining to the Lisker case.

14            So I have estimated and I have said in the past

15   probably 4,000 documents, 4,000 pages, because the stack was

16   two stacks like this (*indicating*) of documents.

17   Q.    And those 4,000 pages include the Murder Book?

18   A.    Yes.

19   Q.    And include those photographs that you mentioned?

20   A.    Yes.

21   Q.    And at the time that you gave Detective Vanina those

22   documents in December of 2003 or January of 2004, had you

23   had those bloody footprints analyzed?

24   A.    No.

25   Q.    But you have the photographs?

189

1   A.   Yes.

2   Q.   And you -- did you give all of those thousands of

3   documents to Detective Vanina?

4   A.   Yes.

5   Q.   And what was your understanding as to why you were

6   giving him those documents?

7   A.   He told me that Captain Egan wanted him to look at it

8   and see if there was any validity to the allegations that

9   Bruce Lisker was making.

10  Q.   And you gave him the documents?

11  A.   Yes.

12  Q.   And did you ever learn from Detective Vanina that he

13  had indeed reviewed the documents?

14  A.   Yes.

15  Q.   And when did you hear next from him?

16  A.   I believe it was the next day.

17  Q.   So the next day you had a discussion with him?

18  A.   Yes.

19  Q.   And what was the gist of that conversation?

20  A.   He's guilty; close it out.

21  Q.   And when you say "He's guilty; close it out," who's

22  saying that?

23  A.   Detective Vanina.

24  Q.   So Detective Vanina came to you and said, "He's guilty;

25  close it out"?

1   A.   Yes.

2   Q.   Okay.  And did you respond to that?

3   A.   Not right away.

4   Q.   What did you do?

5   A.   Because I was in the room with other people and I

6   didn't think it was appropriate to question him in front of

7   them.

8   Q.   Why not?

9   A.   Well, I have taught -- at that point I had taught

10   supervisor school for almost two and a half years; and you

11   never chastise somebody in public.  It's always in private.

12          And in a paramilitary organization, you never

13   question your supervisor in front of subordinates and peers.

14   Q.   So weren't implying that you were going to chastise

15   him, were you?

16   A.   No, I wasn't going to chastise him.  I was going to

17   hopefully talk to him and remind him of the conversation we

18   had about Dave Lambkin and the Cold Case Unit.

19   Q.   And did you, in fact, do that?

20   A.   Yes.

21   Q.   And what did you tell him?

22   A.   Just that I felt that there was enough information here

23   to warrant a second look not by me, but by the Cold Case

24   Unit and that the Cold Case Unit, Dave Lambkin had 20 years

25   of homicide experience; that let him be the tie-breaker.

1  Q.    I'm sorry.  Let him be the --

2  A.    The tie-breaker.

3  Q.    And when you say "tie-breaker," why do you say that?

4  A.    Because Detective Vanina had said to me he had no

5  homicide experience; I had no homicide experience.  This was

6  definitely a new road that our department was going down.

7        You had a person who was convicted of murder

8  saying that he wasn't the killer.  There was evidence to

9  prove that the detective handling the case had, in fact,

10  falsified documents and provided false testimony.

11        And I think that a trained, seasoned homicide

12  detective would be able to better look at this case and

13  determine what would be the best route to go.

14  Q.    And did you, in fact, persuade Detective Vanina to go

15  forward and provide the information to the Cold Case Unit?

16  A.    Yes.

17  Q.    And what is your understanding of what the Cold Case

18  Unit is?

19  A.    My understanding of the Cold Case Unit is that as DNA

20  has progressed and as we've been able to fine tune and be

21  able to identify people with smaller amounts of DNA, we have

22  been getting positives back on DNA that has been held in SID

23  for 20 years.

24  Q.    And SID is?

25  A.    Scientific Investigative Division; and they're able to

1    identify suspects that committed crimes 20 plus years ago

2    based on DNA.

3            And Dave Lambkin's job was every time a positive

4    came back and came back with a suspect, to retrieve that

5    Murder Book, go through it, reinvestigate the crime, and, if

6    possible, arrest that individual for the crime.

7    Q.   And when Detective Vanina had discussed with you the

8    possibility of meeting with the Cold Case Unit, he mentioned

9    Dave Lambkin in particular, correct?

10   A.   Yes.

11   Q.   And was David Lambkin at that time head of the Cold

12   Case Unit?

13   A.   He was the officer in charge.

14   Q.   Okay.  And when did you meet with the Cold Case Unit?

15   You mentioned February.

16   A.   Yes.  February of 2004.

17   Q.   And would that event be located on your chrono log?

18   A.   Yes, it would be.

19   Q.   And can you locate that event, please.

20   A.   *(Looking at document.)*  It was February 11th, 2004,

21   at 1400 hours.

22           MS. RUGGIERO:  And I'll put that page of the

23   chrono log which on the top of that page is 12-23-03,

24   February 11, 2004.

25           *(The exhibit was displayed on the screen.)*

1   BY MS. RUGGIERO:

2   Q.    Can you read that entry, please.

3   A.    Yes.  "IO Valdez" -- that was my partner --

4   "Detective Vanina, Lieutenant Williams" -- who was the

5   officer in charge of Valley Section -- "and Robbery-Homicide

6   detectives discussed the ongoing case and the direction in

7   which the case should go."

8   Q.    Now, before you met on February 11, 2004, you have a

9   recollection of what evidence you had discovered up to that

10  point in the Lisker investigation?

11  A.    Yes.

12  Q.    And can you briefly summarize that evidence?

13  A.    There was a telephone bill that had never been

14  introduced into evidence that a phone call the day of the

15  murder was made to an individual by the name of Mike Ryan,

16  his mother's house, in Simi -- I think it was Simi Valley.

17  It was the same phone number off by the last digit.

18          That was never introduced.

19  Q.    And what was the relevance of that?

20  A.    Mike Ryan and Bruce Lisker had met at a drug rehab

21  center and became friends; and Mike Ryan had a long criminal

22  history that went back to, I think, the age of ten; and he

23  had committed similar acts with a knife.

24          And because they had met at this drug rehab

25  center, Mrs. Lisker -- Dorka Lisker and Mr. Lisker -- had

```
 1   never met Mike Ryan's parents.  So the possibility of

 2   Mrs. Lisker making that phone call to Mike Ryan's residence

 3   was impossible because I had documents from Harrison County

 4   sheriffs that showed that Mike Ryan had just been released

 5   from juvenile probation in Mississippi or Alabama; and there

 6   was no connection between the families.

 7           But the phone call was made of the day of the

 8   murder, but that wasn't included in the criminal trial.

 9   Q.    Okay.  So let me make sure I'm understanding this.

10           You obtained the telephone records from the Lisker

11   residence?

12   A.    I obtained it from Bruce Lisker.

13   Q.    Okay.  And that showed that Mike Ryan's mother had --

14   that Mike Ryan's mother's phone number, absent one digit,

15   was on that telephone record?

16   A.    Yes.

17           MR. AGUILERA:  Objection; leading.

18           THE COURT:  No.  It's just summarizing what he

19   said.  Overruled.

20   BY MS. RUGGIERO:

21   Q.    And what was the relevance of that?

22   A.    That Mike Ryan had been implicated in the murder of

23   Bruce Lisker's mother by Bruce Lisker; and there were

24   certain things that came up in the investigation that led to

25   not only myself but the Cold Case detectives believing that
```

1    Mike Ryan may have had something to do with the murder of

2    Dorka Lisker not excluding Bruce Lisker.

3            They said that we couldn't exclude Bruce Lisker

4    but that I had proven that there was a second suspect

5    involved in this murder, and that evidence led the

6    detectives to believe that possibly Mike Ryan was involved.

7    Q.   Was the telephone number that you found Mike Ryan's or

8    a number that was similar to Mike Ryan's mother's telephone

9    number, was the timing of that such that that number was

10   called at or around the time of the murder?  Is that why it

11   was relevant?

12   A.   Yes.

13   Q.   And what other evidence did you have or did you

14   discover up to the time that you met with the Cold Case

15   Unit?

16   A.   Bruce Lisker had contacted the National Oceanic

17   Administration, NOAA, and obtained a copy of the weather

18   report for the San Fernando Valley for that date.

19           When the report is taken, it is taken from the

20   Burbank Airport and the Van Nuys Airport; and I don't know

21   if it's every fifteen minutes or every thirty minutes.

22           I called and made contact with the NOAA and they

23   provided me with a copy of the weather report which was

24   consistent with Bruce Lisker's -- foggy, overcast -- and

25   Detective Monsue had testified that it was a clear, sunny

196

1    day.

2    Q.   So you confirmed the weather report that Bruce Lisker

3    had provided you?

4    A.   Yes.

5    Q.   And are you saying that it confirmed that Monsue had

6    not told the truth about the weather for that day?

7    A.   Yes.

8    Q.   And where did he not tell the truth?  Was it during the

9    trial or in some other form or place?

10   A.   It was in one of the reports and during his testimony

11   at the criminal trial.

12   Q.   What other evidence did you have at the time that you

13   met with the Cold Case Unit?

14   A.   *(No response.)*

15   Q.   You mentioned earlier the bloody footprints.  Did you

16   have an analysis done yet or were you just looking at the

17   photographs?

18   A.   When I looked at the arrest report and the follow-up

19   reports, Detective Monsue had mentioned that there could not

20   have been another suspect.  There was only one set of

21   footprints and they went in one direction on the side of the

22   house.

23            So I obtained -- I had already obtained the photos

24   from SID.  I had already -- I went up and visited with

25   Bruce Lisker up at the prison he was at, incarcerated; and

1    he, in a taped interview, said:  I went both directions.  I

2    went down the side of the house and I came back the same

3    direction.

4              When I was looking at the photos, I could see that

5    the SID had put one of those numbers out there for the

6    crime; and to me it was obvious they were focusing in on his

7    footprint.  They took a picture of the footprint and then

8    they had pictures of Bruce Lisker's shoes.

9              What I saw off to the side was an additional

10   footprint which looked like to me the same shoe but going in

11   a different direction.

12             So I contacted our Scientific Investigation

13   Division and said:  Do we do shoe-print analysis?

14             And they said:  Yes, we do.

15             So I took the photos down to SID.  The gentleman

16   looked at the photos.

17             I explained to him what I have explained here.  He

18   looked at the photos and he said:  The picture of this

19   photo -- of this shoe print on the side of the house does

20   not match all the footprints inside the house.

21             And so I asked:  Well, what did that mean?

22             And he said:  That means, your guy, his foot, his

23   shoe, wasn't in the crime scene.

24             And I said:  So the shoe print I found on the

25   side, is that the same shoe?

```
 1            And he said:  No.  He said:  That footprint is the
 2   footprint in the house.
 3   Q.   So are you saying there were two sets of footprints?
 4   A.   Yes.
 5   Q.   And did both sets of footprints have blood on them?
 6   A.   No.
 7   Q.   What set of footprints had blood on them?
 8   A.   The footprints that were not -- the shoes that were not
 9   worn by Lisker when he was arrested.
10   Q.   Do you recall any other evidence that you had at the
11   time that you met with the Cold Case Unit?
12   A.   There were some inconsistencies in statements in the
13   arrest report.  I went down to Scientific Investigative
14   Division to obtain the copies of all the tapes, of all the
15   interviews; and Bruce Lisker's interview tape was missing.
16            It had been checked out by Monsue and had never
17   been checked back in.  So Lisker was saying that the
18   paraphrased statement that was provided in court by Monsue
19   was inaccurate, but I didn't have a tape to compare.
20            The tape had been -- the official police tape had
21   been removed from SID by Monsue; and then the letter to the
22   parole board.
23            When a person is up for parole, the investigating
24   officer has an opportunity to write a letter to the parole
25   board.  Detective Monsue wrote two different letters.
```

```
 1              The second letter he wrote talking about he had
 2    just recently received a phone call from the new residents
 3    and that they had discovered $150 in the attic and other
 4    miscellaneous items that were missing during the crime.
 5              And that was -- he testified to that during the
 6    criminal trial.
 7              I interviewed the person that owned the house and
 8    he said:  I never spoke to Detective Monsue.  I know nothing
 9    about any $150 or anything being found in my attic.
10    Q.   Now, when you're talking about the residents, are you
11    talking about the residents where Dorka Lisker was murdered?
12    A.   Yes.
13    Q.   And when you say "the new owner," somebody who bought
14    the house after the Lisker's owned it?
15    A.   Yes.
16    Q.   And the resident there, did you interview him yourself?
17    A.   Yes, I did.
18    Q.   And did he mention to you that he knew for a fact he
19    didn't find any money or is it something else?
20              MR. AGUILERA:  Objection.  Leading, Your Honor.
21    Hearsay.
22              THE COURT:  All right.  I'll just explain to the
23    jury that whatever this person said is not offered for its
24    truth but to explain the information that this detective --
25    I'm sorry -- this officer had at the time that he was
```

1    conducting the investigation and what led him to believe

2    that further investigation was needed.

3          Okay.  So the question was:  What did the

4    homeowner say to you about the money?  I think that was the

5    question.

6          MS. RUGGIERO:  Right.

7    Q.   What did you learn from the homeowner?

8    A.   His mother, not his mother -- his wife was deceased.

9    She had died of cancer earlier, years back.  He said to the

10   best of his recollection he had never found nor did he

11   believe his wife had ever found money in the house in the

12   attic or any other items that were allegedly left behind by

13   Bruce Lisker and recovered by Detective Monsue.

14         So what I did is because Monsue had mentioned in

15   the letter that he had found $150, I contacted the

16   department, our department, and checked to see if Monsue had

17   ever booked the money into evidence.

18   Q.   What is the importance of the $150?

19   A.   The allegation is that Bruce Lisker went to his

20   mother's house because he was no longer living there and

21   robbed her of the $150 and bludgeoned her to death and the

22   money, according to Lieutenant Monsue, was missing.

23   Q.   And was that money ever located if you know?

24   A.   Through the evidentiary hearing that was held in

25   federal court, yes.

```
 1   Q.   Did you ever locate Dorka Lisker's purse during your

 2   investigation?

 3   A.   No.

 4   Q.   Did you ever locate any document that reflected the

 5   Dorka Lisker purse evidence?

 6   A.   Yes.

 7   Q.   And what was that document?

 8   A.   It was a court document that inventoried Dorka Lisker's

 9   purse.  When I called -- when I contacted Van Nuys court, to

10   the best of my recollection, all of the evidence to

11   prosecute Bruce Lisker had been destroyed.

12            So through the evidentiary hearing, I learned that

13   the clerk had inventoried the purse during the murder trial

14   and inventoried $150 that was within the purse.

15   Q.   So money actually was in the purse the whole time as

16   far as you understood?

17   A.   Yes.

18   Q.   So when you met with the Cold Case Unit, you had all

19   this evidence that you just testified to, correct?

20   A.   Yes.

21   Q.   And other than David Lambkin, you mentioned in your

22   chrono log that Lieutenant Williams was present during that

23   meeting.

24   A.   Yes.

25   Q.   And, again, could you tell us how Lieutenant Williams
```

1   fit into the hierarchy, your chain of command at that time?

2   A.   He had just recently been appointed to Internal Affairs

3   and had been assigned to Valley Section Internal Affairs.

4   He was our officer in charge.

5          You have a Lieutenant II that is normally the

6   officer in charge and then there's a Detective III that is

7   an assistant OIC.

8   Q.   Just so it's clear, Detective Robert Vanina, what was

9   his role in the hierarchy?

10  A.   During a short period of time, he was the officer in

11  charge until Lieutenant Williams came in and was transferred

12  to our division -- to our section.  Detective Vanina was

13  then the assistant officer in charge.

14  Q.   Okay.  So you had Detective Vanina as the assistant

15  officer in charge and then lieutenant now Captain Williams

16  the officer in charge?

17  A.   Yes.

18  Q.   Okay.  And who else was at the meeting?

19  A.   Detective Dave Lambkin, myself, Sergeant Mario Valdez,

20  and Detective Jackson from the Cold Case Unit.

21  Q.   Okay.  So Detective Jackson was also from the Cold Case

22  Unit?

23  A.   Yes.  And I believe Detective Vanina came and went.  He

24  came in, said hello, left for a little while, came back.  So

25  he wasn't a full-time participant in the discussion but

1    Lieutenant Williams was.

2    Q.    And to the best of your recollection, how long did this

3    meeting last with the Cold Case Unit?

4    A.    It's my understanding from my log that it went from

5    1400 to 1700 so that would be three hours.

6    Q.    And does that necessarily mean the meeting took all

7    three hours?

8    A.    No.

9    Q.    What does that mean when you wrote 1400 to 1700?

10   A.    I made copies of different items, put together all the

11   information that I had, just prepared for the meeting, went

12   over what were the points that I wanted to make, how did I

13   get this investigation, and just go over a quick synopsis of

14   what I had done to that point.

15   Q.    Okay.  So the three hours that you put down on your log

16   incorporates your preparation time?

17   A.    Yes.

18   Q.    As well as the meeting?

19   A.    Yes.

20   Q.    Okay.  And during that meeting, was any conclusion

21   reached as to what the direction would be regarding the

22   Bruce Lisker investigation?

23           Let me ask it a different way.

24           At the end of that meeting, was it decided by

25   anyone what you would do as the Internal Affairs

1  investigator in charge of this investigation?

2  A.   Yes.

3  Q.   And what was decided?

4  A.   There were discussions on who would take the role, who

5  would be responsible for the investigation.  Was it going to

6  be bifurcated, meaning we were going to have the

7  administrative portion of the investigation dealing with the

8  letter to the parole board handled by me, and the murder

9  investigation portion handled by a different entity,

10  Robbery-Homicide Cold Case.

11       But Detective Lambkin was concerned because there

12  were six to eight detectives that worked for him and over

13  8,000 cold cases; that they didn't have the manpower and

14  that he felt that because I had been working for this case

15  for almost a year, that I had a better grasp of the case and

16  that he recommended that I go to Florida to meet with this

17  witness and a representative from RHD Cold Case, a homicide

18  detective, accompany me so that if I had any technical

19  questions or I get strayed, that he can help me and assist

20  me with this interview.

21  Q.   How did this trip to Florida come up?

22  A.    I had received information -- again, Mr. Ingels was

23  constantly calling and asking for updates on this case.  He

24  was providing me with information because he was still doing

25  an independent investigation in hopes of obtaining a habeas

1    corpus petition, being granted a new trial.

2            So he had traveled all over the world interviewing

3    people that Bruce Lisker had given him; and two of the

4    people, one was living in the U.S. Virgin Islands, and the

5    other gentlemen by the name of John Scapichio was living in

6    Fort Lauderdale, Florida.

7    Q.   And who is John Scapichio?

8    A.   John Scapichio was a friend of Bruce Lisker.  When

9    Bruce Lisker moved out of his parent's home, he moved to an

10   apartment on Sepulveda Boulevard which happened to be

11   occupied.

12           A neighbor was John Scapichio.  Bruce Lisker's

13   friend was Mike Ryan.  They lived together.

14           So Scapichio allegedly had information that was

15   vital to the investigation because he had never been

16   interviewed prior.

17   Q.   And where did you get that information?

18   A.   From Paul Ingels.

19   Q.   And so Paul Ingels told you about this potential

20   witness?

21   A.   Yes.

22   Q.   And he was living in Florida at the time?

23   A.   Yes.

24   Q.   So when you met with the Cold Case Unit, was that one

25   of the purposes of the meeting to determine whether or not

1    you would go to Florida?

2    A.    I think -- it's my belief that the meeting was

3    ultimately to decide what entity within our department was

4    going to handle this investigation.

5    Q.    And the decision was what?

6    A.    That it would be kept within Internal Affairs; that I

7    would conduct not only the administrative investigation on

8    Lieutenant Monsue, but I would also conduct the homicide

9    investigation or the follow-up because now there's a second

10   suspect theory which means there's additional suspects,

11   witnesses, evidence that has to be followed up on; and we

12   had additional information that required additional work.

13         THE COURT:  Okay.  Miss Ruggiero, I'm going to

14   interrupt because it's 4 o'clock.  We'll adjourn for the

15   day.

16         I just want to remind all of you about the

17   importance of being here at 8 o'clock tomorrow.

18         Since it's the first time you'll be trying to get

19   downtown at that hour, if you'll leave a little extra time

20   to travel, it's a good idea for the first day.

21         I'm here by 7:00 and so any time after 7 o'clock I

22   will buzz you in.  Feel free to bring your coffee and

23   muffins and newspapers, whatever you like and relax in that

24   nice jury room.  Better to be early than late.

25         Have a nice evening.  Don't talk about the case.

1          We'll see you all tomorrow morning at 8:00.

2          THE CLERK:  All rise.

3          *(At 4:01 p.m. proceedings were concluded.)*

4

5                              -oOo-

6

7                           **CERTIFICATE**

8

9          **I hereby certify that pursuant to Section 753,**

10   **Title 28, United States Code, the foregoing is a true and**

11   **correct transcript of the stenographically reported**

12   **proceedings held in the above-entitled matter and that the**

13   **transcript page format is in conformance with the**

14   **regulations of the Judicial Conference of the United States.**

15   Date:  January 16, 2009

16

17

18   _____

19                         **PAT CUNEO, OFFICIAL REPORTER**
                            **CSR NO. 1600**

20

21

22

23

24

25